**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-0643-WJM-NYW

CORE PROGRESSION FRANCHISE LLC,
a Colorado limited liability company,

    Plaintiff,

v.

CHRIS O'HARE, and
CAO ENTERPRISES, INC.,
a North Carolina corporation,

    Defendants.

## INTERIM ORDER GRANTING PLAINTIFF'S CONSTRUED MOTION FOR PRELIMINARY INJUNCTION

In this action, Plaintiff Core Progression Franchise LLC's ("Plaintiff") sues its former franchisee, Defendants Chris O'Hare and CAO Enterprises, Inc. (jointly, "Defendants"), for: (1) breach of the Franchise Agreement between Plaintiff and Defendants, and (2) infringement of Plaintiff's trademarks in violation of the Lanham Act, 15 U.S.C. § 1114.  (ECF No. 1.)

Currently before the Court is Plaintiff's Motion for a Temporary Restraining Order ("TRO") and Order to Show Cause Re: Preliminary Injunction ("Motion")[1] (ECF No. 9). Defendants have responded to Plaintiff's Motion (ECF No. 19), and Plaintiff filed a reply (ECF No. 22).  On March 26, 2021, the Court held an evidentiary hearing on the Motion.

---

[1] On March 10, 2021, the Court denied the portion of the Motion that sought a TRO and construed the remaining portion of the Motion as a Motion for Preliminary Injunction.  (ECF No. 15.)

(ECF No. 33.)

The Court will enter a comprehensive written order in due course. But because of the time-sensitive nature of the relief requested, the Court issues this interim Order now to give the parties immediate notice of its decision, as well as to summarize the major bases (although not all of the bases) of its decision. For the reasons explained below, the Motion is granted.

## I. LEGAL STANDARD

To obtain a preliminary injunction, Plaintiff, as the moving party, must establish

> (1) a substantial likelihood that the movant eventually will prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*NRC Broad. Inc. v. Cool Radio, LLC*, 2009 WL 2965279, at *1 (D. Colo. Sept. 14, 2009). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

The Tenth Circuit applies a heightened standard for "[d]isfavored preliminary injunctions," which do not

> merely preserve the parties' relative positions pending trial. Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the

> balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted).

## II. ANALYSIS

In the Motion, Plaintiff asks that this Court enjoin Defendants from (i) operating a "Competing Business," as defined by the Franchise Agreement, at the location of their Core Progression branded business, (ii) using or disclosing any of Core Progression's confidential or trade secret information, and (iii) infringing on or using Core Progression's registered trademarks. (ECF No. 9 at 1.)

Given Plaintiff's request, the Court finds that Plaintiff seeks an injunction which would change the status quo. Therefore, Plaintiff must meet the Tenth Circuit's heightened standard to obtain the relief it seeks. *See Free the Nipple*, 916 F.3d at 797. For the following reasons, the Court concludes that Plaintiff has made such a showing.

### A. Stipulations by Defendants

At the evidentiary hearing, Defendants made certain stipulations. First, Defendants stipulated to the entry of a preliminary injunction on the third element of relief requested in the Motion. (Tr. at 5–6, 9–10.)[2] Specifically, Defendants agreed to an injunction which enjoins them from infringing on or using Plaintiff's registered

---

[2] Because neither party has yet ordered the transcript of the March 26, 2021 evidentiary hearing, the Court will cite the rough version of the transcript prepared by the undersigned's court reporter. Pagination may differ from a final version of the transcript, to the extent it is prepared.

3

trademarks. Relying on Defendants' stipulation and Plaintiff's acceptance of such stipulation, the Court will make no findings regarding whether Plaintiff has satisfied its Rule 65 burden on its trademark infringement claim and will enter an injunction consistent with Defendants' stipulation.

Second, at the hearing Defendants also agreed to return to Plaintiff the items listed in Paragraph 6.9 of the Franchise Agreement. (Tr. at 186–87.) (ECF No. 9-3 at 16 ¶ 6.9; Pl. Ex. 24 at 13.) This second stipulation does not go to the merits of Plaintiff's breach of contract claim, which the Court will discuss next. Based on this stipulation, however, the Court will include herein an order to Defendants that they forthwith return said items to the Plaintiff.

