IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-0643-WJM-NYW

CORE PROGRESSION FRANCHISE LLC,
a Colorado limited liability company,

      Plaintiff,

v.

CHRIS O'HARE, and
CAO ENTERPRISES, INC.,
a North Carolina corporation,

      Defendants.

---

## AMENDED ORDER GRANTING PLAINTIFF'S CONSTRUED MOTION FOR PRELIMINARY INJUNCTION

---

      In this action, Plaintiff Core Progression Franchise LLC's ("Plaintiff") sues its former franchisee, Defendants Chris O'Hare ("O'Hare") and CAO Enterprises, Inc. ("CAO") (jointly, "Defendants"), for: (1) breach of contract, and (2) infringement of Plaintiff's trademarks in violation of the Lanham Act, 15 U.S.C. § 1114.  (ECF No. 1.)

      Currently before the Court is Plaintiff's Motion for a Temporary Restraining Order ("TRO") and Order to Show Cause Re: Preliminary Injunction ("Motion").[1] (ECF No. 9.) Defendants responded to Plaintiff's Motion (ECF No. 19), and Plaintiff filed a reply (ECF No. 22).  On March 26, 2021, the Court held an evidentiary hearing on the Motion (ECF

---

[1] On March 10, 2021, the Court denied the portion of the Motion that sought a TRO and construed the remaining portion of the Motion as a Motion for Preliminary Injunction.  (ECF No. 15.)

No. 33) and issued an Interim Order granting preliminary injunctive relief (ECF No. 34).[2]

On March 29, 2021, Defendants filed a Forthwith Motion to Vacate March 26, 2021 Order as Unduly Vague and Unenforceable ("Forthwith Motion").  (ECF No. 37.) On March 30, 2021, at the Court's direction (ECF No. 38), Plaintiff filed an expedited response to the Forthwith Motion (ECF No. 39).

This Amended Order more thoroughly explains the bases for the Court's Interim Order, clarifies certain issues identified by the parties in subsequent motion practice, and imposes a bond requirement in an amount certain.

## I. BACKGROUND

### A.    Factual Background[3]

Plaintiff is the franchisor of Core Progression gyms, which offer health and fitness services and classes.  (ECF No. 9 at 3.)  Jonathan Cerf, a personal trainer who founded Core Progression in 2008, has served as the Chief Executive Officer of Core Progression Franchise LLC since January 2017.  (ECF No. 9-1 ¶ 1; Tr. at 11.)  In June 2019, a business broker introduced O'Hare to Core Progression as a potential

---

[2] Under WJM Revised Practice Standard III.L, "No sur-reply, supplemental brief, or supplemental 'notice of authorities', or the substantial equivalent thereof, may be filed without prior leave of Court granted for good cause shown."

On March 25, 2021, in advance of the evidentiary hearing, Defendants filed Defendants' Pre-Hearing Brief.  (ECF No. 30.)  The Court construes this filing as a sur-reply or supplemental brief in connection with Defendants' response to the Motion (ECF No. 18).  Because Defendants did not obtain prior leave of Court before filing this document, the Court will strike Defendants' Pre-Hearing Brief pursuant to RPS III.L and will not consider it for the purposes of ruling on the Motion.

[3] This section is drawn primarily from the Motion, response, and reply briefs.  (ECF Nos. 9, 19, 22.)  The Court supplements this section with testimony and exhibits from the evidentiary hearing.  Because the undersigned's court reporter has not yet prepared and docketed a final transcript of the March 26, 2021 evidentiary hearing, the Court will cite the draft version of the transcript prepared by the court reporter ("Tr.").  Pagination may differ from a final version of the transcript, to the extent it is prepared.

franchisee; O'Hare then spent two months investigating the franchise.  (ECF No. 9 at 3.)

O'Hare, a financial analyst, had no experience operating a gym.  (*Id.* at 5.)  In fact, he

only obtained his certification as a personal trainer a month or two before opening his

Core Progression franchise in August 2020.  (Tr. at 141.)  Part of O'Hare's review of

Plaintiff's business included Core Progression's franchise disclosure document ("FDD")

(ECF No. 19-3), which provided O'Hare with a detailed overview of the franchised

business.  He received the FDD on July 7, 2019.  (ECF No. 9 at 3.)

On September 2, 2019, O'Hare executed a franchise agreement with Plaintiff

("Franchise Agreement") (ECF No. 19-2) on behalf of his company, CAO.[4]  (ECF No. 9

at 4.)  The initial term of the Franchise Agreement was ten years.[5]  (ECF No. 19-2 at 5.)

In executing the Franchise Agreement, Defendants agreed that their entire knowledge

of the operation of a Core Progression business is derived from Plaintiff's trade secrets

and that they would use not this information in any other business for their own benefit.

(ECF No. 9 at 4; ECF No. 19-2 ¶ 14.1.)  Moreover, Defendants agreed that for a period

of one year after the termination of the Franchise Agreement, they would not operate a

competing business within 25 miles of their Core Progression gym.  (*Id.*; ECF No. 19-2 ¶

14.2(b).)

