DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608



**CORE PROGRESSION FRANCHISE LLC**

**FRANCHISE AGREEMENT**

**Franchise #:** 9

**Franchisee:** Chris O'Hare

**Date:** 9/2/2019

**Territory**: "Golden Triangle" Area North Carolina-TBD

{00075378.DOC. }
[2017 FA v2F]

# EXHIBIT 1

## TABLE OF CONTENTS

**Section**                                                                              **Page**

1. COVENANTS, REPRESENTATIONS, AND WARRANTIES OF FRANCHISEE ....................4
2. GRANT OF LICENSE ....................................................................................................5
3. TERM OF THE AGREEMENT AND LICENSE ..........................................................6
4. TERRITORY ..................................................................................................................7
5. FEES ...............................................................................................................................8
6. ACCOUNTING, RECORDS, AUDITS AND LATE PAYMENT CHARGES ..........10
7. SERVICES AND ASSISTANCE .................................................................................12
8. FRANCHISEE'S DUTIES, OBLIGATIONS AND OPERATING STANDARDS ....15
9. PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES ..............................23
10. MARKS, COPYRIGHTED WORKS AND OWNERSHIP OF IMPROVEMENTS ..................24
11. ADVERTISING AND PROMOTION .........................................................................25
12. INSURANCE AND INDEMNITY ..............................................................................31
13. RELATIONSHIP ..........................................................................................................30
14. RESTRICTIVE COVENANTS ....................................................................................33
15. ASSIGNMENT .............................................................................................................32
16. OPTION TO PURCHASE — RIGHT OF FIRST REFUSAL .....................................36
17. DEFAULT AND TERMINATION ..............................................................................37
18. CONDEMNATION AND CASUALTY ......................................................................44
19. NOTICES ......................................................................................................................45
20. DISPUTE RESOLUTION ............................................................................................45
21. MISCELLANEOUS .....................................................................................................48
22. ACKNOWLEDGEMENT ............................................................................................50

ATTACHMENTS:

    A.     Franchise Data Sheet
    B.     Owner's Agreement
    C.     Statement of Ownership

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Franchise Agreement") is made and entered into by and between **CORE PROGRESSION FRANCHISE LLC**, a Colorado limited liability company located at 10693 Melody Drive, Northglenn, CO 80234 ("we", "us", "our" or "Franchisor"), and the "Franchise Owner" identified in Attachment A of this Franchise Agreement ("you", "your" or "Franchisee") effective as of the "Effective Date" identified in Attachment A of this Franchise Agreement.

## RECITALS

**WHEREAS**, Franchisor is offering franchises for the operation of businesses that provide membership-based training and group fitness classes and related products and services (a "Core Progression Business").

**WHEREAS**, the Core Progression Businesses are operated under our unique and proprietary Core Progression system ("System").

**WHEREAS**, the distinguishing characteristics of the System include the trademark "**CORE PROGRESSION**" and other trademarks and trade names, service marks, logos, confidential operating procedures, the confidential Franchise Operations Manual (as defined below), standards and specifications for equipment, services and products, methods of service, management and marketing programs and sales techniques and strategies. All of these distinguishing characteristics may be changed, improved, and further developed by Franchisor.  They are Franchisor's confidential information and trade secrets and are designated by and identified with the Marks described in this Franchise Agreement.

**WHEREAS**, Franchisee acknowledges the benefits of being identified with the System and the value of the Marks.

**WHEREAS**, Franchisee acknowledges the importance to the System and uniform standards of quality, service and customer satisfaction, and recognizes the necessity of opening and operating a Core Progression Business in conformity with the System.

**WHEREAS**, Franchisee recognizes that this Franchise Agreement places detailed obligations on Franchisee, including strict adherence to Franchisor's reasonable present and future requirements regarding the types of products sold, services offered, advertising used, operational techniques and marketing and sales strategies.

**WHEREAS,** Franchisee is aware of the foregoing and desires the right to use the System and the Marks, and wishes to be assisted, trained, and licensed to operate a Core Progression Business under the provisions and within the territory specified in this Franchise Agreement, subject to the terms and conditions in this Franchise Agreement.

The parties agree as follows:

## DEFINITIONS

For the purposes of this Franchise Agreement, the following terms are hereby defined:

(a)    "Affiliate" - means any person or Entity that controls, is controlled by, or is in common control with, Franchisor or Franchisee.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(b)     "Anti-Terrorism Laws" - means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control and any government agency outside the U.S.) addressing or in any way relating to terrorist acts and/or acts of war.

(c)     "Confidential Information" - means the Franchise Operations Manual, training materials and techniques, electronic information and communications, sales and promotional materials, all knowledge, know-how, standards, methods and procedures related to the establishment and operation of the System and includes all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, Franchisee's Core Progression Business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, email addresses, customer purchase records, customer information, customer lists, manuals, promotional and marketing materials, marketing strategies and any other data Franchisor designates as confidential. For purposes of clarification, and not by way of limitation, Confidential Information shall include Business Records as described in Section 6.9.

(d)     "Designated Manager" - defined in Section 8.11.

(e)     "Entity" - means a legal entity such as a limited liability company, partnership or corporation.

(f)     "Franchise" - means the Core Progression Business operated by Franchisee under the terms of this Franchise Agreement.

(g)     "Franchise Agreement" - means this agreement, attachments, and subsequent, written amendments.

(h)     "Franchise Disclosure Document" - means the franchise disclosure document that was presented to you that contained this Franchise Agreement as an exhibit.

(i)     "Franchise Operations Manual" - means, but is not limited to, all directives, books, pamphlets, bulletins, memoranda, order forms, packing slips, invoices, letters, email, Internet or intranet data, or other publications, documents, software programs, videos, transmittances or communications, in any form (including electronic form) prepared by or for Franchisor for use by franchisees generally or for Franchisee in particular, including information, advice and standards, requirements, marketing information and procedures, operating procedures, instructions or policies relating to the operation of the Core Progression Business or the operation of franchises, as may be amended by Franchisor.

(j)     "Gross Revenues" - means the total selling price of all services and products sold at, from, or through your Core Progression Business, including any revenue received from Sublessees, whether or not sold or performed at or from the Gym, including the full redemption value of any gift certificate, voucher or coupon sold for use at the Gym (fees retained by or paid to third party sellers of such gift certificates or coupons are not excluded from this calculation), and all income and revenue of every other kind and nature related to the Core Progression Business operation, whether for cash or credit, and regardless of collection in the case of credit.  Gross Revenues do not include:

{00075378.DOC. }

[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(i)      amount of any tax imposed by any federal, state, municipal or other governmental authority directly on sales and collected from customers, provided the amount of any such tax is shown separately and paid by Franchisee to the appropriate governmental authority; and

(ii)      all customer refunds, Franchisor authorized discounts and coupons, and credits made by the Core Progression Business (exclusions will include no reductions for credit card user fees, returned checks or reserves for bad credit or doubtful accounts).

Gross Revenues shall be deemed received by Franchisee when the services or products from which they were derived are rendered or delivered or when the relevant sale takes place, whichever occurs first, regardless of whether final payment (e.g., collection on a customer's personal check) has been received by Franchisee. Gross Revenues from products or services bartered shall be valued at the retail prices applicable and in effect when they are received.

(k)      "Gym" - means the retail location, commercial facility, or other approved location from which you will operate the Core Progression Business.

(l)      "Initial Term" - means the period covering the Effective Date until midnight on the day before the tenth anniversary of the Opening Date (defined below), and any applicable Interim Periods (as defined in Section 3.5 below).

(m)      "Lease" - means any agreement (oral or written) which grants the right to occupy a Gym and any amendment. Franchisee acknowledges and agrees that before any Lease will be accepted by Franchisor, the Lease must incorporate the Required Terms (as defined in Section 8.5(c) below)

(n)      "Location Assistance" - means all services provided by Franchisor or its affiliate or designee for the selection and authorization of the location for the Gym.  Location Assistance is fully defined in the Franchise Operations Manual, and Franchisor has the right to modify the location selection services in Franchisor's discretion.

(o)      "Managing Owner" - defined in Section 8.11.

(p)      "Marks" - shall mean the trademark "CORE PROGRESSION" and any other trade names, trademarks, symbols, logos, distinctive names, service marks, certification marks, logo designs, insignia or other identifying items designated by Franchisor as part of the System for use by franchisees, and not later withdrawn.

(q)      "Opening Date" - means the date Franchisee's Core Progression Business first opens to the public to provide the Products and Services.

(r)      "Products" - means all supplies, material, equipment, and ancillary items sold, leased, prepared or otherwise dealt with in connection with the Core Progression Business and associated with the Marks.  The Products offered may change over time.

(s)      "Services" - means any services that Franchisor has authorized Franchisee to provide, which currently includes membership-based training and group fitness classes, and related activities conducted or otherwise provided in connection with the Core Progression Business and associated with the Marks.  The Services offered may change over time.

(t)      "Trade Secret(s)" - means information, formulas, patterns, compilations, programs, devices, methods, training techniques or processes related to the System that derive independent

{00075378.DOC. }
[2017 FA v2F]

B-3

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

1.    COVENANTS, REPRESENTATIONS, AND WARRANTIES OF FRANCHISEE

Franchisee covenants, represents, and warrants the following and acknowledges Franchisor is relying on the same in deciding to enter into this Franchise Agreement:

1.1    Franchisee acknowledges it has received, has had time to read, and has read the Franchise Disclosure Document, this Franchise Agreement and all related agreements with Franchisor. Franchisee acknowledges it has had an adequate opportunity to be advised by legal, accounting and other professional advisors of its own choosing regarding all pertinent aspects of the Core Progression Business, Franchisor and this Franchise Agreement.

1.2    Franchisee has funds or has made firm arrangements to acquire funds to commence, open and operate the Core Progression Business and it is financially and otherwise able to accept the risks attendant upon entering into this Franchise Agreement.

1.3    All statements made by Franchisee in writing in connection with its application for this Franchise were, to the best of Franchisee's knowledge, true when made and continue to be true as of the date of this Franchise Agreement.

1.4    Franchisee did not sign this Franchise Agreement in reliance on the continued participation by or employment of any of our shareholders, directors, officers, or employees.

1.5    There are no outstanding actual or contingent material financial obligations of Franchisee as of the date of this Franchise Agreement other than those disclosed to Franchisor by Franchisee in writing.

1.6    Franchisee is not a party to or subject to any court or administrative order or action of any governmental authority which would limit or interfere in any way with the performance of its obligations under this Franchise Agreement or any related agreement.

1.7    Franchisee is not a party to any litigation or legal proceedings other than as disclosed to Franchisor in writing.

1.8    Franchisee represents it is not a party to or subject to agreements that might conflict with this Franchise Agreement and agrees not to enter into any conflicting agreements during the Initial Term or any Successor Term.

1.9    Franchisee agrees and acknowledges it has not been induced to enter into this Franchise Agreement in reliance upon, nor as a result of, any statements, representations, warranties, conditions, covenants, promises or inducements, whatsoever (oral or written), whether directly related to the contents of this Franchise Agreement or related matters, made by Franchisor, its officers, directors, agents, employees or contractors except as stated in this Franchise Agreement. Franchisee acknowledges that Franchisee has been granted franchise rights based on the information supplied to Franchisor in Franchisee's application.

1.10    Franchisee shall comply with all laws, regulations, and requirements applicable to the Core Progression Business.

{00075378.DOC. }                    B-4
[2017 FA v2F]

**EXHIBIT 1**

1.11    Franchisee and its owners agree to comply with and/or to assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with Anti-Terrorism Laws. In connection with such compliance, Franchisee and its owners certify, represent, and warrant that none of their property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and its owners are not otherwise in violation of any of the Anti-Terrorism Laws.

(a)    Franchisee and its owners certify that neither they, their respective employees, or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire (or, if already employed, retain the employment of) any individual who is listed in the Annex.

(b)    Franchisee certifies that it has no knowledge or information that, if generally known, would result in Franchisee, its owners, their employees, or anyone associated with Franchisee to be listed in the Annex to Executive Order 13224.

(c)    Franchisee is solely responsible for ascertaining what actions it must take to comply with the Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that its indemnification responsibilities set forth in this Franchise Agreement pertain to its obligations under this Section 1.11.

(d)    Any misrepresentation under this Section or any violation of the Anti-Terrorism Laws by Franchisee, its owners, agents, its employees shall constitute grounds for immediate termination of this Franchise Agreement and any other agreement Franchisee has entered into with Franchisor or any of Affiliates.

1.12    If Franchisee is an Entity, each of Franchisee's owners and their respective spouses will sign the Owner's Agreement, in the form attached hereto as Attachment B, undertaking personally to be bound, jointly and severally, by all provisions of this Franchise Agreement and any ancillary agreements between Franchisor and Franchisee.  Subject to Franchisor's rights and Franchisee's obligations under Section 15, Franchisee and Franchisee's owners agree to sign and to deliver to Franchisor revised versions of Attachment B from time to time to reflect any changes in the information that Attachment B now contains.

2.    GRANT OF LICENSE

2.1    Subject to all the terms and conditions of this Franchise Agreement, Franchisor grants to Franchisee, and Franchisee accepts, for the Initial Term, the right and license ("License") to:

(a)    Operate one (1) Core Progression Business at an approved location ("Approved Location") and in the territory ("Territory"), each as described in Attachment A;

(b)    Use the Marks and the System; and

(c)    Offer and market only Franchisor's approved Products and Services, unless Franchisor approves in writing in its sole and absolute discretion, Franchisee's request to offer and market complementary and non-competing services or products.

2.2    Franchisee recognizes that variations and additions to the System may be required to preserve and/or enhance the System.  Franchisor expressly reserves the right to add to, subtract from, revise, modify or change the System or any part thereof, including but not limited to the adoption and use of new or modified trade names, trademarks, service marks, or copyrighted materials, new products, new

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

equipment, or new techniques. Franchisee agrees to promptly accept and comply with any such addition, subtraction, revision, modification or change and to make such reasonable expenditures to comply with Section 8.

2.3    Franchisee recognizes that the rights granted to Franchisee are for the Approved Location with the specific Territory defined in Section 4.1 below and no other, and cannot be transferred to an alternate location or territory without the prior written approval of Franchisor, which may be granted or withheld in Franchisor's sole discretion.

3.    TERM OF THE AGREEMENT AND LICENSE

3.1    This Franchise Agreement is effective on the Effective Date and continues through the end of the Initial Term, unless terminated sooner under Section 17.  Upon the expiration of the Initial Term, Franchisee shall have the option, subject to the terms of this Franchise Agreement, to extend Franchisee's rights to operate the Core Progression Business for one additional, consecutive term of 10 years ("Successor Term"). With the Successor Term, Franchisee must pay the Renewal Fee in Section 3.2(b) and comply with the requirements in this Section 3.

3.2    To qualify for the Successor Term, Franchisee must:

(a)    Unless otherwise prohibited by state law, execute a general release of all claims Franchisee may have against Franchisor, its officers, directors, members, shareholders, agents, Affiliates, and employees, whether in their corporate and/or individual capacities. This release shall include all claims arising under any federal, state, or local law, rule, or ordinance arising out of or concerning this Franchise Agreement (to the fullest extent permitted by law) and shall be in a form satisfactory to Franchisor.  Unless otherwise prohibited by state law, Franchisee's failure or refusal to sign such a release in the form presented by Franchisor shall be deemed a rejection by Franchisee of its option to extend its rights to operate the Core Progression Business;

(b)    Pay the successor franchise fee ("Renewal Fee") of 50% of the then-current Initial Franchise Fee, which is due and payable to Franchisor at the time of signing a new Franchise Agreement;

(c)    Upgrade the Gym, computer system, furniture and fixtures used in operation of the Core Progression Business to Franchisor's then-current standards;

(d)    Comply with all other provisions contained in the Franchise Operations Manual, as modified periodically by Franchisor in Franchisor's sole discretion; and

(e)    Provide proof of current licenses, insurance and permits.

3.3    Franchisor may refuse to allow Franchisee to enter into a Successor Term if Franchisee has done any of the following:

(a)    Failed to remedy any breach of this Franchise Agreement specified by Franchisor in a written notice to Franchisee required by Sections 17.1, 17.2 or 17.3; or

(b)    Committed and received notice of two or more breaches of this Franchise Agreement in the 24 months prior to the end of the Initial Term, even if such breaches were timely remedied; or

{00075378.DOC. }                                          B-6
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(c)    Franchisee has failed to give Franchisor a written notice of intent to renew no less than six months or over nine months prior to expiration of the Initial Term; or

(d)    Franchisee is not current in payments to Franchisor or to Franchisee's lessor, suppliers or trade creditors.

3.4    If Franchisee extends its rights to operate the Core Progression Business at the end of the Initial Term and Franchisor consents to such extension, Franchisee will execute a new Franchise Agreement ("Successor Franchise Agreement") and all other agreements in the form then being used by Franchisor in granting new franchises (including but not limited to the then-current form of Owner's Agreement), which may contain materially different terms, higher fees and a modified Territory. Franchisor reserves the right to change any term(s) of the Franchise Agreement form to be signed by Franchisee when Franchisee extends its rights to operate the Core Progression Business (except as specified below). Franchisor will not charge another Initial Franchise Fee when Franchisee signs the Successor Franchise Agreement. In Franchisor's sole discretion, Franchisee may be deemed to have irrevocably declined to extend its rights to operate the Franchise (and its option shall thereupon terminate) if it fails to execute and return to Franchisor the Successor Franchise Agreement and other documents required by Franchisor within 30 days after their delivery to Franchisee, or fails to comply in any other way with the provisions of this Section 3.

3.5    If Franchisee does not sign a Successor Franchise Agreement and this Franchise Agreement expires and Franchisee continues to accept the benefits of this Franchise Agreement after the expiration, then at the option of Franchisor, this Franchise Agreement may be treated either as (i) expired as of the date of expiration with Franchisee then operating in violation of this Franchise Agreement; or (ii) continued on a month-to-month basis ("Interim Period") until one party provides the other with written notice of its intent to terminate the Interim Period, in which case the Interim Period will terminate 30 days after receipt of the notice to terminate the Interim Period. All obligations of Franchisee shall remain in full force and effect during the Interim Period as if this Franchise Agreement had not expired, and all obligations and restrictions imposed on Franchisee upon expiration shall be deemed to take effect upon termination of the Interim Period.

4.    TERRITORY

4.1    You will operate the Core Progression Business at an Approved Location with a protected Territory. During the term of this Franchise Agreement, except as otherwise provided in this Franchise Agreement, Franchisor will not establish or operate, or franchise any entity to establish or operate, a business using the Marks and System at any location within the Territory. Franchisee is not prohibited from directly marketing to or soliciting customers located outside of the Territory so long as Franchisee follows any marketing and soliciting policies and procedures contained in our Franchise Operations Manual. Franchisee may sell products to customers located outside of the Territory so long as they are sold from Franchisee's Gym. Franchisee is not granted any rights to pursue any of Franchisor's or its Affiliates' other business concepts, if any, other than the Core Progression Business. Franchisee may not knowingly sell our proprietary products or any other products to any business or other customer through alternate channels of distribution such as wholesale, Internet or mail order sales.

4.2    Franchisee acknowledges that the franchise granted hereunder is non-exclusive and Franchisor and its Affiliates retain the exclusive right, among others:

(a)    to own, franchise, or operate a Core Progression Business at any location outside of the Territory, regardless of the proximity to the Gym or the impact on Franchisee's existing or potential customers;

{00075378.DOC. }

[2017 FA v2F]

B-7

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(b)    to own, acquire, establish and/or operate, and license others to establish and operate, businesses under trademarks other than the Marks or other systems, at any location within or outside the Territory (even if these businesses are in competition with you);

(c)    to own, acquire, establish, and/or operate, and license others to establish and operate, businesses using any proprietary marks or systems (including the Marks and System) at any airport, train station, other transportation facility, arena, ballpark, stadium, racetrack, other sports facility, cruise ship, casino, or other entertainment facility, college campus, or military base, within any outlet mall or other area mall, or by way of a mobile business, within or outside the Territory;

(d)    to use the Marks and the System to sell any products or services, similar to those which Franchisee will sell, through any alternate channels of distribution within or outside of the Territory, regardless of their proximity to the Gym or their impact on Franchisee's existing or potential customers. This includes, but is not limited to, retail outlets, direct marketing sales, and other channels of distribution such as television, direct mail, mail order, catalog sales, telemarketing, or over the Internet.   Franchisor exclusively reserves the Internet, including computerized or remote entry ordering systems, as a channel of distribution, and Franchisee may not independently market on the Internet or conduct ecommerce unless such activities are expressly authorized by the Franchise Operations Manual or unless authorized in writing in advance by Franchisor, which authorization may be revoked by Franchisor in its discretion;

(e)    to acquire, or be acquired by, any competing system, including a competing system that has one or more locations within Franchisee's Territory; and

(f)    to implement multi-area marketing programs which may allow Franchisor or others to solicit or sell to customers anywhere. Franchisor has the right to issue mandatory policies to coordinate such multi-area marketing programs.

5.    FEES

5.1    Franchisee must pay Franchisor an initial franchise fee in the amount set forth in Attachment A ("Initial Franchise Fee"), and, if due and payable, all federal, state and municipal taxes. The Initial Franchise Fee is payable as set forth in Attachment A.  If Franchisee purchases the rights to open multiple Core Progression Businesses (either a "Multi-3" or "Multi-5" Franchise), Franchisee will sign the "Multi-Unit Addendum," the form of which is attached to the Franchise Disclosure Document in Exhibit H and our then-current form of franchise agreement, for each Core Progression Business Franchisee will open thereunder, but Franchisee will not be required to pay another Initial Franchise Fee (all other fees will apply).  Franchisee acknowledges and agrees that the Initial Franchise Fee is in consideration of all of Franchisor's pre-opening assistance and Franchisor's lost or deferred opportunity to enter into this Franchise Agreement with others, and it offsets some of Franchisor's expenses for franchisee recruitment.  The Initial Franchise Fee is nonrefundable, even if Franchisee fails to open any Core Progression Businesses.