**B.     Substantial Likelihood of Success on the Merits**

On the limited record before it, the Court finds that Plaintiff has shown a substantial likelihood of success on the merits of its breach of contract claim. While Colorado generally prohibits covenants not to compete, the circumstances of the case appear to meet two exceptions to that general rule: covenants governing trade secrets and non-compete contracts for executive or management personnel. Colo. Rev. Stat. § 8–2–113. In executing the Franchise Agreement, O'Hare agreed that upon termination of the Franchise Agreement for any reason, he would not operate a competing business within 25 miles of his Core Progression gym for one year (the "Covenant"). (ECF No. 9 at 8 (citing ECF No. 19-2 at 36 § 14.2(b)).) A purpose of the Franchise Agreement—and particularly the Covenant—was to protect Plaintiff's trade secrets. (ECF No. 9-1 at

4

8 ¶ 22.)  The evidence establishes that as president of CAO Enterprises, Inc., O'Hare was in an executive or management position with access to information that would be unavailable to most other people in the company.

Despite the Covenant, however, the hearing evidence established that O'Hare is operating a competing business under the Altru Fitness brand out of the same location as his Core Progression facility, and he has taken customer data without permission for the benefit of his Altru Fitness business.  At the evidentiary hearing, Defendants effectively, if not literally, conceded that they had breached the Franchise Agreement.  Defendants do not dispute that they took steps to build a competing business out of the same location as their Core Progression gym; that they downloaded the Core Progression client relationship database with customer and membership information before leaving the Core Progression system; or that they wrote Core Progression customers from their @coreprogression.com e-mail accounts to say that they were transitioning to a competing software while they were still franchisees.  Thus, in the Court's view, the only remaining question on the substantial likelihood of success requirement of Rule 65 is whether an enforceable contract exists between the parties.

At this incipient juncture of these proceedings, and for the purposes of preliminary injunctive relief only, the Court finds Defendants' argument that a valid, binding contract does not exist unavailing.  Defendants contend that the Franchise Agreement attached as an exhibit to the Financial Disclosure Document that Plaintiff provided to Defendants contained materially different terms from the Franchise

5

Agreement that Defendants ultimately signed.[3]  Defendants argue that Plaintiff's failure to disclose these material differences between the two contracts constitutes grounds to void the Franchise Agreement.

Despite Defendants' arguments, for the purposes of this Motion, the Court finds there is no evidence in the record that these differences were, in the circumstances of the dispute between these parties, in fact material.  *See Tatonka Capital Corp. v. Connelly*, 390 F. Supp. 3d 1289, 1303 (D. Colo. 2019) (stating that a contract may be voidable where a mistaken party's assent to the contract is caused by a misrepresentation that is either "fraudulent or material" in the context of § 161 cmt. e). At no point did O'Hare testify that, had these changes been brought to his attention prior to his execution of the Franchise Agreement, he would have changed his conduct during contract negotiations, refused to sign the Franchise Agreement, or made a counteroffer to Plaintiff based on the differences.  Based on O'Hare's testimony, the Court concludes the differences between the franchise agreement attached to the FDD and the Franchise Agreement were not material.

---

[3] In the response brief, Defendants state: "The differences between the contracts are important, for example: (1) the 2019 FDD contains a provision explicitly delegating disputes "relating to the interpretation, applicability, enforceability or formation" of the agreement to an arbitrator, whereas the 2017 FA does not, (2) the 2017 FA requires a personal guarantee from a spouse whereas the 2019 FDD does not, (3) the 2017 FA requires the franchisee to accept vouchers and honor memberships from other studios owned by Plaintiff, whereas the 2019 FDD does not, (4) the 2017 FA gives the Plaintiff the right to require minimum prices for services, including free services, whereas the 2019 FDD does not, and (5) the 2017 FA contains a non-solicitation clause for both the franchisee and its immediate family members, whereas the 2019 FDD did not."  (ECF No. 19 at 4.)