After signing the Franchise Agreement and before opening his Core Progression

gym, O'Hare went through comprehensive training to learn how to operate a Core

Progression franchise.  For Phase One, Core Progression assisted O'Hare with site

---

[4] The Franchise Agreement states that O'Hare is the president and 100% shareholder of CAO.  (ECF No. 19-2 at 56, 63.)

[5] "'Initial Term' - means the period covering the Effective Date until midnight on the day before the tenth anniversary of the Opening Date (defined below), and any applicable Interim Periods (as defined in Section 3.5 below)."  (ECF No. 19-2 at 5 (l).)

selection and lease negotiation.  (Tr. at 25–26.)  Next, Core Progression assisted O'Hare with the "modern design specification" for the franchise, which relates to the aesthetics of the business, including the "feel" a customer gets from the gym, the corrugated metal décor, reclaimed wood on the walls, specific colors, and bathroom specifications.  (Tr. at 26–27.)  O'Hare received help with construction management, specifications for the buildout, vendor relationships, and signage.  (Tr. at 27.) Additionally, Core Progression helped O'Hare with the gym's website design by connecting him with a web team located in New York.  (Tr. at 28.)  Core Progression provided O'Hare with 24/7 access to answer his questions, ensure vendors were set up, confirm the payment process was set up, and helped O'Hare obtain insurance.  (Tr. at 29.)  In addition, Core Progression provided O'Hare with a 213-page operations manual. (Tr. at 29.)

For Phase Two, in July 2020, O'Hare spent a week at Core Progression being trained from 8:00 a.m. to 5:00 p.m. daily regarding the use of Core Progression's software systems, training methodology, sales training, client customer retention training, pre-opening marketing training, employee training, and grand opening training. (Tr. at 29–30.)  Core Progression helped O'Hare learn how to identify and find individuals to provide wellness providers, physical therapists, and nutritionists.  (Tr. at 31.)

During Phase Three, which occurred from the end of Core Progression training until the grand opening of O'Hare's franchise, Core Progression and O'Hare had weekly phone calls, a 24/7 support e-mail system, shared access to managers, initial marketing, and help getting the gym open and running.  (Tr. at 31–32.)  Cerf testified

that O'Hare called Core Progression and Cerf himself "incessantly" to obtain answers to questions, discuss sales reports, and obtain sales training.  (Tr. at 32.)  Core Progression provided O'Hare with assistance with customer service, client appreciation, and an 18-page document about customer retention.  (Tr. at 33.)  Additionally, Core Progression provided marketing support to O'Hare, including print, video, posters, fliers, and other materials created over 14 years "of working in this industry to know what consumers respond to."  (Tr. at 34.)

Core Progression and Cerf were excited about expanding the business in North Carolina with O'Hare.  It was Core Progression's first franchise east of the Mississippi River.  (Tr. at 191.)  Cerf testified that "[t]he Raleigh market is one of the best and hottest fitness markets in the [country].  Very comparable to Denver.  We've seen phenomenal success in our Denver market so we were extremely excited about opening up that market in North Carolina."  (Tr. at 65.)

Armed with all of this assistance and training by Core Progression and Cerf, Defendants opened a Core Progression franchise in Apex, North Carolina in August 2020.  (ECF No. 9-1 at 9 ¶ 25.)  Cerf flew to North Carolina to attend the grand opening. (Tr. at 34.)  Four months after opening, Cerf states that Defendants began to default on their monetary obligations.[6]  (ECF No. 9 at 5; ECF No. 9-1 ¶ 26; Tr. at 79–81; Pl. Ex. 37–40.)

On January 7, 2021, Zen Planner, Plaintiff's customer relationship management

---

[6] At the evidentiary hearing, O'Hare contested Cerf's testimony regarding the time at which he stopped paying royalties and testified that he did not "stop paying royalties until after he filed the demand for arbitration."  (Tr. at 161.)  The demand for arbitration was filed on behalf of Defendants on December 18, 2020, which is approximately four months after Defendants opened their franchise in August 2020.  (ECF No. 18-1.)

software, notified Plaintiff that Defendants were attempting to copy the Core Progression database.  (ECF No. 9-1 ¶ 27; Tr. at 78; Pl. Ex. 36.)  Four days later, Plaintiff learned that Defendants had published a new, indexed website without consent. On January 29, 2021, after providing formal notices of default and time to correct material breaches, Plaintiff terminated the Franchise Agreement.  (ECF No. 9 at 5.)

After terminating the Franchise Agreement, Plaintiff learned that since December 2020, Defendants had planned to open a competing business out of the same location as their Core Progression gym.  (*Id.*)  In December 2020, O'Hare sent e-mails to vendors about his move to Alloy Personal Training, a Core Progression competitor.  (*Id.* at 6; Tr. at 85, 125.)  O'Hare hired a new head trainer, Trent Joynt, and announced that there would be significant changes, including equipment purchases and implementation of Alloy's training system.  (ECF No. 9 at 6; ECF No. 9-3 at 107.)  On January 6, 2021, O'Hare asked his online marketing vendor to stop services, stating that he may not have much use for the Core Progression domain and did not want to promote it.  (ECF No. 9-3 at 109.)