5.2    Franchisee shall pay our affiliate, Core Progression, LLC, a location assistance fee of $2,500 for Franchisee's initial Core Progression Business and $1,500 for each additional Core Progression Business Franchisee opens (each a "Location Assistance Fee").   The initial Location Assistance Fee shall be paid when you sign this Franchise Agreement, and the Location Assistance Fee for each subsequent Core Progression Business shall be paid when you sign the franchise agreement for such business.   You acknowledge that the Location Assistance Fee offsets costs incurred in supporting

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

your efforts to find, develop, and open the Gym and is nonrefundable, even if you fail to open any Core Progression Businesses.

5.3    Franchisee must pay Franchisor a security system setup fee ranging from $750 to $850 when Franchisee signs this Agreement and Franchisor's then-current monthly security system fee for ongoing security system service ("Security System Fee") (currently $150).  Franchisee acknowledges that the Security System Fee offsets costs incurred to install and maintain the security system for Franchisee's Gym and is nonrefundable, even if Franchisee fails to open any Core Progression Businesses.  The Security System Fee shall be paid to Franchisor on or before the same day as your first Royalty payment each month for the preceding calendar month.

5.4    Franchisor reserves the right to require Franchisee, its Managing Owner and its Designated Manager, its staff and instructors or other designees to obtain certain Core Progression certifications.  If required by the Franchisor, Franchisee must pay Franchisor the then-current certification for such certification.

5.5    Franchisee shall pay to Franchisor a weekly royalty fee ("Royalty").  The Royalty shall be the greater of (i) 5% of Gross Revenues for the previous week or (ii) $250 ("Minimum Royalty").  You will not be required to pay the Minimum Royalty for the first three months of operation of your Core Progression Business.  The Royalty shall be paid to Franchisor each Wednesday (or such other day of the week as Franchisor may specify) for the preceding calendar week.  The Royalty is an ongoing payment that allows Franchisee to use the Marks and the intellectual property of the System and pays for Franchisor's ongoing support and assistance.

5.6    Franchisee must pay Franchisor a setup and installation fee of $500 for Franchisor's designated operations and scheduling software when Franchisee signs this Agreement and Franchisor's then-current monthly technology fee for use of this software ("Technology Fee") (currently $500).  The Technology Fee is subject to increase with upgrades, modifications, additional software or third party fee increases.  Franchisor currently accesses reports regarding Gross Revenues through the software program for the Gym.  If the software is not functioning or this feature is not available, Franchisee shall prepare monthly reports regarding Gross Revenues.  The Technology Fee shall be paid to Franchisor on or before the same day as your first Royalty payment each month for the preceding calendar month.

5.7    Franchisor provides the Initial Training Program for up to two people at no charge.  If Franchisee desires to have additional people attend the Initial Training Program, Franchisee shall pay to Franchisor the then-current nonrefundable training fee (currently $500 for each additional attendee).

5.8    Franchisor has the right to periodically specify (in the Franchise Operations Manual or otherwise in writing) different payees and/or payment methods, such as, but not limited to, weekly/biweekly/monthly payment, payment by auto-draft, credit card and payment by check.  If Franchisee makes any payment to Franchisor or its Affiliates by credit card for any payment required, Franchisor may charge a service charge of up to 4% of the total charge.

5.7    Unless specified otherwise in this Franchise Agreement or in the Franchise Operations Manual, all payments to Franchisor required under this Franchise Agreement Franchisee shall be made by electronic funds transfer ("EFT") or other similar means utilizing a Franchisor approved computer system or otherwise.  The EFT Authorization is attached to the Franchise Disclosure Document.  Franchisee agrees to comply with procedures specified by Franchisor and/or perform such acts and deliver and execute such documents, including authorization for direct debits from Franchisee's business bank operating account to assist in or accomplish payment.  Franchisee shall authorize Franchisor to initiate debit entries and/or credit correction entries to a designated checking or savings account for payments of

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

fees and other amounts payable to Franchisor and any interest.  Franchisee shall make funds available to Franchisor for withdrawal by electronic transfer no later than the due date for payment. If Franchisee has not timely reported the Gross Revenues to Franchisor for any reporting period, Franchisor shall be authorized, at Franchisor's option, to debit Franchisee's account in an amount equal to (a) the fees transferred from Franchisee's account for the last reporting period for which a report of the Gross Revenues was provided to Franchisor as required hereunder or (b) the amount due based on information retrieved from Franchisor's approved software.  Franchisee shall not subordinate to any other obligation its obligation to pay the Royalty or any other fee or charge due Franchisor or any Affiliate of Franchisor under this Franchise Agreement.

6.     ACCOUNTING, RECORDS, AUDITS AND LATE PAYMENT CHARGES

6.1     Franchisee shall keep such complete records of its Core Progression Business as a prudent and careful businessperson would normally keep.  Franchisee must use any required accounting system or pre-formatted templates prescribed by Franchisor.  Franchisee shall keep its financial books and records as Franchisor may periodically direct in the Franchise Operations Manual or otherwise, including retention of all invoices, order forms, payroll records, cash register tapes, check records, bank deposit receipts, sales tax records, refunds, cash disbursements, journals and general ledgers.  Franchisee shall advise Franchisor of the location of all original documents and shall not destroy any records without the written consent of Franchisor.

6.2     Franchisee shall regularly prepare complete and accurate records concerning all financial, marketing and other operating aspects of the Core Progression Business conducted under this Franchise Agreement.  Franchisee shall maintain an accounting system which accurately reflects all operational aspects of the Core Progression Business including any reports required by Franchisor.  Franchisee's records shall include tax returns, daily reports, statements of Gross Revenues (to be prepared each week for the preceding week), profit and loss statements (to be prepared at least quarterly), and balance sheets (to be prepared at least annually by an independent accountant, unless Franchisor has otherwise approved in writing).

6.3     Franchisee shall also submit to Franchisor current financial statements and any other reports Franchisor may reasonably request to evaluate or compile research and performance data on any operational or other aspect of the Core Progression Business.  Franchisee shall submit Local Advertising Requirement (as defined in Section 11.1(b) below) statements to Franchisor once each calendar quarter. By April 15 of each year, Franchisee shall provide Franchisor with a copy of its federal tax return for the Core Progression Business for the previous tax year.

6.4     The records required under this Section 6 pertain only to Franchisee's operation of the Core Progression Business. Franchisor has no right to inspect, audit or copy the records of any unrelated business activity of Franchisee unless Franchisee comingles these records with its Core Progression Business records.  Franchisee shall keep the books and records of the Core Progression Business separate from the records of any unrelated business activity or personal activity.

6.5     From the date of this Franchise Agreement until five years after the end of the term of this Franchise Agreement, including the Successor Term, Franchisor or Franchisor's authorized agent shall have the right to request, receive, inspect and audit any of the records referred to above wherever they may be located.  Franchisor agrees to do inspections and audits at reasonable times.  Franchisee agrees to keep all records and reports for seven years from the date such records are created.  Should any inspection or audit disclose a deficiency in the payment of any Royalty, Brand Fund Contribution (as defined in Section 11.2), or other amounts required to be paid under this Franchise Agreement, Franchisee shall immediately pay the deficiency to Franchisor, without prejudice to any other remedy of Franchisor

{00075378.DOC. }                                      B-10
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

under this Franchise Agreement.  If Franchisee fails to submit any records or reports required for the audit, or any audit discloses an understatement in the amount of Gross Revenue by more than 2%, Franchisee shall, in addition to paying the deficient amount to Franchisor under the preceding sentence, immediately pay to Franchisor the entire cost of the inspection or audit including travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel, and all legal and accounting fees incurred.  For the purposes of this Section 6.5, an audit period shall be each fiscal year.  If an audit discloses an overpayment of any Royalties, Brand Fund Contributions, or other amounts due, Franchisor shall credit the overpayment to Franchisee's payments of future Royalties and Brand Fund Contributions.

6.6     To encourage prompt payment and to cover the costs and expenses involved in handling and processing late payments, Franchisee shall also pay, upon demand, a late fee of $100 per occurrence, plus the lesser of (i) the daily equivalent of 12% per year simple interest, or (ii) the highest legal rate permitted by applicable law, on all payments due to Franchisor during the period of time said payments are due and unpaid.  Each failure to pay Royalties, Brand Fund Contributions and other amounts payable to Franchisor when due shall constitute a material breach of this Franchise Agreement.  Franchisee acknowledges this Section shall not constitute Franchisor's agreement to accept such payments after they are due or a commitment by Franchisor to extend credit to, or otherwise finance Franchisee's operation of the Core Progression Business.  Franchisee acknowledges that failure to pay all such amounts when due shall, notwithstanding this Section, constitute grounds for termination of this Franchise Agreement, as provided in this Franchise Agreement.

6.7     Any report of the auditor selected by Franchisor under this Section 6 shall be final and binding upon parties to this Franchise Agreement.

6.8     Franchisee authorizes Franchisor to make reasonable inquiries of Franchisee's bank, suppliers and trade creditors concerning the Core Progression Business and directs such persons and companies to provide to Franchisor information and copies of documents pertaining to the Core Progression Business as Franchisor requests under the authority granted by Franchisee in this Section 6.8.

6.9     Franchisee acknowledges and agrees that Franchisor owns all business records ("Business Records") regarding customers and/or related to the Core Progression Business including, without limitation, all databases (whether in print, electronic or other form), including all names, addresses, telephone numbers, email addresses, customer purchase records, and all other records contained in such databases, and all other Business Records created and maintained by Franchisee. Franchisee further acknowledges and agrees that, at all times during and after the termination, expiration or cancellation of this Franchise Agreement, Franchisor may access the Business Records and may utilize, transfer, or analyze the Business Records as Franchisor determines in its sole discretion to be in the best interest of the System. Franchisor hereby licenses to Franchisee the right to use the Business Records during the term of the Franchise Agreement, solely for purposes of operating the Core Progression Business.

6.10     If any payment by Franchisee to Franchisor or its Affiliates does not successfully convey funds due to insufficient funds, stop payment instructions, or any similar event, Franchisee shall pay the lesser of, upon demand, a non-sufficient funds fee of $100 per incident or the highest amount allowed by law.  If this occurs more than once in any calendar year, in addition to all other remedies which may be available, Franchisor shall have the right to any payments and any other sums due to Franchisor under this Franchise Agreement be made by certified or cashier's checks.

6.11     If Franchisee fails to input Gross Revenues information into the Computer System (as defined in Section 8.6(t) below), or otherwise fails to submit any required report or financial statement when due or within five days of a request by Franchisor, Franchisee shall pay Franchisor, or the Brand

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

Fund (as defined in Section 11.2 below) if established, $100 per occurrence and $100 for every week it is past due.

6.12    If Franchisee's copy of the Franchise Operations Manual is lost, stolen, destroyed, or otherwise made unavailable and Franchisor must provide another copy of the Franchise Operations Manual to Franchisee, Franchisee shall pay Franchisor $500.

6.13    Franchisee agrees during term of this Franchise Agreement and for three years after the expiration and termination of this Franchise Agreement, Franchisee shall supply to Franchisor Franchisee's then-current home address and home telephone number for disclosure in the Franchise Disclosure Document as required by law.

7.    SERVICES AND ASSISTANCE

7.1    The initial services provided by Franchisor (or its designee) prior to the Opening Date include:

(a)    Reviewing and commenting on any business plan and pro forma financial projections Franchisee prepares after Franchisee signs this Franchise Agreement.

(b)    Providing site selection guidelines and criteria and provide site selection assistance to determine an acceptable location for Franchisee's Gym, as outlined in the Franchise Operations Manual.

(c)    Assist Franchisee in its site selection process by authorizing a site for Franchisee's Core Progression Franchise and reviewing and authorizing a final lease for the premises.

(d)    Designating Franchisee's Territory as stipulated in Section 4 and on Attachment A.

(e)    Furnishing Franchisee with specifications for all initial and replacement furniture, fixtures, equipment, inventory and supplies required for the operation of Franchisee's Core Progression Business as stipulated in Section 9.

(f)    Authorizing Franchisee's proposed Gym under Section 7.4 and the Lease.

(g)    Provide an initial training program in Northglenn, Colorado or another location designated by us ("Initial Training Program") for up to two people, which must be completed prior to opening your first Core Progression Business by your Managing Owner and, if applicable, your Designated Manager.  The Initial Training Program may include a discussion of the System, procedures, methods of training and operation, advertising, sales techniques, promotional ideas, marketing plans, customer relations, instructions on quality standards and practical experience in the operation of a Core Progression Business.  If Franchisee desires to bring additional attendees to any Initial Training Program, is required to train a Designated Manager, or is otherwise required to bring additional persons to the Initial Training Program, Franchisee must pay Franchisor its then-current fee per attendee ("Initial Training Fee"). Franchisee is responsible for all travel, living, and other related expenses associated with the Initial Training Program.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(h)    Loaning, or making available to Franchisee on Franchisor's website or intranet, one copy the Franchise Operations Manual.  Specifications, standards, guidelines and operating procedures prescribed by Franchisor in the Franchise Operations Manual or otherwise communicated to Franchisee in writing shall constitute provisions of this Franchise Agreement as if fully set forth in this Franchise Agreement herein.  Franchisee shall operate the Core Progression Business strictly in compliance with the Franchise Operations Manual.  Failure to comply with the standards in the Franchise Operations Manual shall constitute a material breach of this Franchise Agreement.  Franchisor reserves the right to provide the Franchise Operations Manual and updates to the Franchise Operations Manual in electronic or other form.  Franchisor shall have the right to add to, delete, and otherwise modify, the Franchise Operations Manual to reflect changes in authorized Products and Services, business image or the operation of the Core Progression Business; Franchisor will notify Franchisee of new or modified standards, specifications, and guidelines through periodic amendments or supplements to the Franchise Operations Manual or through other written communication (including electronic communication such as email or through a system-wide intranet).  Some revisions to the Franchise Operations Manual may include changes regarding: (i) sales and marketing strategies; (ii) equipment and supplies; (iii) accounting and reporting systems and forms; (iv) insurance requirements; (v) operating procedures; (vi) Services; (vii) Products; and (viii) Location Assistance.

(i)    Franchisee agrees to accept, implement and adopt any modifications at its own cost.  Franchisee shall keep its Franchise Operations Manual with replacement pages and insertions as instructed by Franchisor.  The form and content of the Franchise Operations Manual maintained by Franchisor will control if any dispute occurs regarding the form or content of the Franchise Operations Manual.

(ii)    Franchisee acknowledges the Franchise Operations Manual is loaned to Franchisee and shall at all times remain the sole and exclusive property of Franchisor, and upon termination of this Franchise Agreement for any reason whatsoever, Franchisee shall return the Franchise Operations Manual together with all copies of any portion of the Franchise Operations Manual Franchisee made, to Franchisor.

(i)    If Franchisee requires additional opening assistance, Franchisee will pay Franchisor $500 per day plus any travel and lodging expenses.

7.2    Currently, the services provided by Franchisor to Franchisee after the Opening Date include:

(a)    Informing Franchisee of mandatory specifications, standards and procedures for the operation of the Core Progression Business;

(b)    Upon reasonable request, providing advice regarding the operation of the Core Progression Business based on reports or inspections. Advice will be provided during Franchisor's regular business hours and via written materials, electronic media, telephone or other methods in Franchisor's discretion.  Franchisor may, but is not obligated to, provide assistance to Franchisee in the development and operation of Franchisee's Core Progression Business through periodic visits by one of Franchisor's field representatives, in Franchisor's sole discretion.  If visits are provided at Franchisee's request, Franchisee must reimburse Franchisor's expenses and pay Franchisor's then-current training charges;

(c)    Maintaining and using the Brand Fund, if established, to develop promotional and advertising programs for Core Progression Businesses;

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(d)    Providing Franchisee with advice and guidance on advertising and marketing;

(e)    Providing additional assistance, in Franchisor's sole discretion. There may be additional charges for these services. Franchisee will be required to pay the then-current tuition fees for any mandatory or optional additional training. If Franchisor provides additional assistance at Franchisee's request, Franchisor and Franchisee must agree in advance on the charges and the length of the visit;

(f)    Providing ongoing training programs to Franchisee, in Franchisor's sole discretion, for newly hired personnel, refresher training courses, and additional training or assistance that you need or request;

(g)    Guiding you through the Franchise Operations Manual in bulletins or other written materials, through electronic media, telephone conferences, and/or meetings at our offices or at your Gym; and

(h)    Allowing Franchisee to continue to use the Franchise Operations Manual, the System and Marks.

7.3    If Franchisee believes Franchisor has failed to adequately provide pre-opening or ongoing services to Franchisee as provided in this Agreement in Sections 7.1 and 7.2, Franchisee shall notify Franchisor in writing within 30 days of the Opening Date. Absent the timely provision of notice to Franchisor, Franchisee shall be deemed to conclusively acknowledge that all pre-opening and opening services required to be provided by Franchisor were sufficient and satisfactory in Franchisee's judgment.

7.4    During the term of the Franchise Agreement, we (or our designee) may, but are not required to, provide the following assistance and services to you:

(a)    Modify, update, or change the System, including the adoption and use of new or modified trade names, trademarks, service marks, or copyrighted materials, new products, new equipment, or new techniques;

(b)    Make periodic visits to the Gym for the purpose of assisting in all aspects of the operation and management of the Core Progression Business, prepare written reports concerning these visits outlining any suggested changes or improvements, and detailing any problems in the operations which become evident as a result of any visit. If visits are provided at your request, you must reimburse our expenses and pay our then-current training charges;

(c)    Maintain and administer the Brand Fund, if established. We may dissolve the Brand Fund upon written notice; and

(d)    Hold periodic national or regional conferences to discuss business and operational issues affecting Core Progression franchisees.

7.5    Franchisor is not obligated to perform services in this Franchise Agreement to Franchisee's level of satisfaction, but as a function of Franchisor's experience, knowledge and judgment. Franchisor does not represent or warrant that any other services will be provided to Franchisee, other than those in this Franchise Agreement. To the extent any other services, or any specific level or quality of service is expected, Franchisee must obtain a commitment to provide such service or level of service in writing signed by an authorized officer of Franchisor, otherwise Franchisee acknowledges and agrees that Franchisor shall not be obligated to provide any other services or specific level or quality of services.

{00075378.DOC. }                                      B-14
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

8.   FRANCHISEE'S DUTIES, OBLIGATIONS AND OPERATING STANDARDS

8.1   Franchisee shall, consistent with this Franchise Agreement, diligently develop the Core Progression Business and use its best efforts to market and promote the approved Services and Products.

8.2   Franchisee is solely responsible for locating a site for the Gym and negotiating a Lease or purchase agreement for the property.  Franchisee acknowledges that any Lease that is to be signed may require Franchisee, its owners and their respective spouses to sign a personal guaranty.  As part of the Location Assistance, Franchisor's affiliate will provide Franchisee with written site selection guidelines and criteria and may provide other site selection assistance as outlined in the Franchise Operations Manual.  Franchisee acknowledges Franchisee is solely responsible for negotiating the legal and business terms of the Lease and for retaining its own legal counsel for this purpose.  The Gym site and the Lease are subject to Franchisor's written authorization, which may be granted or denied in Franchisor's sole discretion.  Franchisee agrees the location of the Gym is a factor in the potential success of the Core Progression Business and Franchisor may reject any location in its sole discretion.  However, Franchisee agrees that the assistance provided by Franchisor or its affiliate does not constitute a representation or warranty regarding the success or viability of the property or the Lease.  Franchisee agrees Franchisor's authorization of the Territory and the specific site for the Gym indicates only that Franchisor believes the site falls within acceptable criteria established by Franchisor as of the approval date.  Franchisee agrees that Franchisor's review or approval of the Lease is solely an indication by Franchisor that the Lease contains Franchisor's required provisions and otherwise meets Franchisor's minimum standards.

8.3   If Franchisee has not identified an Approved Location for the Gym when Franchisee signs this Franchise Agreement, Franchisee and Franchisor will agree on the Approved Location in writing and amend Attachment A after Franchisee selects and we approve the Approved Location.

8.4   Before leasing or purchasing the site for the Gym, Franchisee must submit to Franchisor, in the form Franchisor specifies, a description of the site, with other information and materials Franchisor may reasonably require.  Franchisor will have 30 days after receipt of the materials to evaluate the proposed site, and if Franchisor disapproves of the proposed site, Franchisee must select another site, subject again to Franchisor's approval.  Franchisee also must submit for review and approval any sale or lease contract for the site before signing it. Franchisee agrees that it is not guaranteed any specific location and it may not be able to obtain its preferred location for the Gym.  If the Lease for Franchisee's Gym expires or is terminated without Franchisee's fault or if the site for Franchisee's Gym is destroyed, condemned, or otherwise rendered unusable, Franchisor will allow Franchisee to relocate the Core Progression Business to a new site acceptable to Franchisor, provided Franchisee will be required to pay Franchisor a $5,000 relocation fee ("Relocation Fee").  Relocation for any other reason will be subject to Franchisor's approval, which may be withheld in Franchisor's sole discretion.  Any relocation will be subject to the site selection and lease provisions in this Franchise Agreement and will be at Franchisee's sole expense.  Franchisor may terminate this Agreement if Franchisee does not submit an approved site for the Gym within six months of the date of this Agreement.  You must purchase or lease, at your expense, the site for your Gym within 180 days after signing this Agreement.  Franchisor may terminate this Agreement if Franchisee fails to open its first Core Progression Business within 240 days after signing this Agreement.