Moreover, there is also no evidence before the Court suggesting Plaintiff had reason to know that the undisclosed differences would influence Defendants' decisionmaking concerning executing the Franchise Agreement. *See Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1230 (10th Cir. 2016) (citing Restatement (Second) of Contracts § 161) ("However, before a non-disclosure may be treated as an affirmative misrepresentation, 'the party failing to disclose must know or have reason to know that the undisclosed fact will influence the decisionmaking of the other party.'").

Finally, the Court finds that Defendants' argument that they did not consider the information Plaintiff provided to Defendants to be proprietary or to constitute trade secrets to be wholly without merit. Jonathan Cerf, owner of Core Progression Franchise LLC, testified that Plaintiff provided to Defendants, as Core Progression franchisees, its proprietary information regarding how to use Core Progression software systems, the methodology of training, sales training, client customer retention training, pre opening marketing training, grand opening and employee training, and site selection. Plaintiff provided Defendants with an operations manual, which is a 213-page document containing almost 14 years of Cerf's industry knowledge, trade secrets, and proprietary information, all of which allows the Core Progression model to be successful. Tellingly, as of the time of the evidentiary hearing earlier today, Defendants had not returned the manual or other trade secret information to Plaintiff, as is required of them by the post-termination provisions of the Franchise Agreement.

7

As a consequence, based on the limited record before it, the Court finds that Plaintiff has shown a substantial likelihood of success on the merits of the breach of contract claim.

**C.     Irreparable Harm**

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018). The moving party "must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016).

At the hearing, Cerf testified:

> I couldn't even quantify the amount of harm, to teach somebody all of my systems, give them access to all of our market proprietary training, work on developing their location for a year, see are great success and then have the name be tarnished. I know even as of February on Google, the listing was showing Altru Fitness with parentheses saying formerly Core Progression. The damage in the marketplace to consumers, it makes it look like my brand went to North Carolina and failed and was a fraud.

(Tr. at 95.)  In addition to Cerf's testimony, O'Hare testified that he responded to a question on a Google review site regarding whether his business was a Core Progression business by saying "the other company [Core Progression] turned out to be a 'fake franchise.'"  (Tr. at 169.)  This evidence, among other testimony presented at the hearing, leads the Court to conclude that a preliminary injunction is required in this case to prevent similar extraordinarily damaging remarks by Defendants against Plaintiff, and

8

to preserve any remaining customer goodwill Core Progression has in the North Carolina market.

Defendants' argument that Plaintiff is not registered with the Secretary of State in North Carolina falls flat. Plaintiff was relying on its franchisee, Defendants, to be its representative in the North Carolina market. Indeed, Cerf testified that he *already* had a franchise (in Defendants) in North Carolina, one he had expectations would expand to multiple locations in that state's North Carolina Golden Triangle market. Cerf also testified that his North Carolina franchise (again, the Defendants), was doing exceedingly well, and he was giving them a chance to have a continued competitive advantage in that market, as O'Hare indicated he was looking to open three locations. Defendants *were* Core Progression's "boots on the ground" in North Carolina, and but for Defendants' actions in misappropriating Plaintiff's trade secrets, including sensitive and valuable customer data, and in rebranding the franchise as Altru Fitness, among other actions, Plaintiff would still today have a presence in the North Carolina market.

**D.     Balance of Hardships**

The balance of hardships favors injunctive relief. Although an injunction may impose serious harms on Defendants—including the temporary closure of Altru Fitness—that injury "may be discounted by the fact that the defendant brought that injury upon itself." *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, 2020 WL 6119470, at *11 (D. Colo. Oct. 16, 2020) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002));

9

*see also Bad Ass Coffee*, 636 F. Supp. 2d at 1251 ("Courts balancing harms to former franchisees who violated non-compete agreements have similarly been unwilling to allow defendants to point to harms that they could have avoided by abiding by their contract."). Even if Altru Fitness is O'Hare's only source of income, judges in the District of Colorado have considered this argument and rejected it where a plaintiff is potentially faced with the loss of trade secrets and significant damage to its business. *See Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1260 (D. Colo. 2005) (balance of harms favored plaintiff, even though the effect of an injunction would render defendant "unable to work in her chosen field").