On January 19, 2021, O'Hare used his @coreprogression.com e-mail address to write to gym customers and tell them changes were underway.  (ECF No. 9 at 6; Tr. at 90; Pl. Ex. 50.)  Following up on O'Hare's attempt to copy Core Progression's database, Zen Planner notified Plaintiff that O'Hare had opened his own account and manually downloaded client reports, including client name and membership data.  (ECF No. 9 at 7; Tr. at 83.)  In addition, Plaintiff states that Joynt has been trying to access the client list on Core Progression's database as recently as February 16, 2021.  (ECF No. 9 at 7.)

According to Plaintiff, Defendants are operating a competing gym at the same location as their Core Progression gym under the brand Altru Fitness.  (*Id.*)  Plaintiff states that Altru Fitness's website reads as if it was copied from the Core Progression website and boasts about awards Core Progression earned.  (*Id.*; Tr. at 28–29.)  To that end, Cerf testified that after termination of the Franchise Agreement, O'Hare's Altru Fitness gym looked exactly like the Core Progression gym, and the website looked "like somebody just copied and pasted exactly what we had on our website and put it on a new website."  (Tr. at 28–29.)

Plaintiff asserts that Defendants are infringing on its marks.  (ECF No. 9 at 7.)  Specifically, Plaintiff states that Altru Fitness's page on Yelp references Core Progression and uses its marks in photos.  (ECF No. 9 at 7; ECF No. 9-3 at 177–79; ECF No. 9-4 at 2.)  According to Plaintiff, the profile for Altru Fitness on mindbodyonline.com shows the Core Progression marks, the Google Maps result for Altru reads "Altru Fitness (formerly Core Progression)," and a review on the page has an image of a customer wearing a Core Progression cap.  (ECF No. 9-4 at 9.)  As a result, Plaintiff states that there is consumer confusion, including a review on Google Maps for Altru Fitness which reads: "Are you Core Progression Elite Personal Training or ALTru Fitness?? All your pictures and reviews refer to the Core Progression brand but you're calling it Altruu [sic] fitness . . . please explain."  (ECF No. 9-1 ¶ 48.)  The "Response from the owner" states: "We are in the process of rebranding to Altru Fitness as quickly as possible. The other company turned out to be a fake franchise.  The exterior signs will be removed next week."  (*Id.*; Tr. at 94.)

In response to the Motion, Defendants state that on December 21, 2020,

Defendants and four other Core Progression franchisees filed arbitration demands against Plaintiff for fraudulent misrepresentation, fraudulent nondisclosure, and fraudulent concealment.  (ECF No. 19-1.)  Defendants state that Core Progression's founder Jonathan Cerf induced O'Hare into signing the Franchise Agreement by representing that O'Hare would be able to "recover his initial investment in six months" and could expect "40% profit margins" and revenues of "$1,000,000 a year."[7]  (ECF No. 19 at 3.)  Defendants also argue that Plaintiff initially provided them with the FDD, which contained certain information, and then changed material terms when it drafted the Franchise Agreement.  (*Id.* at 3–4.)  Essentially, Defendants dispute the enforceability of the Franchise Agreement and argue that a ruling by the Court would invade the province of the arbitrator.[8]  (*Id.* at 6.)

In addition, Defendants argue that Plaintiff's "system" contains nothing proprietary or unique which they could use to gain a competitive advantage.  (*Id.* at 5.) Importantly, Defendants state that they have no desire to continue using Plaintiff's trademarks or operations manual and have taken commercially reasonable efforts to remove Plaintiff's marks after demanding arbitration.  (*Id.* at 6.)

## B.   Procedural History

On March 3, 3021, Plaintiff filed its Complaint against Defendants, asserting two claims: (1) breach of contract against both Defendants; and (2) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, against both Defendants.  (ECF No.

---

[7] At the evidentiary hearing, Cerf contested that he had given O'Hare the impression that a franchisee could make $1 million in the first year of operations.  (Tr. at 55–56.)

[8] As the Court discusses later in this Amended Order, at the evidentiary hearing, Defendants' counsel appears to have conceded that the Court has the authority to hear claims for injunctive relief.  *See* Part III.A.1.

1.)  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1332 and 1338(a) due to the claim for trademark infringement under the Lanham Act and supplemental jurisdiction over the related state law claim under 28 U.S.C. §§ 1338(b) and 1367.  (*Id.* at 4.)

On March 4, 2021, Plaintiff filed its Motion for a Temporary Restraining Order ("TRO") and Order to Show Cause Re: Preliminary Injunction ("Motion") (ECF No. 9), which the Court construed as a Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 15.)  On March 10, 2021, the Court denied the Motion to the extent it sought a TRO because Defendants were already aware of the dispute and Plaintiff's intent to seek the injunctive relief requested and set a briefing schedule on the preliminary injunction portion of the Motion.  (ECF No. 15.)  On March 22, 2021, the Court set an evidentiary hearing on the Motion for March 26, 2021 at 9:00 a.m. (ECF No. 24.)