8.5   Franchisee shall complete construction of Franchisee's Gym and shall maintain the Gym, in accordance with the following requirements:

(a)   Franchisee shall, at Franchisee's sole cost and expense, complete the interior build-out and install all equipment, furniture and fixtures as specified by Franchisor in the Franchise Operations Manual, and required by this Franchise Agreement.   Franchisee must

**EXHIBIT 1**

submit final construction plans and specifications to us for our approval before beginning construction at the Gym. Franchisee must construct the Gym according to those approved plans and specifications.

(b)     The Opening Date must be within 240 days immediately following the Effective Date of this Franchise Agreement. Franchisee's failure to open the Core Progression Business within this 240 day window is a material breach of the Franchise Agreement, which provides Franchisor the right to terminate the Franchise Agreement.

(c)     Franchisee must deliver a copy of any proposed Lease to Franchisor, in a form acceptable to Franchisor, and such Lease must incorporate the "Lease Addendum" contained in Exhibit H of the Franchise Disclosure Document. If Franchisee is unable to incorporate the Lease Addendum, the Lease must contain the following terms ("Required Terms"):

(i)     A provision granting Franchisor the right to receive an assignment of the Lease upon termination or expiration of the Franchise, for it, an Affiliate or another Core Progression franchisee;

(ii)     A provision requiring the lessor to give Franchisor all sales and other information Franchisor requests relating to the Gym's operation;

(iii)     A provision requiring the lessor to concurrently send Franchisor a copy of any written notice of a Lease default sent to Franchisee and granting Franchisor the right (but no obligation) to cure any Lease default within 15 business days after the expiration of Franchisee's cure period (if Franchisee fails to do so);

(iv)     A provision evidencing Franchisee's right to display the Marks according to the specifications in the Franchise Operations Manual (subject only to applicable any law);

(v)     A provision that the Gym may be used only for the operation of the a Core Progression Business; and

(vi)     A provision allowing Franchisor to enter the Gym upon termination or expiration of this Franchise Agreement, or any Successor Franchise Agreement, to de-identify the Gym as a Core Progression Business and/or to take possession of the Gym.

(vii)     A provision requiring the landlord to subordinate its interests in all equipment, Products, inventory and assets of Franchisee to those of Franchisor.

(d)     Franchisee must at all times comply with Franchisor's standards, specifications, processes, procedures, requirements and instructions regarding the Gym's physical facilities, including the layout of the equipment, furnishings, and fixtures. Franchisee is responsible for the costs of preparing architectural, engineering, and construction drawings and site plans, and must submit such plans to Franchisor for review and approval before any construction or remodeling begins on the Core Progression Business. Franchisee must maintain the Gym and any parking areas in good and safe condition, as specified in the Franchise Operations Manual. Franchisee must remodel or upgrade the Gym at its sole cost and expense according to Section 8.6(v) below and Franchisor's standards set forth in the Franchise Operations Manual, which may be modified by Franchisor at any time at Franchisor's discretion.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

8.6     Franchisee shall comply with all present and future standards, specifications, processes, procedures, requirements, and instructions of Franchisor regarding the operation of the Core Progression Business and Franchisee must comply with the following requirements:

(a)     Franchisee (if Franchisee is an individual), Franchisee's Managing Owner (if Franchisee is an entity), and its Designated Manager (if applicable) must attend and successfully complete the Initial Training Program.   In addition, Franchisee's Managing Owner and/or Franchisee's Designated Manager and instructors may be required to obtain Core Progression certifications.

(b)     Franchisor may hold and require Franchisee (or Franchisee's Managing Owner, if Franchisee is an entity) or its Designated Manager to attend mandatory annual conventions at locations Franchisor reasonably designates and Franchisee shall pay Franchisor's then-current convention fee and all travel and lodging expenses it incurs.  This convention fee helps defray the cost of attendance at any annual convention that Franchisor chooses to hold and is due regardless of whether or not Franchisee attends in any given year.  Franchisor may preclude Franchisee from attending any annual convention or System meeting if Franchisee has had two notices of default within 12 months prior to any annual conference or if Franchisee is in default at the time of the annual convention or meeting; provided, however, in any event Franchisee shall still be responsible for paying the convention fee.

(c)     Subject to Section 9, any additional required Service or Product introduced into the System by Franchisor must be offered for sale on a continuing basis at the Core Progression Business as required by Franchisor.  Franchisor shall provide Franchisee at least 30 days' prior written notice of any new required Service or Product.  All equipment, facilities, products, supplies, and other items necessary to add the newly required Services or Products must be acquired, installed, and utilized at the time and in the manner required by Franchisor.  The marketing of new Services and Products must begin at the Core Progression Business as reasonably required by Franchisor.

(d)     Franchisee must honor the memberships of clients of other Core Progression franchises or of other Core Progression businesses operated by Franchisor or its affiliates, and allow members of those franchises and businesses to use Franchisee's location without additional charge or as stated in the Franchise Operations Manual.   Franchisor will administer the franchisee-to-franchisee collections and payments for clients who use locations in this manner, in accordance with the Franchise Operations Manual.

(e)     Only approved Services or Products may be offered for sale through the Core Progression Business, unless Franchisee receives Franchisor's prior written consent (which may be granted or denied in Franchisor's sole discretion).

(f)     Only advertising and promotional materials, services, equipment, tools, inventory, products, signage, supplies, and uniforms that meet Franchisor's standards and specifications shall be used at the Core Progression Business. Advertising and promotional materials, services, equipment, inventory, products, signage, and supplies produced or approved by Franchisor for use by Franchisee may be used only in the manner and during the period specified by Franchisor.

(g)     Services, Products, equipment, inventory, supplies, signage and other items must be added, eliminated, substituted and modified at the Core Progression Business as soon as possible in accordance with Franchisor's specifications and requirements.

{00075378.DOC. }                                          B-17
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(h)    The Core Progression Business and everything related to the Core Progression Business must be maintained in good condition and kept clean, neat and sanitary.  All maintenance, repairs and replacements reasonably requested by Franchisor or required for the Core Progression Business must be promptly made.

(i)    No alterations of the Core Progression Business materially affecting the image of the Core Progression Business may be made except at Franchisor's direction, request or approval, and any alterations must conform to specifications and requirements established or approved by Franchisor.

(j)    The Core Progression Business and the Services provided and Products sold by Franchisee must comply with all applicable federal, state, and local laws, ordinances, rules, regulations and other requirements applicable to the Core Progression Business. Franchisee must obtain all business licenses and permits required by federal, state and local laws, ordinances, rules and regulations before operating its Core Progression Business.  If Franchisee does not obtain all required permits and licenses and other certifications necessary to operate its Core Progression Business within six months after the Effective Date, Franchisor may terminate this Franchise Agreement.

(k)    Franchisee shall maintain a competent, conscientious and trained staff and shall take all steps as are necessary to ensure its employees preserve good customer relations; render competent, prompt, courteous, and knowledgeable service; and meet such minimum standards as Franchisor may periodically establish in the Franchise Operations Manual or otherwise in writing. All employees or independent contractors hired by or working for Franchisee will be Franchisee's employees or independent contractors alone and will not, for any purpose, be deemed Franchisor's employees or subject to Franchisor's control.  Franchisor will not have the power to hire or fire Franchisee's employees. Franchisee shall be solely responsible for training its employees and independent contractors, including any training on the day-to-day operations of the Core Progression Business.  Franchisee will be solely responsible for all other employment decisions and functions of the Core Progression Business, including, without limitation, those related to hiring, firing, training, supervising, establishing remuneration, compliance with wage and hour requirements, personnel policies, benefits, taxes, work schedules, work conditions, assignments, record keeping, supervision, and discipline of employees, regardless of whether Franchisee has received advice from Franchisor on the subject. Franchisee agrees to inform each of its employees, and post a conspicuous back of house notice, that it alone is the employer, and Franchisor is not. Franchisee is responsible for complying with all applicable employment laws. Upon Franchisor's request, Franchisee and each employee must sign an employment relationship acknowledgment form within seven days stating that Franchisee alone is the employer and operates the Core Progression Business.  Franchisee will use its legal name on all documents for use with employees and contractors, including but not limited to, employment applications, time cards, pay checks, and employment and independent contractor agreements and will not use the Marks on these documents.  Without limiting the generality of anything contained herein, Franchisee is responsible for complying with all applicable employment laws.

(l)    All debts and taxes arising in connection from the Core Progression Business must be paid when due, except those duly contested in a bona fide dispute.

(m)    Franchisee will use its best efforts to ensure customer satisfaction; use good faith in all dealings with customers, potential customers, referral sources, suppliers and creditors; respond to customer complaints in a courteous, prompt and professional manner; use its best efforts to promptly and fairly resolve customer disputes in a mutually agreeable manner; and take

{00075378.DOC. }
[2017 FA v2F]

B-18

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

such actions as Franchisor deems necessary or appropriate to resolve customer disputes. If Franchisor, in its discretion, addresses a customer complaint by providing a gift card, refund, or other value to the customer to address the issue, Franchisee must reimburse Franchisor for reasonable costs in responding to the customer complaint.

(n)    Franchisee must keep the business hours specified in the Franchise Operations Manual.

(o)    Franchisee shall, at Franchisor's request, use any credit card vendors and accept debit cards, credit cards, stored value gift cards or other non-cash systems specified by Franchisor to enable customers to purchase the Products and Services offered by the Core Progression Business.  The term "Credit Card Vendors" includes, among other things, companies that provide services for electronic payment, such as near field communication vendors (for example, "Apple Pay" and "Google Wallet").  Franchisee shall acquire all necessary hardware and software used in connection with these non-cash systems at its expense.  Franchisee must, at its sole cost and expense, issue and offer such rebates, giveaways, coupons, and other promotions in accordance with advertising programs established by Franchisor, and further agree to honor the rebates, giveaways, coupons, and other promotions so long as such compliance does not contravene any applicable law.  Franchisee will not create or issue any gift cards/certificates, and will only sell gift cards/certificates that have been issued or sponsored by Franchisor and which are accepted at all Core Progression Businesses, and Franchisee will not issue coupons or discounts of any type except as approved by Franchisor.

(p)    Franchisee shall comply with all terms and pay all fees due under any software license agreement for any software that Franchisor requires Franchisee to use in the operation of its Core Progression Business.

(q)    Franchisee shall promptly pay Franchisor any amount equal to all taxes levied or assessed, including, but not limited to, unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipts taxes, taxes on Royalties, or any similar taxes or levies imposed upon or required to be collected or paid by Franchisor for reason of the furnishing of products, intangible property (including trademarks or trade names) or services to Franchisee through the sale, license or lease of property or property rights provided by this Franchise Agreement.

(r)    If any bona fide dispute occurs as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness under the procedures of the taxing authority or applicable law; however, Franchisee shall not permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the Gym, or any improvements.

(s)    Franchisee shall comply with the advertising requirements in Section 11.

(t)    Franchisee shall, at its expense, purchase or lease and thereafter maintain and use, only the computer hardware and software (including point-of-sale software) we periodically designate to operate its Core Progression Franchise (collectively the "Computer System"), from the suppliers we specify.  You must also maintain a high-speed Internet connection at the Gym.  The Computer System will manage the operations of the Core Progression Franchise, client scheduling, and other information.  You must record all Gross Revenues on the Computer System, store all data and information in the Computer System that we designate, and report data and information in the manner we specify.  Franchisor is not required to provide any ongoing

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

maintenance, repairs, upgrades, updates, or support for the Computer System. Franchisee must arrange for installation, maintenance, and support of the Computer System at Franchisee's cost. Franchisee will keep the Computer System in good maintenance and repair and promptly make any and all additions, changes, modifications, substitutions, and/or replacements at its expense to the Computer System as Franchisor directs. Franchisee will pay any and all software or other fees required by Franchisor to maintain the Computer System. Franchisee acknowledges and agrees that Franchisor's suppliers have the right to increase or decrease the software fees at any time, in their sole discretion, upon written notice to Franchisee. Franchisee acknowledges and agrees that Franchisor reserves the right to change its approved suppliers, including any software suppliers, at any time in its sole discretion. Franchisor or its designees shall have the right to independently access the electronic information and data relating to Franchisee's Core Progression Business, and to collect and use Franchisee's electronic information and data in any manner, including to promote the System and the sale of Core Progression Franchises. Franchisee may not alter the Computer System or use alternative software or suppliers of technology without Franchisor's prior written approval. If Franchisee is in default of any obligations under this Franchise Agreement, Franchisor may, in addition to any other remedy Franchisor may have under this Franchise Agreement, temporarily inhibit Franchisee's access to all or part of the Computer System, including point-of-sale software, until Franchisee has cured such default completely. Upon termination or expiration of this Franchise Agreement, all software, hard drives and other storage media provided to Franchisee by Franchisor must be returned to Franchisor in good condition (reasonable wear and tear accepted) and Franchisee must not delete any materials from the hard drives or other storage devices.

(u)    Franchisee must sell or offer for sale only those Services and Products authorized by Franchisor and which meet Franchisor's standards and specifications. Franchisee must follow Franchisor's policies, procedures, methods, and techniques. Franchisee must sell or offer for sale all Services and Products specified by Franchisor. Franchisor may change or add to its required Services and Products at its discretion with prior notice to Franchisee. Franchisee must discontinue selling and offering for sale any services or products Franchisor in its discretion, disapproves in writing at any time.

(v)    During the Initial Term, any Successor Term or Interim Period, Franchisee will abide by Franchisor's requirements for alterations, remodeling, upgrading or any other improvements to the Gym to achieve the strategic marketing goals of the System. Generally, the standards to satisfactorily comply will not exceed those applicable to new Core Progression Businesses. These requirements will not exceed $40,000 or occur more frequently than every six years. Franchisee will bear all costs of changes or additions, for any changes in, or additions of, equipment, furnishings, fixtures, lighting, carpeting, painting or the taking of other Core Progression Businesses that Franchisor specifies to satisfy its then-current standards for image, positioning, marketing strategy, cleanliness or appearance as Franchisor reasonably requires. The Gym will be required to be updated, repaired and maintained under the specifications in the Franchise Operations Manual. Such a remodeling may include extensive structural changes to the Gym and replacement or modification of furnishings, fixtures and equipment as well as such other changes as the Franchisor may direct, and Franchisee shall undertake such a program promptly upon notice from the Franchisor, and shall complete any such remodeling as expeditiously as possible, but in any event within 90 days of commencing same (and no later than the commencement of the applicable Successor Term), unless Franchisor expressly agrees to a longer period of time. Franchisor may require such remodeling as a condition to its approval of a Successor Term or a transfer.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(w)     Franchisee will be required to maintain a membership with any industry associations Franchisor requires.  Franchisee will also be required to utilize and pay for any promotional websites provided by these associations and pay any required recurring fees.

(x)     Franchisee agrees to comply with all applicable laws pertaining to the privacy of customer, employee, and transactional information ("Privacy Laws").  Franchisee also agrees to comply with our standards and policies pertaining to Privacy Laws.  If there is a conflict between our standards and policies pertaining to Privacy Laws and actual applicable law, you will: (i) comply with the requirements of applicable law; (ii) immediately give us written notice of said conflict; and (iii) promptly and fully cooperate with us and our counsel in determining the most effective way, if any, to meet our standards and policies pertaining to Privacy Laws within the bounds of applicable law.  You agree not to publish, disseminate, implement, revise, or rescind a data privacy policy without our prior written consent as to said policy.

Any required standards exist to protect Franchisor's interests in the System and the Marks and not for the purpose of establishing any control or duty to take control over those matters that are reserved to Franchisee. The required standards generally will be set forth in the Franchise Operations Manual or other written materials. The Franchise Operations Manual also will include guidelines or recommendations in addition to required standards. In some instances, the required standards will include recommendations or guidelines to meet the required standards. Franchisee may follow the recommendations or guidelines or some other suitable alternative, provided Franchisee meets and complies with the required standards. In other instances, no suitable alternative may exist. In order to protect Franchisor's interests in the System and Marks, Franchisor reserves the right to determine if Franchisee is meeting a required standard and whether an alternative is suitable to any recommendations or guidelines.

8.7     In prescribing standards, specifications, processes, procedures, requirements or instructions under Section 8.3 or any other provision of this Franchise Agreement, Franchisor shall provide guidance to Franchisee, as required in Franchisor's sole discretion, in determining the prices to be charged by Franchisee for Services and Products.  Franchisor shall not have control over the day-to-day managerial operations of the Core Progression Business and Franchisee shall be free to establish its own prices; however, Franchisor shall have the right to set minimum and maximum resale prices in accordance with law as part of any national or regional promotion or multi-area marketing plan. Franchisee must honor the terms of all promotional or discount programs that Franchisor offers to the public and must also provide those services and other items Franchisor specifies on such terms at such rates, including free of charge, as Franchisor may specify.

8.8     Franchisor and its representatives shall have the right to inspect the Core Progression Business during business hours without prior notice to Franchisee.  Franchisor and Franchisor's representatives will have the right to observe the manner in which Franchisee is rendering its Services and conducting its operations of the Core Progression Business.  Franchisor and Franchisor's representatives shall have the right to discuss with Franchisee, or other personnel Franchisee may designate, all matters pertaining to compliance with this Franchise Agreement and with Franchisor's standards, specifications, requirements, instructions and procedures. Franchisee shall in all respects cooperate with Franchisor's rights under this Section; provided that Franchisor's exercise of these rights shall not unreasonably interfere with Franchisee's conduct of the Core Progression Business.

8.9     Franchisee agrees to participate in, and, if required, become a member of any advisory councils or similar organizations Franchisor forms or organizes.

8.10    Franchisor may require Franchisee's compliance with this Section 8 even if it does not require compliance by all franchisees.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

8.11    The Core Progression Business will be managed by Franchisee, or if Franchisee is an entity, by one of Franchisee's owners who is a natural person with at least a twenty-five percent (25%) ownership interest and voting power in the entity ("Managing Owner").  Under certain circumstances, Franchisor may allow Franchisee to appoint a designated manager ("Designated Manager") to run the day-to-day operations of the Core Progression Business and have direct responsibility for all operations of the Core Progression Business.  Franchisee (or its Managing Owner) may or may not function as the on-site supervisor but will complete the Initial Training Program whether or not he or she functions in that role.  The Managing Owner will be principally responsible for communicating with Franchisor regarding the Core Progression Business.  If Franchisee is permitted to nominate a Designated Manager, Franchisee will be responsible for ensuring such person has the required experience and has completed the Initial Training Program.  If Franchisee replaces the Designated Manager, the newly hired Designated Manager must complete the Initial Training Program within 60 days following such replacement and prior to assuming duties and responsibilities.  Franchisee will be required to pay the Initial Training Fee for each new Designated Manager.  If Franchisor does not offer an Initial Training Program in the specified time frame, the newly hired Designated Manager must complete the next available Initial Training Program.  Franchisor may require Franchisee (or Managing Owner if Franchisee is an entity) and its Designated Managers to attend system-wide refresher or additional training courses and remedial training course to correct any operational deficiencies.  Franchisee must pay Franchisor's then-current fees for training newly hired personnel, refresher training courses, remedial training, advanced training courses, and any additional or special assistance or training Franchisee needs or requests (currently $500 per additional person for the Initial Training Program, and approximately $500 per attendee per day for additional training).

8.12    Franchisee or its Designated Manager, if applicable, shall at all times have sufficient computer skills to operate the Computer System, understand how to utilize any software Franchisor requires to be used in the Core Progression Business, and to access email and the Internet.

8.13    Franchisee acknowledges and understands computer systems are vulnerable to computer viruses, bugs, power disruptions, communication line disruptions, Internet access failures, Internet content failures, data related problems and attacks by hackers and other unauthorized intruders.  Franchisor does not Guaranty that information or communication systems supplied by Franchisor or its suppliers will not be vulnerable to these problems.  Franchisee acknowledges and agrees that Franchisee is solely responsible for protecting itself from these problems and any and all consequences that may arise if Franchisee's Computer System is not properly operated, maintained, and upgraded.  Franchisee must also take reasonable steps to verify that Franchisee's suppliers, lenders, lessors, customers, and governmental agencies on which Franchisee relies, are reasonably protected.  This may include taking reasonable steps to secure Franchisee's systems, including, but not limited to, using firewalls, access code protection, anti-virus systems, and backup systems.

8.14    Franchisee shall acquire, maintain, and upgrade hardware, software, information processing and communication systems, and Internet and other network access providers, as prescribed in the Franchise Operations Manual and as modified by Franchisor in Franchisor's sole discretion.  Franchisee shall comply with any separate software or other license agreements Franchisor or its designee uses in connection with the System.  Franchisee shall utilize Franchisor's required software, proprietary database management and intranet system, when available, as the exclusive means for tracking and maintaining customer, vendor, and related information, and for such other uses as required by Franchisor periodically in the Franchise Operations Manual, in Franchisor's sole discretion.  Sales and other reporting may occur through the designated software.  In the event of any software failure, Franchisee will be required to submit such reports to Franchisor through other means designated by Franchisor.  Franchisee acknowledges and agrees that Franchisor has the right to independently access any electronic information and data related to the Core Progression Business through the designated software or

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

Computer System and to collect and use this electronic information and data in any manner, including the promotion and development of the System and the sale of Franchises. This may include posting financial information of each franchisee on an intranet website.  There is no contractual limitation on Franchisor's right to receive or use this information.

8.15    Franchisor will only use an email address, related to or associated with the operation of the Core Progression Business, which is a part of the Internet domain name authorized by the Franchise Operations Manual.  All email communication must comply with standards specified in the Franchise Operations Manual or otherwise by Franchisor in writing.  Franchisee shall check the email account regularly unless Franchisee notifies Franchisor it cannot do so for a period of time (such as due to sickness or vacation).