By contrast, Plaintiff "suffers considerable harm each day the Defendants are allowed to flout the noncompete provision[]" in the Franchise Agreement. *Id.*; *see also Panorama Consulting Sols., LLC v. Armitage*, 2017 WL 11547493, at *4 (D. Colo. June 9, 2017) (balance of hardships weighed in plaintiff's favor "not least because any temporary injunctive relief provided will merely require the relevant former employees and LTA to comply with the law and/or observe their agreements with plaintiff").

**E.     Public Interest**

A preliminary injunction will not be adverse to the public interest. In granting preliminary injunctions, other judges in this District have concluded that the fact that Colorado statutes permit such noncompete agreements demonstrates that enforcing one would not be against the public interest. *See e.g.*, *Fitness Together*, 2020 WL 6119470, at *11 (injunction in public interest where preventing unfair competition helps

10

protect and encourage investment in the very businesses that give rise to these opportunities); *Panorama*, 2017 WL 11547493, at *4 (finding it is in public interest for laws to be obeyed and contracts to be observed); *Doubleclick*, 402 F. Supp. 2d at 1260.

**F.    Bond**

Rule 65(c) states that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Although phrased as mandatory, in practice this Court has discretion under this Rule whether to require a bond. *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).

While the Franchise Agreement states that Plaintiff may seek injunctive relief to prevent irreparable harm without posting a bond or security (ECF No. 19-2 at 52 § 20.10), bond is routinely imposed in similar cases in this District. *See, e.g., Fitness Together*, 2020 WL 6119470, at *12 (requiring $50,000 bond); *Panorama*, 2017 WL 11547493, at *5 (requiring $5,000 bond); *Doubleclick*, 402 F. Supp. 2d at 1261 (requiring parties to submit statement recommending amount and terms of security required by Rule 65(c)). Thus, the Court will impose bond in this case in an amount and on terms to be determined.

### III. PRELIMINARY INJUNCTION

In light of the foregoing, the Court issues the following preliminary injunction:

Defendants, as well as their officers, managers, directors, agents, employees, successors and assigns, and all other persons in active concert or participation with them, are hereby IMMEDIATELY AND PRELIMINARLIY ORDERED AND RESTRAINED as follows:

1.   Defendants are enjoined from operating a "Competing Business," as defined by the Franchise Agreement, at the location of their Core Progression branded business;

2.   Defendants are enjoined from using or disclosing any of Plaintiff's confidential or trade secret information. Pursuant to Defendants' stipulation at the evidentiary hearing, by the close of business, Mountain Daylight Time, on **March 29, 2021**, Defendants shall return to Plaintiff all items in Defendants' possession that are listed in Paragraph 6.9 of the Franchise Agreement; and

3.   Defendants are enjoined from infringing on or using Core Progression's registered trademarks, pursuant to Defendants' stipulation at the evidentiary hearing.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Plaintiff Core Progression Franchise LLC's Motion for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction (ECF No. 9), which the Court construes as a Motion for Preliminary Injunction, is GRANTED;

2.   Defendants Chris O'Hare and CAO Enterprises, Inc. are PRELIMINARILY ENJOINED as set forth above; and

3. By the close of business, Mountain Daylight Time, on **March 29, 2021**, both parties shall submit a statement recommending to the Court the amount and terms of the security required by Rule 65(c) which would be appropriate under the facts of this case, supported by a detailed and documented basis for this recommendation.

Entered at Denver, Colorado **this 26th day of March, 2021 at 8:26 p.m. Mountain Daylight Time.**

BY THE COURT:

William J. Martinez
United States District Judge