On March 26, 2021, the Court held an evidentiary hearing on the Motion.  (ECF No. 33.)  Later that day, the Court issued an Interim Order granting Plaintiff preliminary injunctive relief because of the time-sensitive nature of the relief requested.  (ECF No. 34.)  At the Court's direction, the parties filed recommendations regarding an appropriate amount of bond.  (ECF Nos. 35, 36.)  Now, the Court issues a more comprehensive order to discuss in more detail the bases for preliminary injunctive relief and address Defendants' Forthwith Motion.

## II. LEGAL STANDARD

To obtain a preliminary injunction, Plaintiff, as the moving party, must establish

> (1) a substantial likelihood that the movant eventually will prevail on the merits; (2) that the movant will suffer

> irreparable injury unless the injunction issues; (3) that the
> threatened injury to the movant outweighs whatever damage
> the proposed injunction may cause the opposing party; and
> (4) that the injunction, if issued, would not be adverse to the
> public interest.

*NRC Broad. Inc. v. Cool Radio, LLC*, 2009 WL 2965279, at *1 (D. Colo. Sept. 14, 2009).

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

The Tenth Circuit applies a heightened standard for "[d]isfavored preliminary injunctions," which do not

> merely preserve the parties' relative positions pending trial.
> Instead, a disfavored injunction may exhibit any of three
> characteristics: (1) it mandates action (rather than prohibiting
> it), (2) it changes the status quo, or (3) it grants all the relief
> that the moving party could expect from a trial win.  To get a
> disfavored injunction, the moving party faces a heavier
> burden on the likelihood-of-success-on-the-merits and the
> balance-of-harms factors: She must make a strong showing
> that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted).

## III. ANALYSIS

In the Motion, Plaintiff asks that this Court enjoin Defendants from (i) operating a "Competing Business," as defined by the Franchise Agreement, at the location of their Core Progression branded business, (ii) using or disclosing any of Core Progression's confidential or trade secret information, and (iii) infringing on or using Core Progression's registered trademarks.  (ECF No. 9 at 1.)

Given Plaintiff's request, the Court finds that Plaintiff seeks an injunction which would change the status quo.  Therefore, Plaintiff must meet the Tenth Circuit's

10

heightened standard to obtain the relief it seeks.  *See Free the Nipple*, 916 F.3d at 797.

For the following reasons, the Court concludes that Plaintiff has made such a showing.

**A.      Preliminary Matters**

　　　1.      Whether the Court Has Authority to Grant Injunctive Relief

Parties may delegate questions of arbitrability to an arbitrator, "so long as the

parties' agreement does so by clear and unmistakable evidence."  *Henry Schein, Inc. v.*

*Archer & White Sales, Inc.*, 139 S. Ct. 524, 526 (2019).  The question of whether the

parties agreed to have a particular dispute submitted to arbitration is "an issue for

judicial determination [u]nless the parties clearly and unmistakably provide otherwise."

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted).  Such

a "gateway dispute" about "whether an arbitration clause applies to a particular type of

controversy is for the court."  *Id.* at 84.

The dispute resolution provision of the Franchise Agreement provides:

> Franchisor[9] shall not be required to first attempt to mediate
> nor arbitrate a controversy, dispute or claim against
> Franchisee as described in this Section 20 if such
> controversy, dispute or claim concerns an allegation by
> Franchisor that Franchisee has violated (or threaten to
> violate, or pose an imminent risk of violating): (a) any of
> Franchisor's protected intellectual property rights in the
> Marks, the System, or in any of Franchisor's trade secrets or
> confidential information; (b) any claims pertaining to or
> arising out of any warranty issued; (c) securing injunctive
> relief or specific performance under this Franchise
> Agreement; or (d) any of the restrictive covenants contained
> in this Franchise Agreement.

(ECF No. 19-2 ¶ 20.2.)  In addition, the Franchise Agreement provides:

> To protect from violations that would cause immediate loss
> and damages or irreparable harm, Franchisor, without first

---

[9] The Franchise Agreement names Plaintiff as Franchisor.  (ECF No. 19-2 at 3.)

seeking mediation or arbitration, shall have the right to seek from a state or federal court near Franchisor's headquarters (currently in Northglenn, Colorado):

(a) injunctive relief and any related incidental damages;

(b) an action for disputes or claims related to or based on any of Franchisor's protected intellectual property rights in the Marks or the or [*sic*] restrictive covenants;

(c) issues related to the disclosure or misuse of Confidential Information or Trade Secrets; and

(d) any claims pertaining to or arising out of any warranty issued.

(*Id.* ¶ 20.4.) Only if a dispute is not resolved through negotiation or mediation and is not otherwise exempted as described in Paragraph 20.2 or 20.4 from the mediation and arbitration requirements will that dispute be submitted to arbitration. (*Id.* ¶ 20.6.) Thus, because the Franchise Agreement explicitly exempts claims for injunctive relief—such as the ones alleged here—from arbitration, the Court may hear Plaintiff's claim for injunctive relief in this case.[10]

### 2.  Stipulations by Defendants

At the evidentiary hearing, Defendants made certain stipulations. First, Defendants stipulated to the entry of a preliminary injunction on the third element of relief requested in the Motion. (Tr. at 5–6, 9–10.) Specifically, Defendants agreed to an

---

[10] At the evidentiary hearing, Plaintiff's counsel noted during his closing argument that "it is for the Court to decide preliminary and permanent injunctive relief plus incidental damages. It is for the arbitrator . . . to decide damages." (Tr. at 183.)