8.16    Franchisee may not open its Core Progression Business until: (1) Franchisor notifies Franchisee in writing that all of Franchisee's pre-opening obligations have been fulfilled; (2) Franchisee has completed the Initial Training Program to Franchisor's satisfaction; (3) all amounts due to Franchisor have been paid; (4) Franchisor has been furnished with copies of all insurance policies and certificates required by the Franchise Agreement, or other documentation of insurance coverage and payment of premiums Franchisor requests; (5) Franchisee notifies Franchisor that all approvals and conditions stated in the Franchise Agreement have been met; (6) Franchisee has received all required permits and licenses; and (7) Franchisee has ordered, received, and installed your fixtures, equipment, supplies, inventory, and related materials.  Franchisee must be prepared to open and operate its Core Progression Business immediately after Franchisor states Franchisee's Core Progression Business is ready for opening.

9.    <u>PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES</u>

9.1    Except as otherwise provided by Franchisor, Franchisee must purchase or lease all goods**,** services, supplies, fixtures, equipment, inventory, computer hardware and software, and real estate related to establishing and operating the Gym from us, our affiliates, designees or approved suppliers (including manufacturers, wholesalers and distributors).  The standards and specifications for equipment, computer hardware and software, inventory, signage, supplies, services and products required by Franchisor shall be listed in the Franchise Operations Manual.  Franchisor has the right to require Franchisee to discontinue purchasing any products, services, equipment, inventory, supplies, hardware or software from a designated or approved supplier, manufacturer or distributor and may designate or approve new suppliers, manufacturers or distributors at any time in Franchisor's sole discretion.

9.2    Franchisee agrees that Franchisor may receive periodic volume rebates or other revenue or consideration as a result of Franchisee's purchases from designated or approved suppliers of Franchisee's products, services, equipment, inventory, supplies and hardware and software.  Franchisee acknowledges and agrees that Franchisor shall be entitled to keep such rebates and revenue for its own use and account.

9.3    The names and addresses of Franchisor's required or approved suppliers, manufacturers and distributors may be included in the Franchise Operations Manual or on an intranet website.  Franchisor reserves the right to approve all of the products, supplies, services, equipment, inventory, hardware and software used in connection with Franchisee's Core Progression Business.

9.4    Franchisee may request that Franchisor approve or designate a new supplier, product or service by following the procedures, and paying all required fees and expenses associated with Franchisor's evaluation of the proposed supplier, product or service for approval, as set forth in the Franchise Operations Manual and as modified periodically by Franchisor in Franchisor's discretion. Franchisor's written approval must be received before Franchisee uses products, or services not purchased

{00075378.DOC. }

[2017 FA v2F]

B-23

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

from an approved supplier.  Franchisor reserves the right to revoke its approval of any supplier, product, or service that does not continue to meet its specifications.  When you receive written notice of a revocation, you must stop selling any disapproved products, and stop purchasing from any disapproved supplier.

10.   MARKS, COPYRIGHTED WORKS AND OWNERSHIP OF IMPROVEMENTS

10.1   Franchisee acknowledges and agrees that:

(a)   Franchisor and Franchisor's Affiliates are the owner or licensee of all right, title and interest, together and all goodwill of the Marks.  Franchisee further acknowledges that the Marks designate the origin or sponsorship of the System, the Core Progression Business, and the Products and Services, and that Franchisor desires to protect the goodwill of the Marks and to preserve and enhance the value of the Marks.  If Franchisee acquires any rights, title or interest in the Marks, Franchisee agrees to and does assign hereby all rights, title or interest to Franchisor.

(b)   All right, title and interest in all materials, including but not limited to, all artwork and designs, created by Franchisor for use in association of the Franchise ("Copyrighted Materials") are the property of Franchisor or Franchisor's Affiliates.

(c)   Franchisee shall not dispute, contest, or challenge, directly or indirectly, the validity or enforceability of the Marks or Copyrighted Materials or Franchisor's (or Franchisor's Affiliates') ownership of the Marks or Copyrighted Materials, nor counsel, procure, or assist anyone else to do the same, nor will it take any action inconsistent with Franchisor's (or Franchisor's Affiliates') ownership of the Marks or Copyrighted Materials, nor will it represent it has any right, title, or interest in the Marks or Copyrighted Materials other than those expressly granted by this Franchise Agreement.

(d)   Franchisor and its Affiliates may, in their sole and absolute discretion, apply to register or register any trademarks or copyrights regarding the Services, Products and any other products and services and the Copyrighted Materials.  Failure of Franchisor or its Affiliates to obtain or maintain in effect any such application or registration is not a breach of this Franchise Agreement.  Franchisee shall not, before or after termination or expiration of the Franchise Agreement, register or apply to register the Marks or any trademark, service mark or logo confusingly similar thereto or any Copyrighted Materials, anywhere in the world.

(e)   Upon Franchisor's request, Franchisee shall cooperate fully, both before and after termination or expiration of this Franchise Agreement and at Franchisor's expense, in confirming, perfecting, preserving, and enforcing Franchisor's and Franchisor's Affiliates' rights in the Marks and Copyrighted Materials, including but not limited to, executing and delivering to Franchisor documents Franchisor reasonably requests for any such purpose, including but not limited to, assignments, powers of attorney, and copies of commercial documents showing sale and advertising of the Services and Products and other products and services. Franchisee irrevocably appoints Franchisor as its attorney-in-fact to execute such documents.

(f)   All usage of the Marks by Franchisee and any goodwill established by Franchisee's use of the Marks shall inure to the exclusive benefit of Franchisor.  This Franchise Agreement confers no goodwill or other interests in the Marks to Franchisee upon expiration or termination of the Franchise Agreement.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(g)      Franchisor makes no representation or warranty, express or implied, as to the use, exclusive ownership, validity or enforceability of the Marks or Copyrighted Materials.

10.2    Franchisee acknowledges and agrees that:

(a)      Franchisee's right to use the Marks and Copyrighted Materials derive solely from this Franchise Agreement. Franchisee may only use the Marks and Copyrighted Materials in its operation of the Core Progression Business and only in compliance with this Franchise Agreement and all applicable standards, specifications, and operating procedures prescribed by Franchisor in the Franchise Operations Manual and elsewhere during the Initial Term and any Successor Term.   Franchisee shall make every effort for consistency with this Franchise Agreement to protect, maintain, and promote the Marks as identifying the System and only the System.

(b)      Any unauthorized use of the Marks or Copyrighted Materials by Franchisee constitutes a breach of this Franchise Agreement and an infringement of the rights of Franchisor in and to the Marks and Copyrighted Materials.

(c)      Franchisee shall not use any Marks or portion of any Marks as part of a corporate or trade name, or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form.  Franchisee shall obtain such fictitious or assumed name registrations as may be required by Franchisor or under applicable law.

(d)      In order to preserve the validity and integrity of the Marks and Copyrighted Materials licensed herein and to assure Franchisee is properly employing the same in the operation of its Core Progression Business, Franchisor shall have the right of entry and inspection of Franchisee's Core Progression Business and operating procedures under Section 8.5 upon reasonable notice to Franchisee or its agents.

(e)      Franchisee will safeguard and maintain the reputation and prestige of the Marks and Copyrighted Materials and will do nothing that would tarnish the image of or adversely affect the value, reputation or goodwill associated with the Marks. Franchisee will do nothing that would dilute, directly or indirectly, the value of the goodwill attached to the Marks, nor counsel, procure or assist anyone else to do the same.

(f)      Franchisee will use the Marks and Copyrighted Materials only in lettering, logos, print styles, forms, and formats, including but not limited to, advertising and promotional materials, invoices, signage, business checks, business cards, stationery, and promotional items such as clothing, hats, pens, mugs, etc., approved by Franchisor under this Franchise Agreement, and promptly follow instructions regarding the Marks and Copyrighted Materials as provided in the Franchise Operations Manual and otherwise given by Franchisor.

(g)      Franchisee will use the following copyright notice at least once on each piece of advertising, promotional, or other material used in connection with the Products and Services:

© (year of first publication). Core Progression Franchise Inc. All Rights Reserved.

(h)      Franchisee will use the Marks with a superscript "®" or "™", as specified by Franchisor, unless and until advised by Franchisor to use a different notice.

{00075378.DOC. }                                B-25
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

10.3    Franchisee acknowledges and agrees that:

(a)    If, in Franchisor's reasonable determination, the use of Marks or Copyrighted Materials in connection with the Services, Products, other products and services or the Core Progression Business will infringe or potentially infringe upon the rights of any third party, weaken or impair Franchisor's rights in the Marks or Copyrighted Materials, or it otherwise becomes advisable at any time in Franchisor's sole discretion for Franchisor to modify or discontinue use of the Marks or Copyrighted Materials, then upon notice from Franchisor, Franchisee will immediately terminate or modify such use as required by Franchisor. Franchisor may require Franchisee to use one or more additional or substitute trade names, trademarks, service marks or other commercial symbols or copyrighted materials.

(b)    Franchisee shall notify Franchisor immediately after receiving notice of any claim, demand or cause of action based upon or arising from any attempt by any other person, firm or corporation to use the Marks, any colorable imitation thereof of the Marks or the Copyrighted Materials, or use of Franchisor's Confidential Information or Trade Secrets, or if someone challenges Franchisee's use of  Franchisor's Copyrighted Works, Confidential Information, or Trade Secrets.  Upon receipt of timely notice of an action, claim or demand against Franchisee relating to the Marks or Copyrighted Materials, Franchisor shall have the sole right, but not the duty, to defend any such action. Franchisor and its Affiliates shall have the exclusive right to contest or bring action against any third party regarding the third party's use of any of the Marks or Copyrighted Materials and shall exercise such right in the sole discretion of Franchisor.  Franchisor and its Affiliates shall control all actions but not be obligated to take any action.  In any defense or prosecution of any litigation relating to the Marks, Copyrighted Materials or components of the System undertaken by Franchisor or Franchisor's Affiliates, Franchisee shall cooperate with Franchisor, execute any and all documents, and take all actions as may be desirable or necessary in the opinion of Franchisor's or Franchisor's Affiliates' counsel, to carry out such defense or prosecution.  At Franchisor's option, Franchisee will join in any action, in which case Franchisor shall bear all the out-of-pocket costs of Franchisee for such participation.  If Franchisee joins in an action, then the recovery, if any, from such legal action shall be first applied to the total expenses associated therewith and then split equally between Franchisor and Franchisee.

(c)    Franchisee has the right to use the trade name "CORE PROGRESSION" in the operation of its Core Progression Business, but none of the words "CORE PROGRESSION" may be used in the legal name of the Entity used to conduct the Core Progression Business. Franchisee may not register or attempt to register in its own name any trade name using the words "CORE PROGRESSION."  When this Franchise Agreement expires or is terminated, Franchisee must execute any assignment or other documents Franchisor requires to transfer to Franchisor any rights Franchisee possesses in a trade name utilizing "CORE PROGRESSION" or any other Mark.

10.4    All provisions of this Franchise Agreement applicable to the Marks and Copyrighted Materials apply to any and all additional trademarks, service marks, commercial symbols and copyrighted materials authorized for use by and licensed to Franchisee by Franchisor after the Effective Date.

10.5    Any improvements or additions to the System, Copyrighted Materials, website or any other documents or information pertaining to or relating to the System or the Franchise, or any new trade names, trade and service marks, logos, or commercial symbols related to the Core Progression Business or Franchise or any advertising and promotional ideas or inventions related to the  Core Progression Business or Franchise (collectively, the "Improvements") conceived or developed by Franchisee shall

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

become the property of Franchisor or Franchisor's Affiliates. Franchisee agrees to assign and does hereby assign to Franchisor or Franchisor's Affiliates, all right, title and interest in and to the Improvements, including the right to grant sublicenses to any such Improvement. Franchisee shall fully disclose the Improvements to Franchisor, without disclosure of the Improvements to others, and shall obtain Franchisor's written approval prior to using such Improvements.  Any such Improvement may be used by Franchisor, Franchisor's Affiliates and all other Core Progression franchisees without any obligation to Franchisee for royalties or other fees. Franchisor and its Affiliates may, at its discretion, apply for and own copyrights, patents, trade names, trademarks and service marks relating to any such Improvement and Franchisee shall cooperate with Franchisor and Franchisor's Affiliates in securing such rights. Franchisor may also consider such Improvements as its property and Trade Secrets. In return, Franchisor shall authorize Franchisee to utilize any Improvement that may be developed by other franchisees and is authorized generally for use by other franchisees.  All Improvements created by Franchisee or any other person or Entity retained or employed by Franchisee is the property of Franchisor and Franchisor's Affiliates, and Franchisor and Franchisor's Affiliates shall be entitled to use and license others to use such Improvements unencumbered by moral rights. If any of the Improvements are copyrightable materials, they shall be works made for hire within the meaning of the United States Copyright Act and, to the extent the Copyrighted Materials are not works made for hire or rights in the Copyrighted Materials do not automatically accrue to us, you irrevocably assign and agree to assign to us, our Affiliates, successors and assigns, the entire right, title, and interest in perpetuity throughout the world in and to any and all rights, including all copyrights and related rights, in such Copyrighted Materials, which Franchisee and the author of such Copyrighted Materials warrant and represent as being created by and wholly original with the author. Where applicable, Franchisee agrees to obtain any other assignments of rights in the Improvements from another person or Entity necessary to ensure our right in the Improvements as required in this Section.

10.6    Franchisee acknowledges and authorizes Franchisor to use Franchisee's likeness in a photograph or video in any and all of Franchisor's publications, including printed and digital publications and on websites.  Franchisee agrees and understands that any photograph or video using Franchisee's likeness will become Franchisor's property and will not be returned.  Franchisee agrees and irrevocably authorizes Franchisor to edit, alter, copy, exhibit, publish or distribute any photograph or video of Franchisee for any lawful purpose.  Franchisee agrees and waives any rights to royalties or any other compensation related to Franchisor's use of any photograph or video of Franchisee.  Franchisee agrees to hold harmless and forever discharge Franchisor from all claims, demands, and causes of action which Franchisee may have in connection with this authorization.  For purposes of this Section, Franchisee shall also include Franchisee's owners if Franchisee is an Entity.

11.    ADVERTISING AND PROMOTION

11.1    Operating Advertising and Local Advertising.

(a)    Franchisee shall spend a minimum of $10,000 on start-up advertising during the period one month prior to and one month after the Opening Date.

(b)    In addition to any required Brand Fund Contributions, Franchisee must spend 5% of Gross Revenues on local advertising and promotions within the Territory each calendar quarter ("Local Advertising Requirement").  If Franchisee fails to meet the Local Advertising Requirement in any calendar quarter, Franchisee shall pay Franchisor the difference between the amount Franchisee spent and the Local Advertising Requirement, which will be contributed to the Brand Fund, if established.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(c)    All advertising conducted for the Local Advertising Requirement must comply with the Franchise Operations Manual. Franchisee will receive dollar-for-dollar credit against the Local Advertising Requirement for any advertising done through a Cooperative (defined in Section 11.8 below).

(d)    Franchisee agrees to participate in all system-wide promotions and advertising campaigns that Franchisor creates. Except for Franchisee's commitments to participate in system-wide promotions and advertising campaigns and to pay its share of the cost of a classified directory advertisement, Franchisee will have discretion, subject to Subsection 11.1(f) and Franchisor's approval, over the approach Franchisee takes to local advertising and promotions.

(e)    All advertising and promotion by Franchisee shall be conducted in a dignified manner and conform to the standards and requirements in the Franchise Operations Manual or otherwise. Franchisee shall obtain Franchisor's prior approval of all advertising and promotional plans and materials prior to use if such plans and materials were not prepared by Franchisor or previously approved by it. Franchisee must order sales and marketing material from Franchisor or its designated suppliers. It is a material breach of this Franchise Agreement to use other marketing material without obtaining Franchisor's prior written approval. If Franchisee desires to use its own advertising materials, Franchisee must obtain Franchisor's prior approval, which may be granted or denied in Franchisor's sole discretion. Franchisor will review Franchisee's request and respond in writing within 30 days from the date it receives all requested information. Franchisor's failure to notify Franchisee in the specified time frame will be deemed a disapproval. Franchisee is not permitted to have an individual franchisee website. Use of logos, Marks and other name identification materials must follow Franchisor's approved standards. If Franchisor approves of promotional items or services that will be sold at Franchisee's Gym, those items or services must be included in Gross Revenues and will be subject to Royalties and the Brand Fund Contributions (as defined in Section 11.2 below). If Franchisee uses unauthorized advertising materials, it must pay $250 per occurrence to the Brand Fund, if established, or to Franchisor.

(f)    Franchisor shall make available to Franchisee all advertising and promotion materials for the Core Progression Business used by Franchisor and other Core Progression franchisees. Franchisee may not develop advertising materials for use in the Core Progression Business without Franchisor's approval. If Franchisor approves the advertising materials prepared by Franchisee in writing, Franchisor may make available the advertising and promotion materials to other franchisees. Franchisee must pay duplication costs of any advertising or promotion material provided by Franchisor.

11.2    Franchisor reserves the right to form a system-wide brand fund for use in marketing the System, the Marks and Core Progression brand ("Brand Fund"). In such event, Franchisee shall remit up to 2% of the Gross Revenues for the preceding week to Franchisor ("Brand Fund Contribution") at the same time and in the same manner as the Royalty. Franchisor will provide Franchisee with 30 days prior notice before increasing the Brand Fund Contribution. No action taken by Franchisee shall diminish Franchisee's obligations to pay the Brand Fund Contribution to the Brand Fund. The Brand Fund Contribution is in addition to Franchisee's obligations in Section 11.1. Sections 11.3 through 11.7 will apply to the Brand Fund, if established.

11.3    Advertising materials and services will be provided to Franchisee through the Brand Fund. Franchisor may occasionally provide for placement of advertising, development of promotional materials, and undertaking public relations activities for the entire System, including franchisees, or for a particular region, that may not include Franchisee, through the Brand Fund. Franchisor reserves the right

{00075378.DOC. }
[2017 FA v2F]

B-28

**EXHIBIT 1**

to use the Brand Fund Contribution from the Brand Fund to place advertising in national or regional media (including broadcast, print, electronic or other media).  Franchisee acknowledges the Brand Fund is intended to maximize general brand recognition of the System.  Franchisor is not obligated to expend Brand Funds on Franchisee's behalf or for its benefit or expend Brand Funds equivalent or proportionate to Franchisee's contribution of Brand Fund Contributions on Franchisee's behalf or for its benefit.

11.4    Franchisor has complete discretion in how the Brand Fund is used.  The Brand Fund will be administered by Franchisor, or its Affiliates or designees, in Franchisor's discretion, and Franchisor may use a professional advertising agency or media buyer to assist.  The Brand Fund will be used to promote the System, Services and Products sold by Franchisees and will not be used to sell additional franchises; provided, however, Franchisee acknowledges and agrees Franchisor may undertake activities using funds from the Brand Fund that have the effect of increasing the visibility of, and interest in, the System by prospective franchisees. The Brand Fund will collect Brand Fund Contributions from all franchisees, but certain franchisees may contribute on a different basis depending on when they signed their franchise agreement.  Brand Fund Contributions may be used for the administration of the Brand Fund, and Franchisor may reimburse itself, its authorized representatives, and its affiliates from the Brand Fund for administrative costs and expenses, including but not limited to, salaries, overhead, administrative, accounting, collection and legal costs and expenses and all other direct or indirect expenses associated with the programs funded by the Brand Fund. The Brand Fund will be maintained by Franchisor in a separate account. Franchisor will provide an annual unaudited accounting for the Brand Fund showing how the Brand Fund proceeds were spent for the previous year, upon written request. Franchisor assumes no fiduciary duty to Franchisee or other direct or indirect liability or obligation to collect amounts due to the Brand Fund or to maintain, direct, or administer the Brand Fund.

11.5    The Brand Fund may be terminated at any time by Franchisor, in its sole discretion. Brand Fund Contributions are nonrefundable except, if the Brand Fund is terminated, any remaining balance in the Brand Fund will be expended or returned to each franchisee on a pro-rata basis, in Franchisor's sole discretion.

11.6    Franchisee shall fully participate in all such promotional campaigns, prize contests, special offers, and other programs, national, regional, or local in nature (including the introduction of new Services, Products, new franchises or other marketing programs directed or approved by Franchisor), prescribed by Franchisor.  Franchisee shall be responsible for all costs of  participation.  Franchisor will EFT debit Franchisee for any costs associated with such promotional programs.  In addition, Franchisee shall honor any coupons, gift certificates or other authorized promotional offers of Franchisor at Franchisee's sole cost unless otherwise specified in writing by Franchisor.  Franchisee will maintain an adequate supply of marketing brochures, pamphlets and promotional materials as may be required by Franchisor at any time. The cost for such participation will be applied to Franchisee's Local Advertising Requirement.

11.7    Franchisor (and any designee of Franchisor) will have no direct or indirect liability or obligation to Franchisee or the Brand Fund or otherwise regarding the management, maintenance, direction, administration or otherwise of the Brand Fund. Franchisee and Franchisor agree their rights and obligations regarding the Brand Fund and all related matters are governed solely by this Franchise Agreement and neither this Franchise Agreement or the Brand Fund creates a trust, fiduciary relationship, or similar arrangement between Franchisor and Franchisee.