Similarly, Defendants' counsel conceded that the Motion, which requests preliminary injunctive relief, is properly before the Court. The Court stated that there is "an express carve out [in the Franchise Agreement] for preliminary injunctive relief," to which Defendants' counsel replied, "Undoubtedly. But the . . . preliminary injunctive relief doesn't have collateral estoppel effect." (Tr. at 193.)

Therefore, the attorneys' arguments at the evidentiary hearing supports the Court's conclusion that the Franchise Agreement provides that the claims for injunctive relief are properly before the Court.

injunction which enjoins them from infringing on or using Plaintiff's registered trademarks.  Relying on Defendants' stipulation and Plaintiff's acceptance of such stipulation, the Court makes no findings regarding whether Plaintiff has satisfied its Rule 65 burden on its trademark infringement claim and will enter an injunction consistent with Defendants' stipulation.

Second, at the hearing Defendants also agreed to return to Plaintiff the items listed in Paragraph 6.9 of the Franchise Agreement.  (Tr. at 186–87; ECF No. 19-2 ¶ 6.9; Pl. Ex. 24 at 13.)  This second stipulation does not go to the merits of Plaintiff's breach of contract claim, which the Court will discuss next.  Based on this stipulation, however, the Court will include herein an order requiring Defendants to forthwith return said items to Plaintiff.

**B.**     **Rule 65 Factors**

1.     Substantial Likelihood of Success on the Merits

On the limited record before it, the Court finds that Plaintiff has shown a substantial likelihood of success on the merits of its breach of contract claim.  While Colorado generally prohibits covenants not to compete, the circumstances of the case appear to meet two exceptions to that general rule: covenants governing trade secrets and non-compete contracts for executive or management personnel.  Colo. Rev. Stat. § 8–2–113; *see Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997) ("For a covenant not to compete to fit within the trade secret exception to § 8–2–113(2), the purpose of the covenant must be the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets.").  Plaintiff has the burden to prove the existence of valid trade secrets.  *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011).

13

In executing the Franchise Agreement, O'Hare agreed that upon termination of the Franchise Agreement for any reason, he would not operate a competing business within 25 miles of his Core Progression gym for one year (the "Covenant").  (ECF No. 9 at 8 (citing ECF No. 19-2 at 36 ¶ 14.2(b)).)  A purpose of the Franchise Agreement—and particularly the Covenant—was to protect Plaintiff's trade secrets.  (ECF No. 9-1 at 8 ¶ 22.)  According to Cerf,

> [t]he purpose for the non-compete provision is to protect Core Progression's confidential information and its trade secrets.  Franchisees are not only granted a license to use the Marks, they are also provided with instructions and operational guidance that Core Progression built over years of operating its business.  If a franchisee like O'Hare were to operate a competing business right after Core Progression educates them on the industry and within the general area of their franchised location, then Core Progression's proprietary methods and information would most certainly be used to unfairly compete.  The 25-mile radius ensures that a former franchisee cannot open a Core Progression "copycat" in the same trade area.

(*Id.*)  In addition, the noncompete provision covers a 25 mile radius for one year and is likely reasonable and enforceable under Colorado law.  *See Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, 2020 WL 6119470, at *9 (D. Colo. Oct. 16, 2020) (noncompete provision covering three mile radius for one year likely reasonable and enforceable under Colorado law); *Harrison v. Albright*, 577 P.2d 302, 305 (Colo. App. 1977) (noting that covenants for terms up to five years and encompassing 100-mile radii have been upheld and placing the burden of proof on the party challenging enforcement).

Despite the Covenant, however, the hearing evidence established that O'Hare is operating a competing business under the Altru Fitness brand out of the same location

as his Core Progression franchise facility (Tr. at 113), and he has taken customer data without permission for the benefit of his Altru Fitness business (Tr. at 77–79).  At the evidentiary hearing, Defendants effectively, if not literally, conceded that they had breached the Franchise Agreement.  Indeed, Defendants do not dispute that they took steps to build a competing business out of the same location as their Core Progression gym; that they downloaded the Core Progression client relationship database with customer and membership information before leaving the Core Progression system; or that they wrote Core Progression customers from their @coreprogression.com e-mail accounts to say that they were transitioning to a competing software while they were still franchisees.  (*See generally* ECF No. 19; ECF No. 22 at 1.)