11.8    <u>Local and Regional Advertising Cooperatives.</u>

(a)    Franchisor reserves the right to establish a local or regional advertising cooperative ("<u>Cooperative</u>") if two or more Core Progression Businesses are operating in a

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

market designated by us (a "DMA"), for the purpose of jointly advertising and promoting their Core Progression Businesses.  Franchisor may require the members of the Cooperative to prepare governing documents for the Cooperative that must be approved by Franchisor.  Each Cooperative must prepare annual unaudited financial statements and such statements will be made available to each member of such Cooperative.

(b)     Members of the Cooperative will administer the Cooperative.  Advertising cooperative fees and expenditures will be established by members of the Cooperative.  If Franchisor elects to form the Cooperative, or if such Cooperative already exists in the DMA, Franchisee must participate in compliance with the Franchise Operations Manual, which Franchisor may periodically modify in its discretion.

(c)     Each franchisee in the Cooperative will contribute an amount to the Cooperative for each Core Progression Franchise that the franchisee owns that exists within the DMA.  Each Core Progression Franchise owned by Franchisor that exists within the cooperative's area will contribute to the cooperative on the same basis as franchisees.  Franchisee agrees (i) to join, participate in, and actively support any Cooperative established in the Core Progression Business' DMA, and (ii) to make contributions to each Cooperative on the payment schedule adopted by the Cooperative's members and at the contribution rate Franchisor approves.

(d)     Franchisor shall have the right to form, change, dissolve, or modify the DMA at any time in its sole discretion.

(e)     Franchisor shall have the right to form, change, dissolve or merge any Cooperative in its sole discretion.

11.9    Internet; Website.

(a)     Franchisor has established and maintains an Internet website that provides information about the System and the Services and Products that Core Progression Businesses offer.  Franchisor has  sole discretion and control over the website's design and contents.  Franchisor may use part of the Brand Fund Contributions it collects under Section 11.2 to pay or reimburse itself for the costs of maintaining and updating the website, except that Franchisor will not use such contributions to pay for those components of the website devoted to the sale of franchises.

(b)     The website may include a section that provides the address, telephone number and email address of each Core Progression Business. Franchisee must promptly notify Franchisor whenever any information in Franchisee's listing changes or is not accurate.  Franchisor may remove the reference to Franchisee's Core Progression Business on the System Website if Franchisee is in default under the Franchise Agreement.

(c)     Franchisee may not establish or maintain any website or engage in any other marketing of products or services on the Internet without Franchisor's prior written approval, which may be withheld in Franchisor's sole discretion.  Franchisee may not establish an account or participate in any social networking sites (including, without limitation, Facebook, Twitter or any other social or professional networking site or blog) or mention or discuss the Franchise, Franchisor or its affiliates online, without Franchisor's prior written consent and as subject to Franchisor's online policy.   Franchisor's online policies and procedures may change as technology and the Internet changes.  Franchisee will have no independent right to advertise its Core Progression Business on the Internet or establish any website utilizing the Marks without the

{00075378.DOC. }
[2017 FA v2F]

B-30

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

prior written consent of Franchisor, which may be withheld in Franchisor's sole discretion. Franchisor has the right to review all online content on social media sites, discount websites, blogs, in electronic communications, and on other online sites on which the Marks are used.

11.10 <u>Advisory Council</u>.  Franchisor reserves the right to form an advisory council, consisting of franchisees and corporate members, to advise it on the Brand Fund and to promote communications between Franchisor and all franchisees ("<u>Advisory Council</u>").  If any advisory council is formed, Franchisor has the right to change or dissolve the Council, in its sole discretion.

12.    <u>INSURANCE AND INDEMNITY</u>

12.1    Franchisee shall purchase and at all times maintain in full force and effect insurance policies protecting Franchisee, Franchisor and Affiliates, and Franchisor's respective members, managers, employees, and agents against any demand or claim regarding personal and bodily injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring at or in connection with the construction and/or operation of Franchisee's Core Progression Business, including employment practices liability and data theft and cybersecurity.  Such policy must be written by an insurer acceptable to Franchisor who is rated "A" or better by A.M. Best & Company, Inc. and authorized to do business in the state where Franchisee's Core Progression Business is located, and conform to Franchisor's standards and minimum amounts of coverages.  All insurance policies, except for employment liability insurance policies, must name Franchisor and any Affiliate it designates as additional insureds and provide for 30 days' prior written notice to Franchisor of a policy's material modification or cancellation.  If Franchisee fails to obtain or maintain the insurance Franchisor specifies, Franchisor may (but need not) obtain such insurance on Franchisee's behalf and, in such event, Franchisee will reimburse Franchisor for the cost of the insurance plus an administrative fee equal to 20% of the premium.  The cost of Franchisee's premiums will depend on the insurance carrier's charges, terms of payment, and Franchisee's insurance and payment histories.  Franchisee must carry the minimum of insurance coverage as required by statue or rule of the state in which Gym is located.  Franchisor may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverage at any time, at Franchisor's discretion.  Each policy must contain a waiver by Franchisee and Franchisee's insurer of their subrogation rights against Franchisor, its Affiliates, and their respective shareholders, directors, employees and agents.  Each policy, except for employment liability insurance policies, must also name Franchisor, its Affiliates, and their respective shareholders, directors, employees and agents, as additional insureds with primary non-contributory coverage.

12.2    Franchisee shall, during the Initial Term and any Successor Term, and after the termination or expiration of this Franchise Agreement, indemnify and defend Franchisor, its Affiliates and their respective officers, owners, directors, managers, members, and employees, and hold them harmless against all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses (including reasonable attorney fees and amounts paid in settlement or compromise) and liabilities of any kind, whether or not ultimately determined to be meritorious (and including damages suffered by Franchisee or any of its property) (collectively, "<u>Damages</u>") for which they are held liable, or which they incur (including travel, investigation and living expenses of employees and witness fees) in any litigation or proceeding issued as a result of or arising out of:

(a)    a breach of this Franchise Agreement, or any other agreement between the parties, or any breach of a Lease or other instrument granting the right to Franchisee to occupy any Gym or any other premises used by Franchisee to operate the Core Progression Business;

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(b)    any injury to, or loss of property of, any person in, or on, the Gym or any other premises used by Franchisee to operate the Core Progression Business;

(c)    Franchisee's taxes, liabilities, costs or expenses of its Core Progression Business;

(d)    any negligent or willful act or omission of Franchisee, its officers, owners, directors, managers, members, partners, employees, agents, servants, contractors or others for whom it is, in law, responsible;

(e)    any violation of any federal, state or local law, ordinance or regulation imposing requirements or prohibitions on Franchisee in the operation of the Core Progression Business;

(f)    any advertising or promotional material distributed, broadcasted or in any way disseminated by Franchisee, or on its behalf unless such material has been produced, or approved in writing, by Franchisor;

(g)    any loss of data, including but not limited to customer information, resulting from a breach of such data caused, in whole or in part, by Franchisee or Franchisee's negligence; and

(h)    Franchisee's employment or other contractual relationship with its employees, workers, managers, or independent contractors, including but limited to any allegation, claim, finding, or ruling that Franchisor is an employer or joint employer of Franchisee's employees.

12.3    Franchisor will indemnify Franchisee against, and reimburse Franchisee for (1) all damages for which Franchisee is held liable in any judicial or administrative proceeding arising out of Franchisee's use of any Mark or Copyrighted Material in compliance with this Franchise Agreement; and (2) the costs incurred of defending any claim brought against Franchisee or in any proceeding in which Franchisee is named as a party arising out of Franchisee's use of any Mark or Copyrighted Material in compliance with this Franchise Agreement, provided that Franchisee has timely notified Franchisor of the claim or proceeding, and has complied with this Franchise Agreement.

13.    RELATIONSHIP

13.1    Franchisee acknowledges it is an independent contractor and is not an agent, partner, joint venturer or employee of Franchisor and no training or supervision given by, or assistance from, Franchisor shall be deemed to negate such independence. Neither party is liable or responsible for the other's debts or obligations, nor shall either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business authorized by or conducted under this Franchise Agreement. Franchisor and Franchisee agree that no partnership, fiduciary relationship, joint venture or employment relationship exists between them. Franchisee shall conspicuously identify itself in all dealings with the public as an independently owned and operated Core Progression franchisee. The parties intend that this Franchise Agreement establish the relationship of franchisor and franchisee.  It is further agreed that Franchisee has no authority to create or assume in Franchisor's name or on behalf of Franchisor, any obligation, express or implied, or to act or purport to act as agent or representative on behalf of Franchisor for any purpose whatsoever. Franchisee agrees it will not hold itself out as the agent, employee, partner or co-venturer of Franchisor. Franchisee alone will exercise day-to-day control over all operations, activities, and elements of the Core Progression Business and under no circumstances shall Franchisor be deemed to do so.  All employees hired by or working for Franchisee shall be the employees of Franchisee and shall not, for any purpose, be deemed employees of Franchisor or subject to Franchisor's control.  The parties agrees to file their own tax, regulatory and

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

payroll reports regarding their respective employees and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever thereof.

13.2    Neither party shall make any agreements, representations or warranties (except by Franchisor in advertising as provided herein) in the name of, or on behalf of, the other party; neither party hereto shall be obligated by, nor have any liability for, any agreements, representations or warranties made by the other (except by Franchisor in advertising as provided herein) nor shall Franchisor be liable for any damages to any person or property, directly or indirectly, arising out of the operation of Franchisee's Core Progression Business, whether caused by Franchisee's negligent or willful action or failure to act.

13.3    Franchisor shall not have any liability for Franchisee's obligations to pay any third parties, including without limitation, any product vendors, or any value added, sales, use, service, occupation, excise, Gross Revenues, income, property or other tax levied upon Franchisee, Franchisee's property, the Core Progression Business or upon Franchisor in connection with the sales made or business conducted by Franchisee (except any taxes Franchisor is required by law to collect from Franchisee regarding purchases from Franchisor).

14.    <u>RESTRICTIVE COVENANTS</u>

14.1    Franchisee acknowledges and agrees that:

(a)    Franchisee's entire knowledge of the operation of the Core Progression Business, the System, and the concepts and methods of promoting the Core Progression Business that it has now or obtains in the future, is derived from Franchisor's Confidential Information and Trade Secrets. Franchisee further acknowledges and agrees that all of the Confidential Information and Trade Secrets are the sole property of Franchisor and Franchisor's Affiliates, represent valuable assets of Franchisor and Franchisor's Affiliates,  and that Franchisor and Franchisor's Affiliates have the right to use the Confidential Information and Trade Secrets in any manner at any time.

(b)    Any Designated Manager, and, if Franchisee is an entity, an officer that does not own equity in the Franchisee entity must sign Franchisor's then-current form of "<u>System Protection Agreement</u>" (the current form is attached to the Franchise Disclosure Agreement).  All of your employees, independent contractors, agent or representatives who have access to the Confidential Information and Trade Secrets and have not signed a System Protection Agreement, must sign a confidentiality agreement and agree that they: (1) will not use the Confidential Information or Trade Secrets in any other business or capacity or for their own benefit; (2) will maintain the absolute confidentiality of the Confidential Information and Trade Secrets; (3) will not make unauthorized copies of any portion of the Confidential Information and Trade Secrets; and (4) will adopt and implement all reasonable procedures Franchisor requires to prevent unauthorized use or disclosure of the Confidential Information and Trade Secrets.  Franchisee shall provide Franchisor with signed copies of each of the confidentiality agreements at Franchisor's request.

(c)    Upon the expiration or termination of the Franchise Agreement, Franchisee, Franchisees' owners, Designated Managers and employees who have access to the Confidential Information and Trade Secrets agree for a period of one year after the termination or expiration of the Franchise Agreement (unless such information is a Trade Secret in which case the requirements in this Subsection 14.1(c) will remain in place for as long as such information constitutes a Trade Secret) they: (1) will not use the Confidential Information or Trade Secrets in any other business or capacity or for their own benefit; (2) will maintain the absolute

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

confidentiality of the Confidential Information and Trade Secrets; (3) will not make unauthorized copies of any portion of the Confidential Information or Trade Secrets; and (4) will adopt and implement all reasonable procedures Franchisor requires to prevent unauthorized use or disclosure of the Confidential Information and Trade Secrets including requiring written nondisclosure agreements for those individuals as Franchisor requires and provide Franchisor, at Franchisor's request, with signed copies of each of those agreements. Franchisor will be named as a third-party beneficiary on such nondisclosure agreements.

(d)    Notwithstanding the foregoing, the restrictions on the disclosure and use of the Confidential Information will not apply to: (a) Confidential Information in the public domain after it was communicated to Franchisee through no fault of Franchisee, its owners, Designated Managers or employees; (b) Confidential Information in Franchisee's possession free of any obligation of confidence when it was communicated to Franchisee; or (c) disclosing the Confidential Information in judicial or administrative proceedings if Franchisee is legally compelled to disclose the information, if Franchisee has notified Franchisor before disclosure and used Franchisee's best efforts, and afforded Franchisor the opportunity, to obtain an appropriate protective order or other assurance satisfactory to Franchisor of confidential treatment for the information required to be disclosed.

14.2    Franchisee covenants and agrees that:

(a)    During the Initial Term of this Franchise Agreement and any Successor Terms, if any, Franchisee, its owners and immediate family members of owners, Designated Managers, officers, directors, managers, members, and partners shall not, without the prior written consent of Franchisor, either individually or in an Entity or jointly or in conjunction with any person, firm, association, syndicate or corporation, as principal, agent, shareholder, member, partner or in any manner whatsoever, carry on or be engaged in or be concerned with or interested in or advise, lend money to, Guaranty the debts or obligations of or permit its name or any part thereof to be used or employed in any business that: (i) sells or offers to sell products the same as or similar to the type of products sold by Franchisee in and/or from the Territory (including, but not limited to, the products Franchisor authorizes); or (ii) provides or offers to provide services the same as or similar to the type of services sold by Franchisee in and/or from the Territory (including, but not limited to, the services Franchisor authorizes), but excludes a Core Progression Business operating pursuant to a franchise agreement with Franchisor ("Competitive Business") as carried on during the Initial Term or any Successor Term of this Franchise Agreement.

(b)    Upon termination or expiration of the Initial Term or any Successor Term, or the transfer, sale or assignment of this Franchise Agreement by Franchisee, neither Franchisee, the Designated Manager nor Franchisee's owners (or any immediate family members of owners), officers, directors, managers, members, or partners will have for a period of one year, without the prior written consent of Franchisor, either individually or in an Entity or jointly or in conjunction with any person, firm, association, syndicate or corporation, as principal, agent, shareholder, member, partner or in any manner whatsoever, carry on or be engaged in or be concerned with or interested in or advise, lend money to, Guaranty the debts or obligations of or permit its name or any part thereof to be used or employed in any Competitive Business in: (1) the Territory or any other Core Progression franchisee or Franchisor or Affiliate-owned territory; (2) within a 25 mile radius of the Core Progression Business, or within a 25 mile radius of any Franchisor or Affiliate-owned or franchisee Core Progression Business that is operating or under construction.

14.3    During the Term or any Successor Term of this Franchise Agreement and for a period of one year thereafter, Franchisee, Franchisee's owners (and the immediate family members of the owners),

**EXHIBIT 1**

officers, directors, managers, members, partners, and the Designated Manager shall not attempt to attain an unfair advantage over other Core Progression franchisees or Franchisor or any Affiliates by soliciting for employment any person who is, at the time of such solicitation, employed by Franchisor, other franchisees or any Affiliates, nor shall Franchisee, Franchisee's owners, officers, directors, managers, members, partners, nor the Designated Manager, directly or indirectly induce or attempt to induce any such person to leave his or her employment.

14.4   If any person restricted by this Section 14 refuses to voluntarily comply with the foregoing obligations, the restricted period will commence with the entry of any order of a court or arbitrator enforcing this Section 14.

15.   ASSIGNMENT

15.1   Franchisee acknowledges that Franchisor's obligations under this Franchise Agreement are not personal.  Franchisor shall have the absolute right, in its sole discretion at any time, to unconditionally transfer or assign this Franchise Agreement or any of its rights or obligations under this Franchise Agreement to any person, corporation or other party.

15.2   Franchisor reserves the right to assign the Core Progression franchise system to anyone, including the operator of a competing national or regional chain or franchise system.  Franchisee acknowledges and agrees that Franchisor may sell its assets, the Marks or the System to any third party; may offer its securities privately or publicly; may merge with or acquire other business entities or be acquired by another Entity; may permit and participate in any transfer or distribution of its securities in connection with a spin-off; may undertake a refinancing, recapitalization, leveraged buyout, or other economic or financial restructuring; or may terminate or cease to exist or dissolve, in any such case without Franchisee's consent and, provided the transferee expressly assumes and materially performs Franchisor's obligations, do so free of any responsibility or liability whatsoever to Franchisee after the transaction occurs.

15.3   Franchisee expressly waives any claims, demands, or damages against Franchisor arising from or related to the transfer of the Marks, assets or the System from Franchisor to any other party.

15.4   Franchisee understands and acknowledges the rights and duties in this Franchise Agreement are personal to Franchisee.  Accordingly, this Franchise Agreement, Franchisee's rights and interests under this Franchise Agreement, the property and assets owned and used by Franchisee for the Core Progression Business, and any shares, stock, membership or interest in any Entity having an interest in the Core Progression Business, shall not be voluntarily or involuntarily, directly or indirectly sold, pledged, gifted, signed, transferred, shared, subdivided, sub-franchised, encumbered or transferred in any way (including, without limitation, in the event of the death of Franchisee if Franchisee is an individual), in whole or in part, in any manner whatsoever without the prior written approval of Franchisor and compliance with all terms of this Section 15. Any unauthorized sale, assignment, transfer or other conveyance, by operation of law or otherwise, or any attempt to do so, shall be deemed void and grounds for termination of this Franchise Agreement by Franchisor.

15.5   With and after each valid assignment of this Franchise Agreement under this Section 15, the assignee(s) of Franchisee shall be deemed to be Franchisee under this Franchise Agreement and will be bound by and liable for all of Franchisee's existing and future obligations. No stockholder, member or partner of any Entity which becomes the Franchisee shall have any rights under this Franchise Agreement because of reason of his, her or its stock ownership, membership interest or partnership interest.

{00075378.DOC. }                                     B-35
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

15.6    If Franchisee wishes at any time to sell, in whole or in part, the Core Progression Business, Franchisee shall obtain a bona fide, executed, written offer ("Purchase Offer") for the Core Progression Business together and all real or personal property, leasehold improvements and other assets used by Franchisee in its Core Progression Business from a responsible, arms' length, and fully disclosed purchaser and shall submit an exact copy of such Purchase Offer to Franchisor. Franchisor will have a right of first refusal to purchase the Core Progression Business as provided in Section 16 below.

15.7    No transfer or assignment of this Franchise Agreement will be approved by Franchisor or be effective unless all the following conditions are satisfied:

(a)    the proposed transfer is at least one year after the Opening Date;

(b)    Franchisee is in full compliance with this Franchise Agreement, including payment of all amounts due, and Franchisor has not exercised its right of first refusal;

(c)    the transferee executes Franchisor's then-current form of franchise agreement and related documents, including but not limited to Franchisor's then-current form of Owner's Agreement or other guaranty, any and all of the provisions of which may differ materially from any and all of those contained in this Franchise Agreement, but which shall not require the payment of another Initial Franchise Fee), and executes all other documents as may be reasonably requested by Franchisor;

(d)    Franchisee pays to Franchisor a transfer fee ("Transfer Fee") equal to 50% of the then-current Initial Franchise Fee, plus the Training Fee.  Franchisee will pay to Franchisor a nonrefundable deposit of $1,000 when Franchisee requests approval of a transfer.  Upon approval, Franchisee will pay the remaining amount of the Transfer Fee plus the Training Fee in certified funds when Franchisee executes the transfer documents;

(e)    Franchisee, or the proposed transferee, reimburses Franchisor upon receipt of Franchisor's invoice for any broker or other placement fees Franchisor incurs as a result of the transfer;

(f)    Franchisee executes a general release of Franchisor, including its officers, directors, members, agents, and employees and Affiliates from such parties' obligations under the Franchise Agreement;

(g)    the transferee is an individual or an Entity having adequate financial resources who meets all criteria established by Franchisor for franchisees. The transferee shall also complete Franchisor's then-current training program established by Franchisor for Core Progression franchisees unless: (i) the transferee is a current Core Progression franchisee in good standing in the System, or (ii) the transferee is or has been a Designated Manager for a period of one year or more of a Core Progression Business in good standing;

(h)    at Franchisor's request, Franchisee prepares and furnishes to the transferee and/or Franchisor such financial reports and other data relating to the Core Progression Business and its operations as Franchisor deems reasonably necessary or appropriate for the transferee and/or Franchisor to evaluate the Core Progression Business and the proposed transfer.  Franchisee authorizes Franchisor to confer with a proposed transferee and furnish it with information concerning the Core Progression Business and the terms and conditions of the proposed transfer, and Franchisor may do so with no liability, except for intentional misstatements made to a transferee;

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(i)       the parties to the proposed transaction will have entered into a binding agreement subject only to the rights of Franchisor set out in Section 16.  Franchisor shall be furnished a copy of this binding agreement, and such agreement is subject to Franchisor's approval in writing. Franchisee must advise each prospective transferee of this provision and other terms of this Franchise Agreement;

(j)       the proposed transferee or the stockholders, partners, members or owners of a beneficial interest in a proposed Entity transferee, provide jointly and severally personal Guarantys required by Franchisor, Guarantying the proposed transferee's performance of its obligations under the agreements to be entered into in the form of any Owner's Agreement or other form specified by Franchisor;

(k)       the proposed transferee demonstrates to Franchisor's satisfaction it, he or she meets in all respects Franchisor's standards applicable to new Core Progression franchisees regarding experience, personal and financial reputation and stability, willingness and ability to devote its, his or her full time and best efforts to the operation of the Core Progression Business, and any other conditions as Franchisor may reasonably apply in evaluating new Core Progression franchisees. Franchisor must be provided with all information about the proposed transferee as Franchisor may reasonably require. Because of the Confidential Information and Trade Secrets available to a Core Progression franchisee, no assignment will be permitted to a transferee that owns a Competitive Business;

(l)       the transferee agrees to bring the Gym up to current standards for Core Progression Businesses; and

(m)       the landlord consents to assignment of the Lease to the transferee, if applicable; and

(n)       Franchisee signs an agreement not to engage in a Competitive Business for one year within a 25 mile radius of Franchisee's former Gym or another Core Progression Business then operating or under construction**.**

15.8     Notwithstanding anything to the contrary in this Franchise Agreement, Franchisor shall, upon Franchisee's compliance with Franchisor's requirements (including obtaining all necessary approvals to the assignment of the Lease, if any, of the Gym), consent to an assignment of Franchisee's right, title and interest in this Franchise Agreement and the property and assets owned and used by Franchisee and any other agreement then in effect between Franchisee and Franchisor to an Entity wholly owned and controlled by Franchisee, except such assignment shall not release Franchisee from any liability under this Franchise Agreement:

(a)       Contemporaneously with such assignment and thereafter upon the appointment or election of any person as director, officer, partner or manager of an Entity, such Entity shall cause each shareholder, partner, member, manager, director(s) and officer(s) of the Entity to execute a written agreement with Franchisor, personally Guarantying full payment and performance of Franchisee's obligations to Franchisor and individually being bound, jointly and severally, by this Franchise Agreement or any new current form of Franchise Agreement;

(b)       No shares or membership interests in the capital of an Entity shall be issued nor shall Franchisee directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, sell, assign, transfer, convey, donate, pledge, mortgage or otherwise encumber any

{00075378.DOC. }

[2017 FA v2F]

B-37

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

such shares or membership interests or offer or attempt to do so or permit the same to be done without Franchisor's prior written consent;

(c)     The Entity shall maintain stop transfer instructions against transferring shares or membership interests on its records subject to the restrictions of this Section;

(d)     The articles of incorporation, articles of organization, operating agreement, partnership agreement, shareholder agreement, and by-laws of the Entity shall provide that its objectives or business is confined exclusively to the operation of the Core Progression Business as provided for in this Franchise Agreement, and copies thereof shall be furnished to Franchisor upon request;

(e)     Franchisor's consent to transferring any interest subject to the restrictions of this Section shall not constitute a waiver of any claim it may have against the assignor, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of this Franchise Agreement by the assignee;

(f)     The Entity shall advise Franchisor and keep Franchisor current as to the names and addresses of the directors, officers, members, partners and shareholder of and persons financially involved in the Entity

(g)     Franchisee agrees to devote its full time and best efforts to manage the day-to-day operations of the Core Progression Business unless it has an operational partner or Designated Manager approved by Franchisor; and

(h)     Franchisee shall reimburse Franchisor for any legal fees it incurred in relation to the transfer.