Indeed, Cerf testified that he was "appalled and astounded" when he learned from Zen Planner's representative that O'Hare had asked to open another database and transfer all of the Core Progression data, including billing information, membership, business records, attendance, among other things, to a new database that was not under Core Progression's purview.  (Tr. at 78–79; ECF No. 9-1 ¶ 41.)  Cerf testified that he asked Zen Planner to look into O'Hare's request and "make sure that doesn't happen."  (Tr. at 79.)  The parties agreed in the Franchise Agreement that Defendants could use Plaintiff's business records regarding customers and/or related to the Core Progression business during the term of the Franchise Agreement, "solely for purposes of operating the Core Progression Business."  (ECF No. 19-2 ¶ 6.9.)  In other words, the Franchise Agreement prohibited Defendants from using such information outside the scope of the franchise relationship.  As such, even if Defendants' use of the information is not trade secret misappropriation (which is not a claim brought in this case), the use

"likely qualifies as a breach of contract."  *Fitness Together*, 2020 WL 6119470, at *10.

The evidence also establishes that as president of CAO, O'Hare was in an executive or management position with access to information that would be unavailable to most other people in the company.  Thus, in the Court's view, the only remaining question on the substantial likelihood of success requirement of Rule 65 is whether an enforceable contract exists between the parties.

At this incipient juncture of these proceedings, and for the purposes of preliminary injunctive relief only, the Court finds Defendants' argument that a valid, binding contract does not exist unavailing.  Defendants contend that the Franchise Agreement attached as an exhibit to the Financial Disclosure Document that Plaintiff provided to Defendants contained materially different terms from the Franchise Agreement that Defendants ultimately signed.[11]  Defendants argue that Plaintiff's failure to disclose these material differences between the two contracts constitutes grounds to void the Franchise Agreement.

Despite Defendants' arguments, for the purposes of this Motion, the Court finds there is no evidence in the record that these differences were, in the circumstances of the dispute between these parties, in fact material.  *See Tatonka Capital Corp. v. Connelly*, 390 F. Supp. 3d 1289, 1303 (D. Colo. 2019) (stating that a contract may be

---

[11] In the response brief, Defendants state: "The differences between the contracts are important, for example: (1) the 2019 FDD contains a provision explicitly delegating disputes "relating to the interpretation, applicability, enforceability or formation" of the agreement to an arbitrator, whereas the 2017 FA does not, (2) the 2017 FA requires a personal guarantee from a spouse whereas the 2019 FDD does not, (3) the 2017 FA requires the franchisee to accept vouchers and honor memberships from other studios owned by Plaintiff, whereas the 2019 FDD does not, (4) the 2017 FA gives the Plaintiff the right to require minimum prices for services, including free services, whereas the 2019 FDD does not, and (5) the 2017 FA contains a non-solicitation clause for both the franchisee and its immediate family members, whereas the 2019 FDD did not."  (ECF No. 19 at 4.)

voidable where a mistaken party's assent to the contract is caused by a misrepresentation that is either "fraudulent or material" in the context of Restatement (Second) of Contracts § 161 cmt. e).  At no point did O'Hare testify that, had these changes been brought to his attention prior to his execution of the Franchise Agreement, he would have changed his conduct during contract negotiations, refused to sign the Franchise Agreement, or made a counteroffer to Plaintiff based on the differences.  Based on O'Hare's testimony and for the purposes of this Amended Order only, the Court concludes the differences between the franchise agreement attached to the FDD and the Franchise Agreement were not material.

Moreover, there is also no evidence before the Court suggesting Plaintiff had reason to know that the purportedly undisclosed differences would influence Defendants' decisionmaking concerning executing the Franchise Agreement.  *See Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1230 (10th Cir. 2016) ("However, before a non-disclosure may be treated as an affirmative misrepresentation, 'the party failing to disclose must know or have reason to know that the undisclosed fact will influence the decisionmaking of the other party.'" (citing Restatement (Second) of Contracts § 161)).

Finally, the Court finds that Defendants' argument that they did not consider the information Plaintiff provided to Defendants to be proprietary or to constitute trade secrets to be wholly without merit.  Cerf testified that Plaintiff provided to Defendants, as Core Progression franchisees, its proprietary information regarding the use of Core Progression software systems, the methodology of training, sales training, client customer retention training, pre-opening marketing training, grand opening and

employee training, and site selection.  Plaintiff provided Defendants with an operations manual, which is a 213-page document containing almost 14 years of Cerf's industry knowledge, trade secrets, and proprietary information, all of which allows the Core Progression model to be successful.  Tellingly, as of the time of the evidentiary hearing, Defendants had not returned the manual or other trade secret information to Plaintiff, as is required of them by the post-termination provisions of the Franchise Agreement.

As a consequence, based on the limited record before it, the Court finds that Plaintiff has shown a substantial likelihood of success on the merits of the breach of contract claim.

2.    Irreparable Harm

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).  The moving party "must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."  *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016).