15.9     Upon the death or permanent disability of an individual Franchisee (or the controlling shareholder, member or partner if Franchisee is an Entity), the personal representative of such person shall transfer all right, title and interest in this Franchise Agreement or such interest in Franchisee to any approved third party, which may include an heir or legatee that otherwise satisfies Franchisor's then-current standards and qualifications for new franchisees.  Such disposition of this Franchise Agreement or such interest (including, without limitation, transfer by bequest or inheritance, provided such transfer meets the requirements of this Section 15.9) shall be completed within a reasonable time, not to exceed 180 days from the date of death or permanent disability (unless extended by probate proceedings), and shall be subject to all the terms and conditions applicable to transfers contained in this Section. Franchisee's estate or legal representative must apply to Franchisor for the right to transfer to Franchisee's next of kin within 120 days of Franchisee's death or disability. Franchisor shall have the right, in Franchisor's sole discretion, to operate the Gym or to appoint a representative or designee to operate the Core Progression Business, for a period of up to 180 days, or until Franchisee's interest shall have been transferred to an approved third party, whichever occurs first.  Franchisor or the appointed representative shall be entitled to retain all revenues, and shall pay all operating expenses from the operation of the Core Progression Business, without the right to seek or require reimbursement by Franchisee's estate or personal representative, during the period of operation of the Core Progression Business.  Failure to transfer the interest in this Franchise Agreement or interest in Franchisee within said period of time shall constitute a breach of this Franchise Agreement and Franchisor may terminate this Franchise Agreement without further notice or the opportunity to cure.  The term "Permanent Disability" shall mean a mental or physical disability, impairment or condition that prevents Franchisee or Franchisee's controlling shareholder, member or partner from performing the essential functions of Franchisee.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

15.10    Franchisee shall not grant any security interest in the assets of the Core Progression Business unless the secured party agrees in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and the option to be substituted as obligor to the secured party and to cure any default of Franchisee, except that any acceleration of indebtedness due to Franchisee's default shall be void.

15.11    Franchisee shall not have the right to grant a subfranchise.

16.    <u>OPTION TO PURCHASE - RIGHT OF FIRST REFUSAL</u>

16.1    Unless otherwise explicitly provided by this Franchise Agreement, Franchisor shall be entitled to exercise the rights provided in this Section immediately upon:

(a)    The expiration without extension of Franchisee's rights to operate the Core Progression Business or the termination for any reason of this Franchise Agreement;

(b)    Any breach, default or other event that gives Franchisor the right to terminate this Franchise Agreement, after expiration of any applicable notice and cure period; or

(c)    The receipt by Franchisor of a copy of a Purchase Offer.

16.2    Upon any event described in Subsection 16.1, Franchisor shall have the option to purchase any or all of Franchisee's rights, title and interest in the Core Progression Business, and all its improvements, furniture, fixtures, equipment and products, contract rights and other business assets. Without limiting the generality of anything contained in this Franchise Agreement, Franchisee understands that the Business Records, the accounts, customer and vendor lists, work in progress, the System and all other related intellectual property is owned by Franchisor, and shall not be transferred in any assignment nor purchased under this Right of First Refusal.

16.3    The purchase price for assets itemized in Subsection 16.2 will be, subject to Section 16.4: (i) the current fair market value if Subsection 16.1(a) or 16.1(b) applies; or (ii) the price specified in the Purchase Offer received by Franchisee if Subsection 16.1(c) applies.  If Franchisee and Franchisor cannot agree on fair market value within a reasonable time, an independent appraiser will be designated by Franchisee and Franchisor and an average of the two appraised values will be binding.  Appraised values will exclude any and all consideration for goodwill or going concern value created by the Marks and business system licensed to Franchisee.

16.4    If Franchisor elects to exercise any option to purchase in this Section 16, Franchisor will have the right to set off all amounts due from Franchisee under the Franchise Agreement or any other agreements between the parties, any commissions or fees payable to any broker, agent or other intermediary and the cost of the appraisal, if any, against any payment.  Franchisee shall also have the right to substitute cash for any other form of consideration specified in the Purchase Offer and pay in full the entire purchase price at closing.

16.5    Franchisor will notify Franchisee whether or not it intends to exercise its right to purchase ("<u>Notice of Intent</u>") within 30 days following an event described in Subsection 16.1. The Notice of Intent will specify the assets to be purchased, and the current fair market value as determined by Franchisor if Subsection 16.1(a) or 16.1(b) applies. If Franchisor is purchasing the assets under Subsections 16.1(a) or (b), Franchisee will have 14 days following receipt of Franchisor's Notice of Intent to object to any of the prices specified, and any disputes over pricing shall be resolved through appraisal as specified by Subsection 16.3.  If Franchisor declines to exercise its rights in connection with

{00075378.DOC. }
[2017 FA v2F]

B-39

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

Subsection 16.1(c) within the 30 day period described above, Franchisee may thereafter sell or dispose of the Core Progression Business to the third party identified in the Purchase Offer in the event of a sale under Subsection 16.1(c), but not at a lower price nor on more favorable terms than set forth in the Purchase Offer and subject to the prior written permission of Franchisor and satisfaction of the other assignment conditions in Section 15.  If the sale to such third party purchaser is not completed within 90 days after Franchisor delivers the Notice of Intent to Franchisee, Franchisor shall again have its right of first refusal provided.

16.6     If Franchisor provides Franchisee with its Notice of Intent to exercise its rights under this Section 16, the purchase and sale contemplated in this Section shall be consummated as soon as possible.  If Franchisor is purchasing the assets under Subsections 16.1(a) or (b), following the delivery of a Notice of Intent as specified in Subsection 16.5, Franchisor or Franchisor's designee shall have the immediate right to take possession of the Core Progression Business and to carry on and develop the Core Progression Business for the exclusive benefit of Franchisor or its designee exclusively.  If Franchisor declines to exercise its rights under this Section 16, this shall not constitute consent to the transfer or waiver of any other provision of the Franchise Agreement, including any of the requirements with respect to the proposed transfer.

17.     DEFAULT AND TERMINATION

17.1     Franchisor shall have the right, at its option, to (i) suspend performance of certain or all of its services to Franchisee while Franchisee is in default of this Franchise Agreement; or (ii) terminate this Franchise Agreement and all rights granted Franchisee hereunder (subject to applicable state law governing franchise termination and renewal), effective upon receipt of notice by Franchisee, addressed as provided in Section 18, upon the occurrence of any of the following events:

(a)     Franchisee intentionally or negligently discloses to any unauthorized person the contents of or any part of Franchisor's Franchise Operations Manual, Confidential Information or Trade Secrets of Franchisor;

(b)     Franchisee voluntarily abandons the Core Progression Business for a period of five consecutive days, or any shorter period that indicates an intent by Franchisee to discontinue operation of the Core Progression Business, unless abandonment is due to fire, flood, earthquake or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(c)     Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee under any insolvency, bankruptcy or reorganization act, or if Franchisee makes an assignment for the benefit of creditors, or a receiver is appointed for Franchisee;

(d)     Any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for 30 days or longer (unless a supersedes or other appeal bond has been filed); or if execution is levied against Franchisee's Core Progression Business or any of the property used for the operation of the Core Progression Business and is not discharged within five days; or if the real or personal property of Franchisee's Core Progression Business is sold after levy by any sheriff, marshal or constable;

(e)     Franchisee, the Designated Manager, or any owner of greater than 10% of the Franchisee's Entity is charged or convicted of any felony charge, or a crime involving moral

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

turpitude, or any crime or offense reasonably likely, in the sole opinion of Franchisor, to materially and unfavorably affect the System, Marks, goodwill or reputation thereof;

(f)       Franchisee fails to pay any amounts due Franchisor or its Affiliates or approved suppliers within 10  days after receiving notice that such fees or amounts are overdue;

(g)       Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within five days after notification from Franchisor;

(h)       Franchisee has received two notices of default regarding Franchisee's obligations hereunder from Franchisor within a 12 month period, regardless of whether the defaults were cured by Franchisee;

(i)       Franchisee sells, transfers or otherwise assigns the Core Progression Business, an interest in the Core Progression Business or Franchisee's Entity, this Franchise Agreement, or a substantial portion of the assets of the Core Progression Business owned by Franchisee without complying with Section 15;

(j)       Franchisee submits on two or more occasions during the Initial Term and any Successor Term a report, financial statement, tax return, schedule or other information or supporting record which understates its Gross Revenues by more than 2%, unless Franchisee demonstrates that such understatement resulted from inadvertent error;

(k)       Franchisee fails, or refuses, to submit any required report, financial statement, tax return, schedule or other information or supporting records, or submits such reports over five days late on two or more occasions during the Term or any Successor Term unless due to circumstances beyond the control of Franchisee;

(l)       Franchisee sells or offers for sale any unauthorized merchandise, product or service or engages in any unauthorized business or under the Marks or under a name or mark confusingly similar to the Marks;

(m)       Franchisee contests in any court or proceeding the validity of or Franchisor's ownership of the Marks or copyrighted materials;

(n)       Franchisee is an Entity and any action is taken which purports to merge, consolidate, dissolve or liquidate such Entity without Franchisor's prior written consent;

(o)       Franchisee, its Managing Owner or its Designated Manager fails to successfully complete Franchisor's Initial Training Program or any continuing training programs, or obtain any required Core Progression certifications;

(p)       Franchisee receives from Franchisor during the Initial Term and any Successor Term, three or more notices of default regardless whether such notices of default relate to the same or different defaults, or whether such defaults have been remedied by Franchisee; or

(q)       Franchisee made misrepresentations under Section 1.11 or any violation of Anti-Terrorism Laws by Franchisee, its Designated Manager, its owners, officers, directors, managers, members, partners, agents or employees.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

17.2     Franchisor shall have the right, at its option, to (i) suspend performance of certain or all of its services to Franchisee while Franchisee is in default of this Franchise Agreement; or (ii) terminate this Franchise Agreement (subject to any state laws to the contrary, where state law shall prevail), effective: (A) upon three days written notice to Franchisee if Franchisee fails to cure health, safety, or sanitation law violations or fails to operate safely, (B) upon 10 days written notice to Franchisee if Franchisee fails to cure monetary defaults, or (C) upon 30 days written notice to Franchisee, if Franchisee breaches any other provision of this Franchise Agreement (except as set forth above) and fails to cure the default within 30 days. In any such event, this Franchise Agreement will terminate without further notice to Franchisee, effective upon expiration of the period described above. Defaults under Section 17.2(ii)(C) include, but are not limited to:

(a)     Franchisee fails to maintain the then-current operating procedures and standards established by Franchisor in this Franchise Agreement or the Franchise Operations Manual or otherwise communicated to Franchisee;

(b)     Franchisee fails, refuses or neglects to obtain Franchisor's prior written approval or consent required by this Franchise Agreement;

(c)     Franchisee fails or refuses to comply with the then-current requirements of the Franchise Operations Manual;

(d)     Franchisee, or any Entity in which Franchisee has a controlling equity interest or which has a controlling equity interest in Franchisee, defaults under any term of the Lease of the Gym or any other premises used by Franchisee to operate the Core Progression Business, any other franchise agreement with Franchisor or any other agreement material to the Core Progression Business and such default is not cured within the time specified in such Lease, other franchise agreement or other agreement;

(e)     Franchisee fails, refuses or neglects to submit any required report under this Franchise Agreement;

(f)     Franchisee fails, refuses or neglects to accurately report Gross Revenues, sales information or other information required by Franchisor; or

(g)     Franchisee fails to comply with any other provision of this Franchise Agreement or any specification, standard or operating procedure prescribed by Franchisor and does not correct such failure within 30 days after written notice from Franchisor (which shall describe the action that Franchisee must take) is delivered to Franchisee.

17.3     Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot be reasonably cured within the cure period described above and Franchisee has commenced and is continuing to make good faith efforts to cure the breach during such cure period, Franchisee shall be given an additional reasonable period of time to cure the same, not to exceed thirty additional days.

17.4     Franchisee shall have the right to terminate this Franchisee Agreement solely upon a material breach by Franchisor which is not cured within 30 days after Franchisor receives written notice of breach; provided that neither Franchisee nor its owners is in default of this Franchise Agreement.  If Franchisor cannot correct the default within 30 days, Franchisor shall have reasonable additional time to cure the default. Any other termination of this Franchise Agreement by Franchisee shall be a termination without cause, and a breach by Franchisee. Franchisee agrees it shall not, on grounds of an alleged nonperformance by Franchisor of any of its obligations or any other reason, withhold payment of any

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

amount due to Franchisor whatsoever or set off amounts owed to Franchisor under this Franchise Agreement, against any monies owed to Franchisee, which right of set off is expressly waived by Franchisee.

17.5    No endorsement or statement on any check or payment of any sum less than the full sum due Franchisor shall be construed as an acknowledgment of payment in full or an accord and satisfaction, and Franchisor may accept and cash such check or payment without prejudice to its right to recover the balance due or pursue any other remedy provided herein or by law.  Franchisor may apply any payments by Franchisee against any past due indebtedness of Franchisee as Franchisor sees fit.  Franchisor may set off against any payment due Franchisee hereunder any outstanding debts of Franchisee to Franchisor, and may, at Franchisor's option, pay Franchisee's trade creditors out of any sum otherwise due to Franchisee.

17.6    Franchisee agrees to pay within five days of the effective date of termination or expiration of the Franchise Agreement, all amounts owed Franchisor, the lessor of the Gym and Franchisee's trade and other creditors which are then unpaid.

17.7    All Royalties and Brand Fund Contributions, all amounts due for goods purchased by Franchisee from Franchisor or its Affiliates, and any other amounts owed Franchisor or its Affiliates by Franchisee under this Franchise Agreement or any other agreement shall bear interest after the due date at the rate described in Section 6.6 above. The acceptance of any interest payment shall not be construed as a waiver by Franchisor of its rights regarding the default causing such payment and shall be without prejudice to Franchisor's right to terminate this Franchise Agreement regarding such default.

17.8    A default under any other franchise agreement or other agreement between Franchisee or its affiliates and Franchisor or Affiliates shall constitute a default under this Franchise Agreement and vice versa, with like remedies available to Franchisor.

17.9    Franchisee agrees to take the following action upon termination or expiration of this Franchise Agreement:

(a)    Immediately discontinue using all Marks, signs, structures, forms of advertising, telephone listings, websites,  facsimile numbers, email addresses, the Franchise Operations Manual, all materials, Products and Services of any kind identified or associated with the System and return all these materials and Products to Franchisor;

(b)    Immediately provide to Franchisor all materials, including the Franchise Operations Manual, customer lists, records, files, instructions, brochures, advertising materials, agreements, Confidential Information, Trade Secrets and any and all other materials provided by Franchisor to Franchisee or created by a third party for Franchisee relating to the operation of the Core Progression Business (all of which are acknowledged to be Franchisor's property). Under no circumstances shall Franchisee retain any printed or electronic copies of the Franchise Operations Manual, customer lists, Confidential Information or Trade Secrets or portions thereof upon expiration or termination of this Franchise Agreement;

(c)    Franchisee acknowledges that all telephone numbers, facsimile numbers, social media websites, Internet addresses and email addresses (collectively "Identifiers") used in the operation of Franchisee's Gym constitute Franchisor's assets, and upon termination or expiration of this Franchise Agreement, Franchisee will take such action within five days to cancel or assign to Franchisor or Franchisor's designee as determined by Franchisor, all of Franchisee's right, title and interest in and to such Identifiers and will notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use any Identifiers, and any

{00075378.DOC. }

[2017 FA v2F]

B-43

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

regular, classified or other telephone directory listing associated with the Identifiers and to authorize a transfer of the same to, or at Franchisor's direction.  Franchisee agrees to take all action required cancel all assumed name or equivalent registrations related to Franchisee's use of the Marks.  Franchisee acknowledges that, Franchisor has the sole rights to, and interest in, all Identifiers used by Franchisee to promote Franchisee's Gym and/or associated with the Marks.  Franchisee hereby irrevocably appoints Franchisor, with full power of substitution, as Franchisee's true and lawful attorney-in-fact, which appointment is coupled with an interest, to execute such directions and authorizations as may be necessary or prudent to accomplish the foregoing. Franchisee further appoints Franchisor to direct the telephone company, postal service, registrar, Internet Service Provider, listing agency, website operator, or any other third party to transfer such Identifiers to Franchisor or Franchisor's designee.  The telephone company, postal service, registrar, Internet Service Provider, listing agency, website operator, or any other third party may accept such direction by Franchisor pursuant to this Franchise Agreement as conclusive evidence of Franchisor's rights to the Identifiers and Franchisor's authority to direct their transfer**;**

(d)     Make no representation nor state Franchisee is in any way approved, endorsed or licensed by Franchisor or associated or identified with Franchisor or the System in any manner;

(e)     Immediately take all steps necessary to amend or terminate any registration or filing of any d/b/a or business name or fictitious name or any other registration or filing containing the Marks to delete the Marks and all references to anything associated with the System;

(f)     Franchisee shall, at Franchisor's option, immediately assign to Franchisor any interest Franchisee has in any Lease for the Gym, and shall permit Franchisor the immediate right to enter and take possession of the Gym in order to maintain continuous operation of the Gym, to provide for the orderly change of management and disposition of personal property and to otherwise protect Franchisor's interest. If Franchisor does not elect to exercise its option to acquire the Lease for the Gym, then to the extent, if any, Franchisee is permitted to conduct any business at the Gym under this Franchise Agreement or a separate written agreement with Franchisor, and acknowledging the distinctiveness of Franchisor's interior design and décor, Franchisee shall make such modifications or alterations to the premises immediately upon termination or expiration of this Franchise Agreement as may be necessary to distinguish the appearance of such premises from that of other Core Progression Businesses operating under the System and Marks, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  If Franchisee fails or refuses to comply with the requirements of this Section, Franchisor shall have the right to enter the Gym without being guilty of trespass or any other tort, for the purposes of  making or causing to be made such changes as may be required, at the expense of Franchisee, which Franchisee agrees to pay upon demand;

(g)     Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit copy, or colorable imitation of the Marks, either in connection with such other business or its promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's or Franchisor's Affiliates rights in and to the Marks, and agrees not to use any designation of origin, description, representation, trademark, or trade name which suggests or represents a past or present association or connection with Franchisor, the System or the Marks;

(h)     Provide Franchisor the option to purchase set forth in Section 16; and

{00075378.DOC. }
[2017 FA v2F]

B-44

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

(i)        Comply with Subsections 10.1(c), (d) and (e) and Section 14.