The "majority of courts that have considered the question have concluded that franchising companies suffer irreparable harm when their former franchisees are allowed to ignore reasonable covenants not to compete."  *Fitness Together*, 2020 WL 6119470, at *10 (quoting *Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1249 (D. Utah 2009)).  Further, "[i]njunctive relief is especially warranted when the ex-franchisee 'operates out of the same locations as the former . . . franchises.'"  *Id.* (citation omitted).  Judges in the District of Colorado have found that "when a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed."  *Port-a-Pour, Inc. v. Peak Innovations, Inc.*,

49 F. Supp. 3d 841, 872 (D. Colo. 2014) (citation and internal alterations and quotation marks omitted).

Plaintiff primarily points to its loss of its trade secrets and confidential information, from which it derives "substantial, incalculable value," as the basis of its irreparable harm.  (ECF No. 9 at 12.)  "The right to use one's property as one wishes—either to use the property to its own advantage, to exclude another from its use, or to sell, lease, license or transfer such property to another—is fundamental, and being excluded from the rights inherent in one's property constitutes irreparable injury."  *Port-a-Pour*, 49 F. Supp. 3d at 872.  In addition, irreparable harm stems from the difficulty in calculating damages and the intangible harms Plaintiff has suffered, such as loss of goodwill and competitive market position.  (ECF No. 9 at 13.)  *See id.*; *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004).  "Providing plaintiff with monetary relief will simply not remedy the loss of competitive advantage plaintiff may lose from the alleged misappropriation of its confidential information."  *Panorama Consulting Sols., LLC v. Armitage*, 2017 WL 11547493, at *1 (D. Colo. June 9, 2017).

At the hearing, Cerf testified:

> I couldn't even quantify the amount of harm, to teach somebody all of my systems, give them access to all of our market proprietary training, work on developing their location for a year, see [our] great success and then have the name be tarnished.  I know even as of February on Google, the listing was showing Altru Fitness with parentheses saying formerly Core Progression.  The damage in the marketplace to consumers, it makes it look like my brand went to North Carolina and failed and was a fraud.

(Tr. at 95.)  In addition to Cerf's testimony, O'Hare testified that he responded to a question on a Google review site regarding whether his business was a Core

Progression business by saying "the other company [Core Progression] turned out to be a 'fake franchise.'" (Tr. at 169.)  This evidence, among other testimony presented at the hearing, leads the Court to conclude that a preliminary injunction is required in this case to prevent similar extraordinarily damaging remarks by Defendants against Plaintiff, and to preserve any remaining customer goodwill Core Progression has in the North Carolina market.

Defendants' argument that Plaintiff is not a registered franchisor with the Secretary of State in North Carolina also falls flat.  (Tr. at 100–01.)  Plaintiff was relying on its franchisee, Defendants, to be its representative in the North Carolina market. Indeed, Cerf testified that he *already* had a franchise (operated by Defendants) in North Carolina, one he had expectations would expand to multiple locations in that state's Golden Triangle market.  Cerf also testified that his North Carolina franchise (again, operated by Defendants), was doing exceedingly well, and he was giving them a chance to have a continued competitive advantage in that market, as O'Hare indicated he was looking to open three locations.  (Tr. at 100–01.)  Defendants *were* Core Progression's "boots on the ground" in North Carolina, and but for Defendants' actions in misappropriating Plaintiff's trade secrets, including sensitive and valuable customer data, and in rebranding the franchise as Altru Fitness, among other actions, Plaintiff would still today have a presence in the North Carolina market.

    3.    Balance of Hardships

The balance of hardships favors injunctive relief.  Although an injunction may impose serious harms on Defendants—including the temporary closure of Altru Fitness—that injury "may be discounted by the fact that the defendant brought that injury upon itself."  *Fitness Together*, 2020 WL 6119470, at *11 (quoting *Novartis*

*Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002)); *see also Bad Ass Coffee*, 636 F. Supp. 2d at 1251 ("Courts balancing harms to former franchisees who violated non-compete agreements have similarly been unwilling to allow defendants to point to harms that they could have avoided by abiding by their contract.").  Even if Altru Fitness is O'Hare's only source of income, judges in the District of Colorado have considered this argument and rejected it where a plaintiff is potentially faced with the loss of trade secrets and significant damage to its business.  *See Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1260 (D. Colo. 2005) (balance of harms favored plaintiff, even though the effect of an injunction would render defendant "unable to work in her chosen field").

By contrast, Plaintiff "suffers considerable harm each day the Defendants are allowed to flout the noncompete provision[]" in the Franchise Agreement.  *Id.*; *see also Panorama*, 2017 WL 11547493, at *4 (balance of hardships weighed in plaintiff's favor "not least because any temporary injunctive relief provided will merely require the relevant former employees and LTA to comply with the law and/or observe their agreements with plaintiff").

4.     <u>Public Interest</u>

A preliminary injunction will not be adverse to the public interest.  In granting preliminary injunctions, other judges in this District have concluded that the fact that Colorado statutes permit such noncompete agreements demonstrates that enforcing one would not be against the public interest.  *See, e.g.*, *Fitness Together*, 2020 WL 6119470, at *11 (injunction in public interest where preventing unfair competition helps protect and encourage investment in the very businesses that give rise to these opportunities); *Panorama*, 2017 WL 11547493, at *4 (finding it is in public interest for

laws to be obeyed and contracts to be observed); *Doubleclick*, 402 F. Supp. 2d at 1260.

     5.   <u>Bond</u>

Rule 65(c) states that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Although phrased as mandatory, in practice this Court has discretion under this Rule whether to require a bond.  *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).