17.10    If, within 30 days after termination or expiration of this Franchise Agreement, Franchisee has not taken all steps necessary to amend or terminate any registration or filing of any business name or d/b/a or any other registration or filing containing the Marks, Franchisee irrevocably appoints Franchisor as Franchisee's true and lawful attorney for Franchisee, and in Franchisee's name, place and stead and on Franchisee's behalf, to take action as may be necessary to amend or terminate all registrations and filings, enabling Franchisor to protect the System.  If, within 30 days after termination or expiration of this Franchise Agreement, Franchisee has not taken all steps necessary as described above in Section 17.9 to de-identify its Core Progression Business, then Franchisor may, but is not obligated to do so, and in such event Franchisee shall pay for all of Franchisor's expense.

17.11    Termination or expiration of this Franchise Agreement shall not affect, modify or discharge any claims, rights, causes of action or remedies Franchisor may have against Franchisee, whether such claims or rights arise before or after termination or expiration.

17.12    All obligations of the parties which expressly or by their nature survive the expiration or termination of this Franchise Agreement shall continue in full force and effect notwithstanding such expiration or termination. Without limiting the generality of the foregoing, Section 5.5 which requires Franchisee to pay a Royalty and Sections 10, 12, 14 and 16, shall survive termination or expiration of this Franchise Agreement.

17.13    If this Franchise Agreement expires or is terminated for any reason whatsoever and Franchisor is the lender under any loan agreement ("Loan") or the holder of any promissory note ("Note") or the holder of any personal property, security interest, chattel mortgage, debenture or mortgage of any nature whatsoever ("Security Interest") from Franchisee concerning assets used at any time by Franchisee in the Core Progression Business or which are on the Core Progression Business premises, such Loan, Note or Security Interest shall, upon the effective date of termination or expiration, immediately become fully due and payable as to all principal and interest so loaned and secured.

17.14    If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of this Franchise Agreement than is required hereunder, the prior notice or other action required by such law or rule shall be substituted for the notice requirements hereof. Such modifications to this Franchise Agreement shall be effective only in such jurisdiction and shall be enforced as originally made and entered into in all other jurisdictions.

17.15    If termination of this Franchise Agreement occurs for any reason whatsoever the parties shall accept its default remedies herein as full and final satisfaction of all claims. The parties waive, to the extent permitted by law, any claim against the other for punitive or exemplary damages; except for such punitive or exemplary damages for violation of the Lanham Act, trademark infringement or dilution, unauthorized dissemination of the Confidential Information or Trade Secrets or arising under the indemnification set out in Section 12.

17.16    The rights of the parties hereto are cumulative and no exercise or enforcement by a party of any right or remedy under this Franchise Agreement shall preclude the exercise or enforcement by that party of any other right or remedy in this Franchise Agreement, or to which it is entitled by law.

17.17    Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief to prevent irreparable harm, in addition to all other remedies. If it is necessary for Franchisor to seek preliminary or permanent injunctive relief, Franchisor may do so without a bond.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

17.18    The parties agree in the event the terms of this Franchise Agreement regarding termination or expiration are inconsistent with applicable state or federal law, such law shall govern franchisee's rights regarding termination or expiration of this agreement.

17.19    To secure Franchisee's performance under this Franchise Agreement and indebtedness for all obligations owed and sums due Franchisor or its Affiliates, Franchisor shall have a lien upon, and Franchisee hereby grants to Franchisor a security interest in, the following collateral and any and all attachments, accessories, additions, accessions, and substitutions to or for it and the cash and non-cash proceeds derived from insurance or the disposition of such collateral: (a) all inventory, equipment, furniture, furnishings, fixtures, and supplies now leased, owned or after-acquired by Franchisee and the Core Progression Business, including but not limited to all inventory, equipment, furniture, furnishings, fixtures, and supplies transferred to or acquired by Franchisee in connection with this Franchise Agreement; (b) all accounts of Franchisee and/or the Core Progression Business now existing or subsequently arising, together with all interest in Franchisee and/or the Core Progression Business, now existing or subsequently arising, together with all chattel paper, documents, and instruments relating to such accounts; (c) all contract rights of Franchisee and/or the Core Progression Business, now existing or subsequently arising; (d) all general intangibles of Franchisee and/or the Core Progression Business, now owned or existing, or after-acquired or subsequently arising; (e) all of Franchisee's and/or the Core Progression Business interests in the real estate where the Core Progression Business is located; and (f) all improvements to any real estate associated with the Core Progression Business.  Franchisee hereby authorizes Franchisor to file and record financing statements, financing statement amendments, continuation financing statements, fixture filings and other documents Franchisor deems necessary to evidence, perfect and continue the priority of security interests in and to these assets.  Franchisee also agrees to execute and deliver any documents to Franchisor upon its request.  Franchisee shall also reimburse Franchisor for all expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with enforcing the terms of this Franchise Agreement, or collecting amounts due Franchisor or its Affiliates hereunder.

17.20    Franchisor has the right (but not the obligation), under the circumstances described below, to enter the Gym and assume the Core Progression Business management (or to appoint a third party to assume its management).  If Franchisor (or a third party) assumes the Core Progression Business management, Franchisee agrees to pay Franchisor (in addition to the Royalties and Brand Fund Contributions and other amounts due Franchisor or its Affiliates) $500 per day that Franchisor or a third party manages the Core Progression Business, plus Franchisor's (or the third party's) direct out-of-pocket costs and expenses.  If Franchisor (or a third party) assumes the Core Progression Business management, Franchisee acknowledges Franchisor (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or Franchisee's owners for any debts, losses, or obligations the Core Progression Business incurs, or to any of Franchisee's creditors for any supplies, products, or other assets or services the Core Progression Business purchases, while Franchisor (or the third party) manages it. Franchisor (or a third party) may assume the Core Progression Business management under the following circumstances:  (1) if Franchisee abandons or fails to actively operate the Core Progression Business; (2) if Franchisee fails to comply with any provision of this Franchise Agreement and does not cure the failure as specified by the Franchise Agreement or Franchisor; or (3) if this Franchise Agreement is terminated and Franchisor is deciding whether to exercise the option to purchase the Core Progression Business under Section 16.  If Franchisor exercises its rights under this Section, it will not affect Franchisor's right to terminate this Franchise Agreement under Section 17.

17.21    Upon termination of this Franchise Agreement by Franchisor under Section 17, or by Franchisee without legal cause, Franchisee agrees to pay to Franchisor within 15 days after the effective date of this Franchise Agreement's termination, in addition to the amounts owed hereunder, liquidated damages calculated by multiplying the combined monthly average of Royalties and Brand Fund

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

Contributions (without regard to any fee waivers or other reductions) owed by Franchisee to Franchisor, beginning with date you open your Core Progression Business through the date of early termination, multiplied by the lesser of: (i) 36; or (ii) the number of full months remaining in the term of the Franchise Agreement, except that liquidated damages will not, under any circumstances, be less than $30,000.

The parties hereto acknowledge and agree that it would be impracticable to determine precisely the damages Franchisor would incur from this Franchise Agreement's termination and the loss of cash flow from Royalties and Brand Fund Contributions due to, among other things, the complications of determining what costs, if any, Franchisor might have saved and how much the Royalties and Brand Fund Contributions would have grown over what would have been this Franchise Agreement's remaining term. The parties hereto consider this liquidated damages provision to be a reasonable, good faith pre-estimate of those damages.

The liquidated damages provision only covers Franchisor's damages from the loss of cash flow from the Royalties and Brand Fund Contributions. It does not cover any other damages, including damages to Franchisor's reputation with the public and landlords and damages arising from a violation of any provision of this Agreement other than the Royalty and Brand Fund sections. Franchisee and each of Franchisee's owners agree that the liquidated damages provision does not give Franchisor an adequate remedy at law for any default under, or for the enforcement of, any provision of this Franchise Agreement other than the Royalty and Brand Fund section.

18.    CONDEMNATION AND CASUALTY

18.1    Franchisee shall promptly advise Franchisor upon Franchisee's receipt of a notice of default or termination under Franchisee's Lease or mortgage, and shall promptly provide Franchisor a copy of the notice. Franchisee shall also immediately give Franchisor notice of any proposed taking of the Gym or any portion through eminent domain. If the Gym or a substantial part thereof is to be taken, the Core Progression Business may be relocated within the Territory specified in Attachment A, or elsewhere with Franchisor's written approval under Franchisor's relocation procedures in the Franchise Operations Manual. If Franchisee opens a new business as provided above at another location under Franchisor's standards and general specifications within one year of closing the old Gym, the new Core Progression Business shall be deemed to be the Core Progression Business licensed under this Franchise Agreement. If a condemnation, Lease termination or mortgage default takes place and a new Core Progression Business does not, for any reason, become the Core Progression Business as provided in this Section 18.1, then the License shall terminate upon notice by Franchisor.

18.2    Franchisee shall expeditiously repair the Gym if it is damaged. If the damage or repair requires closing the Core Progression Business, Franchisee shall immediately notify Franchisor in writing, and shall:

(a)    Relocate the Core Progression Business as provided in Section 18.1; or

(b)    Repair or rebuild the Core Progression Business at the Gym under Franchisor's then existing standards and general specifications, and reopen the Core Progression Business for continuous business operations as soon as practical (but within 12 months after closing the Core Progression Business at the Gym), giving Franchisor 30 days advance notice of the date of reopening;

(c)    If the Core Progression Business is not (or, in the opinion of Franchisor cannot be) reopened under this Section 18.2, or relocated under Section 18.1, the License shall terminate upon notice to Franchisee.

{00075378.DOC. }                                            B-47
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

18.3    The Initial Term will not be extended by any interruption in the Core Progression Business's operations, except for an act of God that results in the Core Progression Business being closed not less than 60 days nor more than 180 days.  Franchisee must apply for any extension within thirty 30 days following the reopening of the Core Progression Business.  No event during the Initial Term or any Successor Term will excuse Franchisee from paying Royalties or Brand Fund Contributions as provided in this Franchise Agreement.

19.     NOTICES

Any notice, request, demand, approval, consent or other communication which the parties may be required to give or are permitted to be given hereunder shall be in writing and given to the party for whom it is intended by personal delivery, electronic mail provided that the recipient expressly acknowledges receipt of such electronic mail,  facsimile transmission or delivering it to such party by mailing it by prepaid registered mail, or by recognized overnight delivery or courier services to the address listed for Franchisor in the opening paragraph of this Franchise Agreement and the address listed in Attachment A for Franchisee.

Any notice or other document delivered personally or by facsimile transmission shall be deemed to have been received by and given to the addressee on the day of delivery and any such other notice or other document mailed shall be deemed to have been received by and given to the addressee at the earlier of the date of actual receipt of such notice or the third business day following the date of mailing, and any delivery made by recognized overnight delivery or courier services shall be deemed delivered the next business day.  Any party may at any time give notice in writing to any other party of any change of address.

20.     DISPUTE RESOLUTION

20.1    All claims or disputes between Franchisee and Franchisor or its Affiliates arising out of, or in any way relating to, this Franchise Agreement, or any of their respective rights and obligations arising out of this Franchise Agreement, shall be submitted first to mediation prior to a hearing in binding arbitration or a trial court proceeding.  Such mediation shall take place in Northglenn, Colorado (or Franchisor's then-current headquarters) under the auspices of the Judicial Arbitration and Mediation Service ("JAMS"), under JAMS's Commercial Mediation Rules then in effect.  Franchisee may not commence any action against Franchisor or Affiliates regarding any such claim or dispute in any court unless mediation proceedings have been terminated either:  (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) because of a written declaration by Franchisor.  The parties shall each bear their own costs of mediation and shall share equally the filing fee imposed by JAMS and the mediator's fees.  Franchisor reserves the right to specifically enforce its right to mediation.

20.2    Prior to mediation, and before commencing any legal action against Franchisor or Affiliates regarding any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies  the precise nature and grounds of such claim or dispute.  Franchisor shall not be required to first attempt to mediate nor arbitrate a controversy, dispute or claim against Franchisee as described in this Section 20 if such controversy, dispute or claim concerns an allegation by Franchisor that Franchisee has violated (or threaten to violate, or pose an imminent risk of violating):  (a) any of Franchisor's protected intellectual property rights in the Marks, the System, or in any of Franchisor's trade secrets or confidential information; (b) any claims pertaining to or arising out of any warranty issued; (c) securing injunctive relief or specific performance under this Franchise Agreement; or (d) any of the restrictive covenants contained in this Franchise Agreement.

{00075378.DOC. }                                          B-48
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

20.3    The parties will first attempt to resolve any dispute relating to or arising out of this Franchise Agreement by negotiation or mediation as described above in this Section 20. Franchisor will provide a procedure for internal dispute resolution in the Franchise Operations Manual, and the parties agree this procedure may be revised in Franchisor's discretion. Nonbinding mediation hereunder will be concluded within 60 days of the issuance of the request for mediation, or such longer period as may be agreed upon by the parties in writing ("Mediation Termination Date"). All aspects of the mediation process will be treated as confidential, will not be disclosed to others, and will not be offered or admissible in any other proceeding or legal action whatsoever.

20.4    To protect from violations that would cause immediate loss and damages or irreparable harm, Franchisor, without first seeking mediation or arbitration, shall have the right to seek from a state or federal court near Franchisor's headquarters (currently in Northglenn, Colorado):

(a)    injunctive relief and any related incidental damages;

(b)    an action for disputes or claims related to or based on any of Franchisor's protected intellectual property rights in the Marks or the or restrictive covenants;

(c)    issues related to the disclosure or misuse of Confidential Information or Trade Secrets; and

(d)    any claims pertaining to or arising out of any warranty issued.

20.5    If a judicial action is expressly permitted by Sections 20.2 and 20.4 of this Franchise Agreement, any such action brought by you against us will be brought exclusively, and any such action brought by us against you may be brought, in the federal district court covering the location of our principal place of business when the action is commenced, provided, however, that if the federal court would not have subject-matter jurisdiction had the action been commenced in such court, then, in such event, the action will (with respect to the actions commenced by you), and may (with respect to actions commenced by us), be brought in the state court within the judicial district covering the location of our principal place of business at the time the action is commenced. The parties waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

20.6    If a dispute is not resolved through negotiation or mediation as described above, and is not otherwise exempted as described in Section 20.2 or 20.4 above from the mediation/arbitration requirements, then such dispute shall be submitted to final and binding arbitration as the sole and exclusive remedy for any such controversy or dispute. Without limiting the generality of anything contained herein, the following shall be subject to mediation and then binding arbitration: any controversy or dispute arising out of, or relating to the Franchise or this Franchise Agreement including, but not limited to, any claim by Franchisee or any Persons in Privity with or claiming through, for or in the right of Franchisee, concerning the entry into, performance under, or termination of, this Franchise Agreement or any other agreement entered into by Franchisor, or its subsidiaries or Affiliates, and Franchisee; any claim against a past or present employee, officer, director, member, shareholder or agent of Franchisor; any claim of breach of this Franchise Agreement; and any claims arising under State or Federal laws.

(a)    "Persons in Privity" shall be defined as any person(s) or entities with or claiming through, on behalf of or in the right of Franchisee include but are not limited to, spouses and other family members, domestic partners, heirs, executors, representatives, successors and assigns. Subject to this Section, the right and duty of the parties to this Franchise Agreement to resolve any disputes by arbitration shall be governed exclusively by the Federal Arbitration Act, as

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

amended, and arbitration shall take place according to the commercial arbitration rules (in effect as of the date the demand for arbitration is filed) of, and under the auspices of, JAMS.

(b)    The arbitration, which shall be held before a single arbitrator, shall be held in the JAMS office nearest to Franchisor's headquarters (currently in Northglenn, Colorado), or at such other location as shall be mutually agreed upon by the parties in writing.  The parties expressly consent to personal jurisdiction in the State of Colorado and agree that such court(s) will have exclusive jurisdiction over any determination of the "prevailing party" under such issues not subject to arbitration.

20.7    A single arbitrator shall be selected by the parties from a panel of neutral arbitrators provided by JAMS and shall be chosen by the striking method. Each party shall bear its own costs of arbitration; however, the fees of the arbitrator shall be divided equally between the parties. The arbitrator shall have no authority to amend or modify the terms of this Franchise Agreement. The award or decision by the arbitrator shall be final and binding on the parties and may be enforced by judgment or order of a court having subject-matter jurisdiction in the state where the arbitration took place. The parties consent to the exercise of personal jurisdiction over them by such court and to the propriety of venue of such court to carry out this provision and waive any objections they would otherwise have concerning such matters.

20.8    Parties to arbitration under this Franchise Agreement shall not include, by consolidation, joinder or in any other manner, any person other than Franchisee and any Person in Privity with or claiming through, in the right of or for Franchisee or Franchisor, unless both parties consent in writing. To the extent permitted by applicable law, no issue of fact or law shall be given preclusive or collateral estoppel effect in any arbitration hereunder, except to the extent such issue may have been determined in another proceeding between Franchisor and Franchisee or any Person in Privity with or claiming through, in the right of or on behalf of Franchisee or Franchisor.

20.9    The parties agree that any arbitration arising out of a dispute relating to this Franchise Agreement is only a matter between Franchisor and Franchisee and no other franchisees or area developers, if any.  Franchisee agrees not to join or attempt to join other franchisees, area developers, or other third parties in any arbitration proceeding and to not participate in any "class action" litigation or arbitration proposed or asserted by any other franchisee(s).

20.10    Nothing in this Franchise Agreement will bar either party's right to seek injunctive relief without the posting of any bond or security to obtain the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Franchise Agreement.  Either party also will be able to seek injunctive relief to prohibit any act or omission by the other party or its employees that constitutes a violation of any applicable law, is dishonest or misleading to your customers or to the public, or which may impair the goodwill associated with the Marks.  The prevailing party will be entitled to recover its costs and reasonable attorney fees incurred by it in obtaining such relief.

20.11    No right or remedy conferred upon or reserved to us or you hereby is intended to be, nor will be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

20.12    If JAMS or any successor is no longer in existence at the time mediation or arbitration is commenced, Franchisor and Franchisee will agree on another mediation or arbitration organization to conduct the proceeding.

20.13    Any claim or controversy arising out of or related to this Franchise Agreement, or the making, performance, breach, interpretation, or termination thereof, brought by any party hereto against

{00075378.DOC. }                                                    B-50
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

the other, will be commenced within one year from the occurrence of the facts giving rise to such claim or action, or such claim or action will be barred.  THE PARTIES TO THIS FRANCHISE AGREEMENT HEREBY WAIVE IN ANY ARBITRATION OR JUDICIAL ACTION, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OF ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM, EACH WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT.

21.    MISCELLANEOUS

21.1    Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other applicable federal law, this Franchise Agreement shall be interpreted under the laws of the State of Colorado, and any dispute between the parties shall be governed by and determined under the substantive laws of the State of Colorado, which laws shall prevail in the event of any conflict of law; provided, however, the parties expressly agree this Franchise Agreement is not intended to confer on any Franchisee that is not a resident of the State of Colorado the benefit of any Colorado law providing specific protection to franchisees residing or operating in the State of Colorado. **FRANCHISEE AND FRANCHISOR HAVE NEGOTIATED REGARDING A FORUM IN WHICH TO RESOLVE ANY DISPUTES WHICH MAY ARISE BETWEEN THEM AND HAVE AGREED TO SELECT A FORUM IN ORDER TO PROMOTE STABILITY IN THEIR RELATIONSHIP.  IF A CLAIM IS ASSERTED IN ANY LEGAL PROCEEDING INVOLVING FRANCHISEE, ITS OFFICERS, DIRECTORS, MANAGERS, MEMBERS, OR PARTNERS AND FRANCHISOR, ITS OFFICERS, DIRECTORS, SHAREHOLDERS, MANAGERS, MEMBERS, EMPLOYEES OR AFFILIATES, BOTH PARTIES AGREE THAT THE EXCLUSIVE VENUE FOR DISPUTES BETWEEN THEM SHALL BE IN COLORADO AND EACH WAIVES ANY OBJECTION EITHER MAY HAVE TO THE PERSONAL JURISDICTION OF OR VENUE IN COLORADO.  FRANCHISEE IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY OBJECTION FRANCHISEE MAY HAVE TO EITHER THE JURISDICTION OR VENUE IN SUCH COURT.**

21.2    All provisions of this Franchise Agreement are severable and this Franchise Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not included herein; all partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.

21.3    If either party institutes a legal proceeding, including a permitted court proceeding or arbitration, and prevails entirely or in part in any action at law or in equity against the other party based entirely or in part on this Franchise Agreement, the prevailing party shall be entitled to recover from the losing party, in addition to any judgment, reasonable attorney fees, court costs and all of the prevailing party's expenses in connection with any action at law.

21.4    No failure, forbearance, neglect or delay of any kind by Franchisor in connection with the enforcement or exercise of any rights under this Franchise Agreement shall affect or diminish Franchisor's right to strictly enforce and take full benefit of each provision of this Franchise Agreement at any time, whether at law for damages, in equity for injunctive relief or specific performance, or otherwise. No custom, usage or practice regarding this Franchise Agreement by Franchisee or Franchisor's other franchisees shall preclude the strict enforcement of this Franchise Agreement under its literal terms. No waiver by Franchisor of performance of any provision of this Franchise Agreement shall constitute or be implied as a waiver of Franchisor's right to enforce that provision in the future.  No interpretation, change, termination or waiver of any provision of this Franchise Agreement, and no consent or approval under this Franchise Agreement, shall be binding upon Franchisee or Franchisor or effective unless in

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

writing signed by Franchisee and Franchisor's Chief Executive Officer, President or Vice President, except a waiver need be signed only by the party waiving.

21.5    This Franchise Agreement, together with the Franchise Operations Manual, any written related agreements, all Exhibits, Attachments, and the State Addenda attached to the Franchise Disclosure Document as Exhibit F, constitutes the entire understanding and agreement between Franchisee and Franchisor and supersedes all prior understandings, whether oral or written, pertaining to this Franchise Agreement, the License, the System or the Core Progression Business.  Nothing in the Franchise Agreement or in any related agreement is intended to disclaim the representations franchisor made in the franchise disclosure document.