While the Franchise Agreement states that Plaintiff may seek injunctive relief to prevent irreparable harm without posting a bond or security (ECF No. 19-2 ¶ 20.10), a bond is routinely imposed in similar cases.  *See, e.g.*, *Fitness Together*, 2020 WL 6119470, at *12 (requiring $50,000 bond); *Panorama*, 2017 WL 11547493, at *5 (requiring $5,000 bond); *Doubleclick*, 402 F. Supp. 2d at 1261 (requiring parties to submit statement recommending amount and terms of security required by Rule 65(c)).

The Court has considered the parties supplemental filings recommending bond terms.  (ECF Nos. 35, 36.)  At the evidentiary hearing, in discussing O'Hare's sales at the Core Progression franchise, Attorney Mulcahy stated: "[O'Hare] spent two months in a COVID environment, he was up to $10,000 in sales by the third month.  It's in excess of $17,000 when you look at July—when you look at September, October, November, December."  (Tr. at 175.)  Also at the hearing, in discussing O'Hare's sales, Attorney Cohen stated: "[Y]ou're dealing with 10 to $15,000 in gross sales over 12 months, and it would be over the life of the lease."  (Tr. at 194.)

To calculate the bond amount, the Court takes the average of these two ranges, which equals $13,000.  The Court multiplies $13,000 over the length of the Covenant,

which is 12 months, to calculate what it determines to be a reasonable bond in these circumstances of $156,000.  Therefore, Plaintiff shall be required to deposit a bond in the amount of $156,000 into the court registry as security, and it is encouraged to use the "Temporary Restraining Order Cash Bond Form" posted on the District of Colorado website.

## IV. PRELIMINARY INJUNCTION[12]

In light of the foregoing, the Court issues the following preliminary injunction:

Defendants, as well as their officers, managers, directors, agents, employees, successors and assigns, and all other persons in active concert or participation with them, are hereby IMMEDIATELY AND PRELIMINARILY ORDERED AND RESTRAINED as follows:

1.      Defendants are enjoined from operating any type of gym or fitness business at the location of their Core Progression branded business;

2.      Defendants are enjoined from using or disclosing any of Plaintiff's confidential or trade secret information.  No later than the close of business, Mountain Daylight Time, on **April 2, 2021**, Defendants shall return to Plaintiff all items containing any of Plaintiff's "Confidential Information," "Trade Secrets," or "Business Records" in Defendants' possession, provided that all electronically stored information shall be returned to Plaintiff in native format.

"Confidential Information" means: Plaintiff's Operations Manual, training materials

---

[12] The Preliminary Injunction in this Amended Order was amplified and clarified using Plaintiff's proposed language provided in its response to the Forthwith Motion (ECF No. 39) to address Defendants' arguments in the Forthwith Motion (ECF No. 37) that the Preliminary Injunction in the Interim Order (ECF No. 34) was unduly vague and unenforceable under Rule 65(d)(1).

and techniques, electronic information and communications, sales and promotional materials, all knowledge, know-how, standards, methods and procedures related to the establishment and operation of Plaintiff's System and includes all records pertaining to customers, suppliers, and other service providers of and/or related in any way to, Defendants' franchised business including, without limitation, all databases (whether in print, electronic, or other form), all names, addresses, phone numbers, e-mail addresses, customer purchase records, customer information, customer lists, manuals, promotional and marketing materials, marketing strategies, and any other data Plaintiff has designated as confidential.  For purposes of clarification, and not by way of limitation, Confidential Information shall include "Business Records."

"Business Records" means: All business records regarding customers and/or related to the Core Progression Business including, without limitation, all databases (whether in print, electronic, or other form), including all names, addresses, telephone numbers, e-mail addresses, customer purchase records, and all other records contained in such databases, and all other Business Records created and maintained by Defendants.

"Trade Secret(s)" means: Information, formulas, patterns, compilations, programs, devices, methods, training techniques or processes related to Plaintiff's System that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

3.      Defendants are enjoined from infringing on or using Core Progression's

24

registered trademarks, pursuant to Defendants' stipulation at the evidentiary hearing.

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiff Core Progression Franchise LLC's Motion for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction (ECF No. 9), which the Court construes as a Motion for Preliminary Injunction, is GRANTED;

2.      Defendants Chris O'Hare and CAO Enterprises, Inc. are PRELIMINARILY ENJOINED as set forth above;

3.      Defendants' Pre-Hearing Brief (ECF No. 30) is STRICKEN as a construed sur-reply or supplemental brief filed without prior leave of Court;

4.      The Court has clarified the definitions Defendants argued required additional clarification in their Forthwith Motion to Vacate March 26, 2021 Order as Unduly Vague and Unenforceable (ECF No. 37), and as a result, the Forthwith Motion is DENIED AS MOOT; and

5.      Plaintiff shall deposit a bond of $156,000 into the court registry as security no later than **April 12, 2021**.

Dated this 1st day of April, 2021, *nunc pro tunc* to the 26th day of March, 2021.

BY THE COURT:

William J. Martinez
United States District Judge