21.6    The headings of the sections hereof are for convenience only and do not define, limit or construe the contents of the sections of such Sections or other Sections.  The term "Franchisee" herein is applicable to one or more persons, or an Entity, as the case may be, and the singular usage (where applicable) includes the plural and the masculine and neuter usages (where applicable) include the other and the feminine.  The term "Lease" shall include a sublease, and a renewal or extension of a lease or sublease.

21.7    When calculating the date upon or the time within which any act is to be done under this Franchise Agreement, the date which is the reference date in calculating such period is excluded; if the last day of such period is a non-business day, the period in question shall end on the next business day. Time shall be of the essence of this Franchise Agreement and of every part thereof.

21.8    Neither party shall be liable for any loss or damage due to any delay in the performance of the terms of this Franchise Agreement (except for the payment of money) because of strikes, lockouts and other labor relations, fires, riots, wars, terrorist attacks, embargoes and civil commotion, or acts of God ("Force Majeure Event").  Any such delay shall extend performance only so long as such event is in progress except such Force Majeure Event will not affect or change Franchisee's obligation to pay Royalties and Brand Fund Contributions when due.  Notwithstanding the foregoing, if there is a Force Majeure Event, Franchisor may, in its sole discretion, elect to waive the Royalties and Brand Fund Contributions during the period of delay caused by the Force Majeure Event or such shorter period.

21.9    Franchisee shall execute and deliver such instruments, contracts, forms and other documents and shall perform such acts as may be necessary or desirable to carry out, complete and perform all terms, covenants and obligations of this Franchise Agreement.  Franchisee irrevocably appoints Franchisor as its attorney, which appointment is coupled with an interest, and empowers Franchisor to execute such instruments regarding the Marks for and in Franchisee's name in order to give full effect to Sections 10, 12, 15, and 17 of this Franchise Agreement.  Franchisee declares that the power of attorney herein granted may be exercised during any subsequent legal incapacity on its part.

21.10    This Franchise Agreement shall be binding upon, and subject to Section 15, shall inure to the benefit of, Franchisor's and Franchisee's successors and permitted assigns.

21.11    This Franchise Agreement may only be modified in writing and signed by Franchisee and Franchisor.  Franchisee agrees Franchisor may modify its standards and specifications and operating and marketing techniques in the Franchise Operations Manual unilaterally under any conditions and to the extent in which Franchisor, in its sole discretion, deems necessary to protect, promote, or improve the Marks, and the quality of the System, but under no circumstances will such modifications be made arbitrarily without such determination.  Notwithstanding anything herein to the contrary, Franchisor shall have the unilateral right to reduce the scope of any covenants of Franchisee in this Franchise Agreement upon notice to Franchisee and Franchisee shall comply with the modified covenants.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

21.12   Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties hereunder to third parties, whether the same are agents of Franchisor or independent contractors which Franchisor has contracted with to provide such services.  Franchisee agrees in advance to any delegation by Franchisor of any or all of its obligations and duties hereunder.

22.   <u>ACKNOWLEDGMENT</u>

BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL.

FRANCHISEE ACKNOWLEDGES AND AGREES THAT:

1.   NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS AGREEMENT, OR ADDENDA, IF APPLICABLE, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.  **INITIAL** _____

2.   FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE SYSTEM AND RECOGNIZES THAT THE CORE PROGRESSION BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT AND ITS SUCCESS INVOLVES SUBSTANTIAL BUSINESS RISK AND WILL BE LARGELY DEPENDENT UPON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE CORE PROGRESSION BUSINESS.  FRANCHISEE HEREBY ASSUMES THE RESPONSIBILITY FOR ITS SUCCESS OR FAILURE OF THE CORE PROGRESSION BUSINESS VENTURE.  **INITIAL** _____

3.   FRANCHISOR HAS NOT PROVIDED ANY STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION OF ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL PURCHASES, SALE, COST, EARNINGS, INCOME OR PROFITS TO FRANCHISEE.  **INITIAL** _____

4.   FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED, ANY ASSURANCE, WARRANTY OR GUARANTY, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS, EARNINGS OR SUCCESS OF THE CORE PROGRESSION BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.  **INITIAL** _____

This entire Franchise Agreement, including corrections, changes, and all attachments and addenda, will only be binding upon Franchisor when executed or initialed by Franchisor's authorized representative.

*(Signatures on following page)*

{00075378.DOC. }
[2017 FA v2F]

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

IN WITNESS WHEREOF, the parties have executed this Franchise Agreement as of the date first set forth above.

**FRANCHISOR:**

CORE PROGRESSION FRANCHISE LLC

Date: 9/5/2019

By: _____

Title: CEO / Founder

**FRANCHISEE:**

Date: _____

Individually

OR:
(if a corporation or partnership)

CAO Enterprises, Inc.

Company Name

Date: 9/2/2019

By: _____

Title: President

{00075378.DOC. }
[2017 FA v2F]

B-54

**EXHIBIT 1**

**ATTACHMENT A**
**TO FRANCHISE AGREEMENT**

**FRANCHISE DATA SHEET**

1.      Effective Date.  The Effective Date set forth in the introductory Paragraph of the Franchise Agreement is: _____September 2nd_, 20 _19_.

2.      Franchise Owner.  The Franchise Owner set forth in the introductory Paragraph of the Franchise Agreement is: _____CAO Enterprises Inc._____

3.      Initial Franchise Fee.  The Initial Franchise Fee described in Section 5.1 of the Franchise Agreement is $___45,000_____.

4.      Notice Address.  The notice address for Franchise Owner set forth in Section 19 of the Franchise Agreement is:

> Attn: Chris O'Hare– CAO Enterprises Inc.
> ___2842 Lanasa Lane___
> ___Apex, NC 27523___
> _____

5.      Territory. The Territory in Section 4.1 of the Franchise Agreement shall be the geographic area described below and as depicted on the following map:

> To be completed, initialed and dated when Territory is determined.

6.      Approved Location.  The Approved Location in Section 4.1 of the Franchise Agreement shall be:

> To be completed, initialed and dated when Approved Location is determined.

**FRANCHISOR:**

CORE PROGRESSION FRANCHISE LLC

By: _____
DocuSigned by:
A6C0A2B2A87E4E2...
CEO / Founder
Title: _____

**FRANCHISEE:**

CAO Enterprises Inc.
_____

By: _____
DocuSigned by:
Chris O'Hare
3D1CC5F06F434C7...
President
Title: _____

**EXHIBIT 1**

**ATTACHMENT B**
**TO FRANCHISE AGREEMENT**

**OWNERS AGREEMENT**

As a condition to the granting by Core Progression Franchise LLC ("we" or "us"), of a Franchise Agreement with _____CAO Enterprises Inc._____ ("Franchisee"), each of the undersigned individuals ("Owners"), who constitute all of the owners of a beneficial interest in Franchisee, as well as their respective spouses, covenant and agree to be bound by this Owner's Agreement ("Owner's Agreement").

1.      **Acknowledgments.**

        1.1      Franchise Agreement.  Franchisee entered into a franchise agreement with us effective as of ____September 2nd____, 20 _19_ ("Franchise Agreement").  Capitalized words not defined in this Owner's Agreement will have the same meanings ascribed to them in the Franchise Agreement.

        1.2      Owners' Role.  Owners are the beneficial owners of all of the equity interest in Franchisee and acknowledge there are benefits received and to be received by each Owner, jointly and severally, and for themselves, their heirs, legal representatives and assigns. Franchisee's obligations under the Franchise Agreement, including the confidentiality and non-compete and non-solicitation obligations, would be of little value to us if Franchisee's owners were not bound by the same requirements.  Under the provisions of the Franchise Agreement, Owners are required to enter into this Owner's Agreement as a condition to our entering into the Franchise Agreement with Franchisee.  Owners will be jointly and severally liable for any breach of this Owner's Agreement.

2.      **Nondisclosure and Protection of Confidential Information.**

        Under the Franchise Agreement, we will provide Franchisee with specialized training, proprietary trade secrets, and other Confidential Information relating to the establishment and operation of a franchised business.  The provisions of the Franchise Agreement governing Franchisee's nondisclosure obligations relating to our Confidential Information are hereby incorporated into this Owner's Agreement by reference, and Owners agree to comply with each obligation as though fully set forth in this Owner's Agreement as a direct and primary obligation of Owners.  Further, we may seek the same remedies against Owners under this Owner's Agreement as we may seek against Franchisee under the Franchise Agreement.  Any and all information, knowledge, know-how, techniques, and other data, which we designate as confidential, will also be deemed Confidential Information for purposes of this Owner's Agreement.

3.      **Covenant Not To Compete and Not To Solicit.**

        3.1      Non-Competition and Non-Solicitation During and After the Term of the Franchise Agreement.  Owners acknowledge that as a participant in our system, they will receive proprietary and confidential information and materials, trade secrets, and the unique methods, procedures and techniques which we have developed.  The provisions of the Franchise Agreement governing Franchisee's restrictions on competition and solicitation both during the term of the Franchise Agreement and following the expiration or termination of the Franchise Agreement are hereby incorporated into this Owner's Agreement by reference, and Owners agree to comply with and perform each such covenant as though fully set forth in this Owner's Agreement as a direct and primary obligation of Owners.  Further,

{00075378.DOC. }                                        B-B-1
[2017 FA v2F]

**EXHIBIT 1**

we may seek the same remedies against Owners under this Owner's Agreement as we may seek against Franchisee under the Franchise Agreement.

3.2    Construction of Covenants.  The parties agree that each such covenant related to non-competition will be construed as independent of any other covenant or provision of this Owner's Agreement.  If all or any portion of a covenant referenced in this Section 3 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a final decision to which we are a party, Owners agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 3.

3.3    Our Right to Reduce Scope of Covenants.  Additionally, we have the right, in our sole discretion, to unilaterally reduce the scope of all or part of any covenant referenced in this Section 3 of this Owner's Agreement, without Owners' consent (before or after any dispute arises), effective when we give Owners written notice of this reduction.  Owners agree to comply with any covenant as so modified.

4.    **Guaranty.**

4.1    Payment.  Owners will pay us (or cause us to be paid) all monies payable by Franchisee under the Franchise Agreement on the dates and in the manner required for payment in the relevant agreement.

4.2    Performance.  Owners unconditionally Guaranty full performance and discharge by Franchisee of all of Franchisee's obligations under the Franchise Agreement on the date and times and in the manner required in the relevant agreement.

4.3    Indemnification.  Owners will indemnify, defend and hold harmless us, all of our affiliates, and the respective shareholders, directors, partners, employees, and agents of such entities, against and from all losses, damages, costs, and expenses which we or they may sustain, incur, or become liable for by reason of: (a) Franchisee's failure to pay the monies payable (to us or any of our affiliates) pursuant to the Franchise Agreement, or to do and perform any other act, matter, or thing required by the Franchise Agreement; or (b) any action by us to obtain performance by Franchisee of any act, matter, or thing required by the Franchise Agreement.

4.4    No Exhaustion of Remedies.  Owners acknowledge and agree that we will not be obligated to proceed against Franchisee or exhaust any security from Franchisee or pursue or exhaust any remedy, including any legal or equitable relief against Franchisee, before proceeding to enforce the obligations of the Owners as guarantors under this Owner's Agreement, and the enforcement of such obligations can take place before, after, or contemporaneously with, enforcement of any of Franchisee's debts or obligations under the Franchise Agreement.

4.5    Waiver of Notice.  Without affecting Owners' obligations under this Section 4, we can extend, modify, or release any of Franchisee's indebtedness or obligation, or settle, adjust, or compromise any claims against Franchisee, all without notice to the Owners.  Owners waive notice of amendment of the Franchise Agreement and notice of demand for payment or performance by Franchisee.

4.6    Effect of Owner's Death.  Upon the death of an Owner, the estate of such Owner will be bound by the obligations in this Section 4, but only for defaults and obligations hereunder existing at the time of death; and the obligations of any other Owners will continue in full force and effect.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

**5.    Transfers.**

Owners acknowledge and agree that we have granted the Franchise Agreement to Franchisee in reliance on Owners' business experience, skill, financial resources and personal character.  Accordingly, Owners agree not to sell, encumber, assign, transfer, convey, pledge, merge or give away any direct or indirect interest in this Franchisee, unless Owners first comply with the sections in the Franchise Agreement regarding Transfers. Owners acknowledge and agree that any attempted Transfer of an interest in Franchisee requiring our consent under the Franchise Agreement for which our express written consent is not first obtained will be a material breach of this Owner's Agreement and the Franchise Agreement.

**6.    Notices.**

6.1    Method of Notice.  Any notices given under this Owner's Agreement shall be in writing and delivered in accordance with the provisions of the Franchise Agreement.

6.2    Notice Addresses.  Our current address for all communications under this Owner's Agreement is:

> Core Progression Franchise LLC
> 10693 Melody Drive
> Northglenn, CO 80234

The current address of each Owner for all communications under this Owner's Agreement is designated on the signature page of this Owner's Agreement.  Any party may designate a new address for notices by giving written notice to the other parties of the new address according to the method set forth in the Franchise Agreement.

**7.    Enforcement of This Owner's Agreement.**

7.1    Dispute Resolution.  Any claim or dispute arising out of or relating to this Owner's Agreement shall be subject to the dispute resolution provisions of the Franchise Agreement.  This agreement to engage in such dispute resolution process shall survive the termination or expiration of this Owner's Agreement.

7.2    Choice of Law; Jurisdiction and Venue.  This Owner's Agreement and any claim or controversy arising out of, or relating to, any of the rights or obligations under this Owner's Agreement, and any other claim or controversy between the parties, will be governed by the choice of law and jurisdiction and venue provisions of the Franchise Agreement.

7.3    Provisional Remedies.  We have the right to seek from an appropriate court any provisional remedies, including temporary restraining orders or preliminary injunctions to enforce Owners' obligations under this Owner's Agreement.  Owners acknowledge and agree that there is no adequate remedy at law for Owners' failure to fully comply with the requirements of this Owner's Agreement.  Owners further acknowledge and agree that, in the event of any noncompliance, we will be entitled to temporary, preliminary, and permanent injunctions and all other equitable relief that any court with jurisdiction may deem just and proper.  If injunctive relief is granted, Owners' only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Owners expressly waive all claims for damages they incurred as a result of the wrongful issuance.

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

**8.    Miscellaneous.**

8.1    No Other Agreements.  This Owner's Agreement constitutes the entire, full and complete agreement between the parties, and supersedes any earlier or contemporaneous negotiations, discussions, understandings or agreements.  There are no representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Owner's Agreement, other than those in this Owner's Agreement.  No other obligations, restrictions or duties that contradict or are inconsistent with the express terms of this Owner's Agreement may be implied into this Owner's Agreement.  Except for unilateral reduction of the scope of the covenants permitted in Section 3.3 (or as otherwise expressly provided in this Owner's Agreement), no amendment, change or variance from this Owner's Agreement will be binding on either party unless it is mutually agreed to by the parties and executed in writing.  Time is of the essence.

8.2    Severability.  Each provision of this Owner's Agreement, and any portions thereof, will be considered severable.  If any provision of this Owner's Agreement or the application of any provision to any person, property or circumstances is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Owner's Agreement will be unaffected and will still remain in full force and effect.  The parties agree that the provision found to be invalid or unenforceable will be modified to the extent necessary to make it valid and enforceable, consistent as much as possible with the original intent of the parties (i.e. to provide maximum protection for us and to effectuate the Owners' obligations under the Franchise Agreement), and the parties agree to be bound by the modified provisions.

8.3    No Third Party Beneficiaries.  Nothing in this Owner's Agreement is intended to confer upon any person or entity (other than the parties and their heirs, successors and assigns) any rights or remedies under or by reason of this Owner's Agreement.

8.4    Construction.  Any term defined in the Franchise Agreement which is not defined in this Owner's Agreement will be ascribed the meaning given to it in the Franchise Agreement.  The language of this Owner's Agreement will be construed according to its fair meaning, and not strictly for or against either party.  All words in this Owner's Agreement refer to whatever number or gender the context requires.  If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation

8.5    Binding Effect. This Owner's Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed an original.  This Owner's Agreement is binding on the parties and their respective heirs, executors, administrators, personal representatives, successors and (permitted) assigns.

8.6    Successors.  References to "Franchisor" or "the undersigned," or "you" include the respective parties' heirs, successors, assigns or transferees.

8.7    Nonwaiver.  Our failure to insist upon strict compliance with any provision of this Owner's Agreement shall not be a waiver of our right to do so. Delay or omission by us respecting any breach or default shall not affect our rights respecting any subsequent breaches or defaults.  All rights and remedies granted in this Owner's Agreement shall be cumulative.

8.8    No Personal Liability.  You agree that fulfillment of any and all of our obligations written in the Franchise Agreement or this Owner's Agreement, or based on any oral communications which may be ruled to be binding in a court of law, shall be our sole responsibility and none of our owners, officers,

{00075378.DOC. }
[2017 FA v2F]

B-B-4

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

agents, representatives, nor any individuals associated with us shall be personally liable to you for any reason.

8.9    Owner's Agreement Controls.  In the event of any discrepancy between this Owner's Agreement and the Franchise Agreement, this Owner's Agreement shall control.

**IN WITNESS WHEREOF**, the parties have entered into this Owner's Agreement as of the effective date of the Franchise Agreement.

**OWNERS:**

Chris O'Hare
2842 Lanasa Lane
Apex, NC 27523

[Insert Name and Address of Owner]                    [Insert Name of Spouse]

[Insert Name and Address of Owner]                    [Insert Name of Spouse]

[Insert Name and Address of Owner]                    [Insert Name of Spouse]

[Insert Name and Address of Owner]                    [Insert Name of Spouse]

Franchisor hereby accepts the Owner(s)' agreements hereunder.

FRANCHISOR:

CORE PROGRESSION FRANCHISE LLC

By: _____

Title: _____

CEO / Founder

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

**ATTACHMENT C**
**TO FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP**

Franchisee:  ___CAO Enterprises Inc._____

Trade Name (if different from above): _____

Form of Ownership
(Check One)

_____ Individual  _____ Partnership  _⟋ℓ_ Corporation  _____ Limited Liability Company

        If a Partnership, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

        If a Corporation, give the state and date of incorporation, the names and addresses of each officer and director, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

        If a Limited Liability Company, give the state and date of formation, the name of the manager(s), and list the names and addresses of every member and the percentage of membership interest held by each member.

State and Date of Formation:  ___North Carolina –August 23rd, 2019_____

Management (managers, officers, board of directors, etc.):

| Name | Title |
|---|---|
| Chris O'Hare | President |
|  |  |
|  |  |
|  |  |
|  |  |

Members, Stockholders, Partners:

| Name | Address | Percentage Owned |
|---|---|---|
| Chris O'Hare | 2842 Lanasa Lane | 100% |
|  | Apex, NC 27523 |  |
|  |  |  |
|  |  |  |
|  |  |  |

        Franchisee acknowledges this Statement of Ownership applies to the Core Progression Business authorized under the Franchise Agreement.

{00075378.DOC. }
[2017 FA v2F]

B-C-1

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

Use additional sheets if necessary. Any and all changes to the above information must be reported to Franchisor in writing.

**FRANCHISEE:**

Entity name (if any):

      CAO Enterprises Inc.

By: _____ *Chris O'Hare* _____

Printed Name: _____ Chris O'Hare _____

Title: _____ President _____

{00075378.DOC. }

[2017 FA v2F]

B-C-2

**EXHIBIT 1**

DocuSign Envelope ID: AF049516-54E0-49B0-A9F3-A0017DA6C608

Addendum for CAO Enterprises Inc.:

CAO Enterprises Inc. will have the opportunity to open a 2nd Core Progression Franchise at the discounted franchise fee rate of $40,000. To receive this discount the second territory would need to be purchased within 6 months of the first territory opening. CAO Enterprises Inc. will then have the opportunity to open a 3rd Core Progression franchise at the discounted franchise fee rate of $14,000. To receive this discount, the 3rd territory would need to be purchased within 6 months of the 2nd territory opening. The opening of the 2nd and 3rd territories would need to adhere to the development schedule of a multi-unit purchase as outlined in the Franchise Agreement to qualify for discounted fees stated.

Core Progression Franchise LLC grants a 6-mile protected territory to CAO Enterprises Inc. once the territory is secured in the "Golden Triangle" area of Chapel Hill / Raleigh/ Durham NC. This will go into effect once the desired site is identified and then the radius will be in placed around that site.

Core Progression Franchise LLC grants CAO Enterprises Inc. the first right of refusal for the cities of the "Golden Triangle" area of Chapel Hill / Raleigh / Durham, NC.  The period to exercise the first right refusal would be 30 days from first contact about a request for that city.    If CAO Enterprises Inc. choses to exercise that right, the territory would need to be signed and franchise fees paid in full at the end of the 30-day period.  This will also be on the condition that there are no outstanding defaults of any kind with any other locations owned by Chris O'Hare and CAO Enterprises Inc., and that all locations are in compliance with all Franchise Agreement and FDD documents.

Core Progression Franchise LLC grants CAO Enterprises Inc. the right to a $15,000 transfer fee if such transfer is executed.

Core Progression Franchise LLC

_____
**Franchisor**

_____
**By**            CEO / Owner

_____
**Title**

          9/5/2019
_____
**Date Signed**

CAO Enterprises Inc.

_____
**Franchisee**

_____
**By**            President

_____
**Title**

          9/2/2019
_____
**Date Signed**

**EXHIBIT 1**