| | |
|---|---|
| **CHRIS O'HARE and CAO ENTERPRISES, INC.;**<br><br>**TIM MCNUTT and CEDAR DRIVE INVESTMENTS, LLC; and**<br><br>**MYTCHELL MEAD, JAN MEAD, ALTRU FITNESS LLC, and ALTRU FITNESS COS LLC f/k/a COLORADO SPRINGS CORE PROGRESSION, LLC**<br><br>Claimants<br><br>v.<br><br>**JONATHAN CERF and CORE PROGRESSION FRANCHISE LLC**<br><br>Respondents | JAMS Consolidated Arbitration Case ID 27679 |
| **INTERIM AWARD** | |

The Panel, having considered the testimony, exhibits, argument, and briefing described below, now enters the following Interim Award in this consolidated arbitration.

## I.    INTRODUCTION, PARTIES AND CLAIMS, INITIAL PROCEDURAL HISTORY, AND GOVERNING LAW

1.    This is a franchise-related dispute between two former franchisee groups, Chris O'Hare and CAO Enterprises, Inc. (collectively, "O'Hare") and Mytchell Mead, Jan Mead, Altru Fitness LLC, and Altru Fitness Cos LLC f/k/a Colorado Springs Core Progression, LLC (collectively, "Mead") and one current franchisee group, Tim McNutt and Cedar Drive Investments, LLC (collectively "McNutt") against franchisor Core Progression Franchise LLC ("CP") and its founder and managing member Jonathan Cerf ("Cerf"). O'Hare, Mead, and McNutt are sometimes referred to individually as a "Claimant" and collectively as the "Claimants." We sometimes refer to CP and Cerf collectively as the "Respondents." We sometimes refer to Claimants and Respondents collectively as the "Parties."

2.    The Claimants, along with two former claimant groups – Douglas Filipov and Las Vegas CP1 LLC (collectively, "Filipov"), and Kris Pacey, Christina Pacey, and CP Fit Lifestyle LLC (collectively, "Pacey") – all filed separate Demands for Arbitration against Respondents on December 20, 2020.

3.    In February 2021, after JAMS Denver's staff circulated an arbitrator strike list for the Filipov arbitration, a dispute arose between the Parties regarding whether the same arbitrator would resolve each Claimant's claims or a different arbitrator would decide each arbitration.

4.    Via an email dated February 19, 2021, our staff informed the Parties that "All 5 of these matters are on hold pending the resolution of this issue." On September 1, 2021, JAMS

**EXHIBIT 3**

Denver arbitrator Judge C. Scott Crabtree (Ret.) entered an order holding that there would be a different arbitrator for each arbitration, to be selected pursuant to JAMS Rule 15.

5.      Mead filed an Amended Demand on August 10, 2021.

6.      On December 22, 2021, the Parties filed a Stipulation to consolidate what were originally five separate arbitrations into a single arbitration to be heard and decided by a panel of three arbitrators (the "Stipulation").

7.      Thereafter the current Panel – Judge John W. Madden, IV (Ret.), Chair; Judge Robert McGahey (Ret.); and Steven C. Choquette, Esq. – was assembled to conduct this consolidated arbitration.

8.      After consolidation and in lieu of proceeding to the Final Hearing, Filipov and Pacey settled with Respondents.[1] As a result, we dismissed Filipov's and Pacey's claims against Respondents, and CP's Counterclaim Nos. 1 and 2 against Filipov,[2] with prejudice, and those claims and counterclaims therefore are not addressed in this Interim Award. *See* January 19, 2023, Order of Dismissal with Prejudice as to the Pacey Claimants Only *and* January 27, 2023, Order of Dismissal with Prejudice as to the Filipov Claimants Only.

9.      O'Hare's claims, in all cases against both Respondents, are:

   a. Fraudulent misrepresentation;
   b. Fraudulent nondisclosure;
   c. Fraudulent concealment;
   d. Deceptive trade practices pursuant to C.R.S. § 6-1-101, *et seq*. (the Colorado Consumer Protection Act, or "CCPA");
   e. Negligence (against both Respondents);
   f. Negligent misrepresentation;
   g. Civil theft pursuant to C.R.S. § 18-4-405; and
   h. Conversion (subsequently withdrawn, as noted below).

10.     McNutt's claims, again against both Respondents, are:

   a. Fraudulent misrepresentation;
   b. Fraudulent nondisclosure;
   c. Fraudulent concealment;

---

[1] Claimants first informed us via email dated December 14, 2022, that settlements between Respondents and Filipov and Pacey were likely. On January 18, 2022, Pacey filed a Withdrawal from Arbitration, confirming Respondents and Pacey had settled. On January 19, 2022, Respondents informed us they had no objection to Pacey's withdrawal from the arbitration. Counsel informed us that Filipov and Respondents had settled during our consideration of preliminary matters on the first day of the Final Hearing, January 23, 2023.

[2] CP did not assert counterclaims against Pacey.

**EXHIBIT 3**

    d.   CCPA;

    e.   Negligence;

    f.   Negligent misrepresentation;

    g.   Civil theft pursuant to C.R.S. § 18-4-405; and

    h.   Conversion (subsequently withdrawn, as noted below).

11. Mead's amended claims, against both Respondents except as noted, are:

    a.   Fraudulent misrepresentation;

    b.   Fraudulent nondisclosure;

    c.   Fraudulent concealment;

    d.   Breach of contract and covenant of good faith and fair dealing (against CP only);

    e.   Civil theft pursuant to C.R.S. § 18-4-405; and

    f.   Conversion (subsequently withdrawn as noted below).[3]

12.    We held a Preliminary Conference on March 14, 2022, and issued Scheduling Order No. 1 on March 25, 2022.

13.    As reflected in Scheduling Order No. 1, the consolidated arbitration is governed by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* and JAMS' Comprehensive Arbitration Rules and Procedures effective June 1, 2021 (collectively the "JAMS Rules," or singly a "JAMS Rule"). Colorado substantive law governs, "[e]xcept to the extent [the franchise agreement is] governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other applicable federal law …." *See* Exs. 2006, 2018 & 2022, Claimants' signed Franchise Agreements (collectively the "FAs," or singly an "FA"), at § 21.1.[4]

## II.    FURTHER PROCEDURAL HISTORY

14.    In Scheduling Order No. 1, we ordered that, "Any amended claims or demand must be filed by April 8, 2022. Any response and any counterclaims must be filed by May 2, 2022. Any reply to counterclaims must be filed by May 16, 2022." We also ordered the Parties to complete their initial exchange of documents by April 29, 2022.

15.    In March and April 2022, the Parties briefed the allocation of JAMS Denver's and our fees and costs. On April 27, 2022, we entered Procedural Order No. 1 re Payment of JAMS' Fees, holding that "Respondents shall pay 50% of JAMS' and the Arbitrators' fees and costs, and the collective Claimants shall pay 50% of same (to be allocated between Claimant groups as they and their counsel decide)."

---

[3] Claimants have not enlightened us about why Mead's amended claims vary from O'Hare's and McNutt's claims. Mead's original claims were the same as O'Hare's and McNutt's claims.

[4] For ease of reference, where there is overlap between Claimants' Exhibits (which begin at 2001), we will generally refer solely to those Exhibit numbers. Where there is not overlap, we will refer to Respondents' Exhibits (which begin at 1).

**EXHIBIT 3**

16.     Having asserted their respective original claims and Mead's amended claims before their separate arbitrations were consolidated into this one, Claimants did not tender amended Demands by the April 8, 2022, deadline.[5] Respondents made a record of this in an April 12, 2022, email to JAMS and Claimants. In that same email, Respondents stated, "Respondents will move forward with filing a counterclaim by May 2, 2022, as stated in paragraph 8 [of Scheduling Order No. 1]." *Id.*

17.     In an April 13, 2022, email to JAMS, Claimants expressed their objection to Respondents assertion of any counterclaims. Via our April 14, 2022, Order entitled Direction to Brief Issue, we set a briefing schedule regarding potential counterclaims by Respondents and indicated we would decide the matter on the briefs.

18.     On May 2, 2022, Respondents filed and served what they denominated "Core Progression Franchise LLC's Answer" and "Core Progression Franchise LLC's Counterclaims." It is apparent from the body of it that the Answer was filed on behalf of *both* CP and Cerf.  Therein, as permitted by JAMS Rule 9, Respondents generally denied Claimants' allegations, claims, and alleged damages.  They asserted twelve affirmative defenses:

    a.  Failure to state a cause of action;
    b.  Unclean hands;
    c.  Waiver;
    d.  Estoppel;
    e.  Non-actionable future predictions;
    f.  Non-actionable deceptive trade practice [*e.g.*, non-actionable CCPA claim];
    g.  No actual reliance;
    h.  No reasonable reliance;
    i.  Not material;
    j.  Offset;
    k.  Failure to mitigate; and
    l.  Causation

19.     CP[6] asserted the following Counterclaims against Claimants:

    a.  O'Hare:[7]

        i.  Breach of contract – Franchise Agreement;

---

[5] As noted above, Mead asserted an Amended Demand before we held the Preliminary Hearing and issued Scheduling Order No. 1.

[6] Unlike the Answer, the text of which indicates both CP and Cerf were answering and asserting affirmative defenses, *only CP* asserted the Counterclaims. Thus, Cerf did not pursue counterclaims against any Claimant at the Final Hearing.

[7] For reasons described below, none of CP's counterclaims against O'Hare was heard at the Final Hearing.

**EXHIBIT 3**

    ii.   Trademark Infringement - 15 U.S.C. § 1114;
   iii.   Trade Dress Infringement - 15 U.S.C. § 1125;
    iv.   Unfair competition;
     v.   Common law trademark infringement;
    vi.   Trade secret misappropriation – 18 U.S.C. § 1836;
   vii.   Trade secret misappropriation – C.R.S. 7-74-101 et seq.; and
  viii.   Civil conspiracy

b. Mead[8]

     i.   Breach of contract – Franchise Agreement;
    ii.   Trademark infringement - 15 U.S.C. § 1114;
   iii.   Trade dress infringement - 15 U.S.C. § 1125;
    iv.   Unfair competition;
     v.   Common law trademark infringement;
    vi.   Trade secret misappropriation – 18 U.S.C. § 1836;
   vii.   Trade secret misappropriation – C.R.S. 7-74-101 et seq.; and
  viii.   Civil conspiracy

c. McNutt

     i.   Accounting

20.     On May 6, 2022, we received: Claimants' Brief Re: Counterclaims Issue. On May 20, 2022, we received CP's Response to Claimants' Brief Re Counterclaims Issue. On May 27, 2022, we received Claimants' [Reply] Brief Re: Counterclaims Issue. The Parties appended various Exhibits to these Briefs.

21.     Meanwhile, in Scheduling Order No. 2, dated May 14, 2022, we ordered that "[a]ny reply to the counterclaims must be filed seven (7) days after the Panel rules on the Claimants' opposition to the counterclaims[,] if the Panel rules that any counterclaims are accepted."

22.     On June 14, 2022, pursuant to the Parties' request, we entered a Stipulated Protective Order.

23.     On various dates between our issuance of Scheduling Order No. 1 and the Final Hearing, pursuant to Scheduling Order No. 1 at ¶ 11 Panelist Judge McGahey heard and decided various discovery disputes between the Parties. *See*, *e.g.*, August 15, 2022, Discovery Resolution Dispute Order #1 *and* Nov. 30, 2022, Order Re: Claimants' Assertion of Privilege for Certain Documents.

---

[8] For reasons described below, none of CP's counterclaims against Mead was heard at the Final Hearing.

**EXHIBIT 3**

24.    In December 2022, the Parties' briefed Claimants' Objection to Respondents' November 28, 2022, Expert Disclosure of damages expert Robert Taylor. As discussed below, we addressed the Objection during the Pre-Final Hearing Conference.

25.    On December 9, 2022, we issued our Order Regarding Case Status.  Pursuant to same, we convened a Status Conference with counsel for the Parties on December 19, 2022. Following that Conference, on December 21, 2022, we issued Scheduling Order No. 3.

26.    On Saturday, December 14, 2022, counsel for the Parties sent emails to us and one another regarding concerns with respect to witness and exhibit lists. In that exchange, Claimants represented that between July 18, 2022, and January 14, 2023 (well after the above-stated deadlines for both initial document productions and amended claims and counterclaims), Respondents produced more than 28,000 additional pages of documents to Claimants, more than doubling their prior production. Claimants further represented that Respondents produced many of these documents in exceptionally large PDFs containing documents in random order. Respondents did not dispute Claimants' representations. On Sunday, December 15, 2022, we issued an Order re Witness and Exhibit List Issues to address the Parties' concerns.

27.    On January 2, 2023, we issued our Order Regarding Respondent Core Progression Franchise, LLC's Proposed Counterclaims (the "Counterclaims Order"). Therein, with respect to the Parties now before us, we: (a) denied CP's request to pursue Proposed Counterclaims 2-6 & 8-9 against O'Hare as moot (because in its briefing, CP had voluntarily withdrawn them); (b) denied CP's request to pursue Proposed Counterclaims 10-16 against Mead (because CP had not timely notified U.S. District Court Judge R. Brooke Jackson that it intended to pursue such claims in either litigation or arbitration, as Judge Jackson had ordered them to do in *Core Progression Franchise LLC v. Mytchell Mead, et al.*, Case No. 21-CV-01049-RBJ (U.S.D.C. Colo.) (the "Mead Lawsuit")); (c) denied CP's request to pursue Proposed Counterclaim 17 against O'Hare as moot (because, again, in its briefing CP withdrew it) and against Mead on the merits (again, because CP had not given notice of its intention to pursue such a claim as Judge Jackson ordered in the Mead Lawsuit); and (d) granted CP's request to pursue Proposed Counterclaim No. 18 against McNutt. Thus, at the Final Hearing only CP's Counterclaim No. 18 against McNutt was before us. We address it below. We further held that the above-referenced twelve affirmative defenses Respondents had alleged against Claimants would stand as pleaded, and that CP would not be permitted to pursue via new affirmative defenses the Counterclaims against Claimants O'Hare and Mead that we had dismissed.

28.    We held a Pre-Final Hearing Conference with counsel for the Parties via Zoom on January 10, 2023. That same day, McNutt filed his Amended Answer and Affirmative Defenses to Respondents' Counterclaim No. 18.

29.    On January 11, 2023, we issued our Decisions from Pre-[Final] Hearing Conference. Therein, we confirmed our holding during the Conference that Respondents' expert Robert Taylor would be permitted to testify. We also confirmed that the Parties had elected to present oral opening statements at the Final Hearing and submit written Closing Briefs after the Final Hearing rather than oral closings during the Final Hearing.

30.    Respondents filed their Trial Brief and Exhibit List on January 13, 2022.

**EXHIBIT 3**

31.     On January 16, 2023, Claimants filed their Trial Brief, Exhibit List, Hearing Witness List, Amended Hearing Witness List, and Reports of Experts Paul Cadorette and Carmen Caruso. Respondents filed their Witness List and original and corrected Expert Report of Robert Taylor.

32.     On January 17, 2023, Claimants filed their Final Hearing Exhibit List.

33.     On January 18, 2023, Respondents filed a Motion to Exclude Expert Opinion of [Claimants' Expert] Carmen D. Caruso. On January 19, 2023, we issued our Advisement Regarding Respondent's Motion to Exclude, informing the Parties we would address the matter on the first day of the Final Hearing and did not request further briefing.

34.     On January 20, 2023, Claimants filed their reformatted Final Exhibit List, and Respondents filed both their reformatted Final Exhibit List and a Rebuttal Report of their expert Robert Taylor.

35.     The Final Hearing occurred over ten consecutive business days from January 23-February 3, 2023, at JAMS Denver's offices. The Parties elected to have the Final Hearing transcribed by court reporters, who we thank for their service. During the Final Hearing, we received:  motions, oral argument, objections, and representations from counsel; testimony from the Parties and their witnesses; and multiple Exhibits, including the following:

    a.  <u>Preliminary motions and arguments regarding witnesses and claims</u> (by counsel, in person, January 23, 2023);
    b.  <u>Opening Statements</u> (by counsel, in person, January 23, 2023);
    c.  <u>Jonathan Cerf</u> (in person, on January 23, 25, and 26, and February 2 and 3, 2023);
    d.  <u>Timothy McNutt</u> (in person, January 24, 2023);
    e.  <u>Christopher O'Hare</u> (in person, January 26, 27, and 30, 2023);
    f.  <u>Jan Mead</u> (in person, January 27, 2023);
    g.  <u>Robert Owens</u> (via Zoom, January 30, 2023);
    h.  <u>Paul Cadorette</u> (Claimants' expert, via Zoom, January 30, 2023);
    i.  <u>Mytchell Mead</u> (in person, January 31, 2023);
    j.  <u>Jeffrey Lewis</u> (in person, January 31 and February 2, 2023);
    k.  <u>Andrew Machol</u> (via Zoom, February 1, 2023); and
    l.  <u>Robert Taylor</u> (Respondents' expert, via Zoom, February 3, 2023).

36.     In relation to the above-referenced preliminary motions and arguments, we ruled that Claimants' expert Mr. Caruso would not be permitted to offer opinions regarding franchise law, given that it is our role to decide legal issues. Following our ruling, Claimants did not call him to testify.

37.     Counsel offered extensive arguments regarding what Respondents submitted were Claimants' efforts to offer evidence at the Final Hearing on a variety of allegations that Claimants had not expressly pleaded in their Demands and that Respondents therefore contended were not properly before us at the Final Hearing. We took those matters under advisement, permitted much of that evidence to come before us (as reflected in our rulings on objections throughout the ten

**EXHIBIT 3**

days of testimony), and decide the matter below following our review of the Parties' further *written* arguments on the matter in their below-referenced Closing Briefs.

38.    On February 2, 2023, Claimants filed new Exhibits 3000 and 3002, which had not been included in their Final Exhibit List, and Respondents filed new Exhibit 524, which had not been included in their Final Exhibit List. On February 3, 2023, Respondents filed new Exhibits 515 and 523 which had not been included in their Final Exhibit List, while Claimants filed new Exhibit 3004.

39.    At the conclusion of the evidence, we discussed with the Parties the process for submission of their closing argument briefs. On February 14, 2023, we issued our Order Regarding Post-Hearing Submissions.

40.    On March 28, 2023, Claimants informed us they were voluntarily withdrawing their claims for conversion (O'Hare's Eighth Claim for Relief, McNutt's Eighth Claim for Relief, and Mead's Sixth Claim for Relief). Accordingly, we do not address Claimants' conversion claims in this Interim Award.

41.    On March 31, 2023, the Parties simultaneously filed Claimants' Post-Hearing Submission and Respondents' Closing Brief (sometimes referred to, respectively, as "Cl. Clg. Br." And "Resp. Clg. Br."). On April 14, 2023, the Parties simultaneously filed Claimants' Reply to Respondents' Post-Hearing Submission and Respondents' Reply Brief (sometimes referred to, respectively, as "Cl. Rp. Br." And "Resp. Rp. Br."). We sometimes refer to these briefs collectively as the "Closing Briefs."

42.    The Panel had originally intended to deliver this Interim Award by June 13, 2023, based on the Parties' agreement that we would have ninety days after receipt of the foregoing Reply briefs to submit an award. However, owing to the death of an immediate family member of one of us and workload issues, we sought on June 1, 2023, and received on June 1 and 2, 2023, the Parties' written agreement to extend the date for delivery of an award to July 28, 2023. Due to continuing workload issues, the Panel sought on July 24, 2023, and received on July 24 and 26, 2023, the Parties' written agreement to further extend the date for delivery of an award to August 31, 2023. On August 31, 2023, owing to medical developments related to Arbitrator Choquette's elderly mother, we entered *sua sponte* our Order Regarding Issuance of Award, extending the due date for our completion of this award to September 15, 2023. We express our sincere thanks to the Parties and counsel for their patience and these accommodations.

## III.    FACTUAL BACKGROUND

### A.  O'Hare

43.    Claimant Chris O'Hare lives in North Carolina. He has a bachelor's degree in mechanical engineering, and two master's degrees, one in business administration, with a concentration in finance, and the other in mechanical engineering. Day 5, pp. 138:14-139:23. For over a decade, he held various business roles, mostly with ExxonMobil, which included managing budgeting processes, performing monthly accounting activities, analyzing manufacturing operating expenses, participating in annual and five-year planning activities, conducting internal

**EXHIBIT 3**

audits, capital planning, and P&L forecasting. Day 5, p. 139:24-148:5. He became certified as a personal trainer in June 2020. Day 4, pp. 242:17-243:2.

44.     O'Hare first learned of CP via a franchise broker called Franserve. Day 4, p. 145:6-24; Ex. 2015. He had his initial teleconference with Cerf on or about June 28, 2019. Day 4, pp. 152:22-153:24.

45.     O'Hare received the Brochure from Respondents on June 28, 2019. Day 4, p. 154:4-9; Ex. 2016. CP sent O'Hare CP's FDD and the attached FA on or about July 5, 2019. Day 4: p. 155:4-10; Ex. 2017. The former included unaudited financial statements of CP for a two-month period ending September 2017 and the full fiscal year of October 2017 through September 2018.

46.     When Mr. O'Hare reviewed the FDD, he found Item 2, regarding CP's management team to be of importance, given that he was new to franchising and personal training and, "[i]t told me there would be plenty of support for franchisees in the system." Day 4, pp. 195:19-196:6.

47.     On or about July 7, 2019, O'Hare emailed CP to ask whether the wages and employment tax line in Item 19 of the FDD included a manager's salary or assumed the owner manages the facility. Cerf responded the same day, stating that the numbers did not reflect a manager's salary, and that O'Hare should assume a salary range of "$45-65k for a gm." Day 4, pp. 199:13-201:4; Ex. 2102.

48.     O'Hare attended one of what CP called its "Discovery Days" for prospective franchisees on or about August 16, 2019. Day 4, pp. 202:16-204:8; Ex. 2133.

49.     O'Hare signed his FDD and FA on September 2, 2019. Pursuant to negotiations between O'Hare and Respondents, *see* Ex. 2152, the FA included an addendum specific to O'Hare. Day 4, p. 155:11-19; Exs. 2018 & 2019.

50.     On or about September 15, 2019, O'Hare sent CP a draft pro forma. Day 5, p. 152:4-18; Ex. 2181. Consistent with his foregoing exchange with Respondents, O'Hare included a general manager's salary in its pro forma. Day 5, p. 152:4-18; Ex. 2181.

51.     CP sent O'Hare the CP Franchise Operations Manual (the "Operations Manual") on or about December 12, 2019. Day 5, pp. 152:19-153:3; Ex. 2229. Soon after, O'Hare contacted Cerf to ask whether he had a "completed copy" of the manual, because the one sent to him "still contains missing sections in bracketed red text." Ex. 2245. Two weeks later, Cerf sent O'Hare an updated Operations Manual. Ex. 126.

52.     On or about December 16, 2019, O'Hare sent CP a draft of a commercial lease for rental of space for O'Hare's Core Progression gym. O'Hare sought Cerf's review and indicated he planned to have a local lawyer review it. There is no indication Cerf supplied any substantive feedback. Day 5, p. 223:3-13; Ex. 2224.

53.     On or about February 5, 2020, O'Hare signed and personally guaranteed a 10-year commercial lease for space in the Beaver Creek Shopping Center in Apex, North Carolina for his Core Progression gym. Day 5, p. 155:3-11; Ex. 2269.

**EXHIBIT 3**

54.     On or about May 5, 2020, CP (via Mr. Lewis) sent all franchisees including O'Hare an updated Operations Manual. Day 3, pp. 150:24-151:4; day 5, p. 157:10-14; Ex. 2302.

55.     On or about June 26, 2020, O'Hare was texting to Cerf indicating that, thus far, he had found nothing unique or revolutionary about CP's personal training gym franchise. Day 4, pp. 249:2-250:24; Ex. 2342.

56.     O'Hare attended CP new franchisee training in Colorado from July 13-17, 2020. Mr. Mead was also in attendance. Day 4, p. 253:2-5; *See*, *e.g.*, Exs. 2355 & 2358-2360.

57.     The "soft opening" of O'Hare's Core Progression gym occurred on or about August 10, 2020. The "grand opening" was September 12, 2020. Day 4, pp. 258:23-259:5; Day 5, p.160:21-24; Ex. 2443.

58.     On or about October 8, 2020, O'Hare reached out to Alloy Fitness about licensing its personal training coaching methodology. Day 5, p. 288:7-18; Ex. 2494.

59.     Between October 14 and October 20, 2020, Cert and O'Hare had a series of email exchanges in which CP threatened to hold O'Hare in default for marketing O'Hare's Core Progression gym via Instagram and O'Hare provided insight into his numerous frustrations with marketing efforts that were inadequate and unsuccessful, CP's overpricing of marketing and software expenses, and CP's side profits via such charges. Ex. 2546.

60.     On or about November 7, 2022, O'Hare sent CP his post-opening survey, in which he raised a variety of concerns about training, software, support from corporate, and fees being charged. O'Hare testified he thought this was as far as he could go while still trying to maintain a viable relationship with CP. Ex. 2623.

61.     On or about November 17, 2020, Respondents sent O'Hare and all franchisees a lengthy email entitled "Important please read," expressing dismay about the criticisms of franchisees and their lack of compliance with franchise directives, offering to coach for success, admonishing against a pick-and-choose approach to franchisor directions, and terminating weekly and franchise-owner calls for the balance of November and December. Therein, Cerf stated, "In purchasing a Core franchise, you purchased a time tested and true model for success, a recipe, a secret sauce, if you will, and you will only get the desired results if you follow it exactly." Ex. 2662; *see also* Day 5, p. 76:4-24.

62.     On or about December 14, 2020, O'Hare licensed Alloy's personal training fitness materials. Day 5, pp. 64:19-65:5; Ex. 2715.

63.     On December 16, 2020, Respondents sent O'Hare an update email entitled "Happy Holidays," previewing upcoming changes for 2021 including: the addition of software and an increase in monthly software fees; setting new, tighter deadlines for reporting regarding franchise fees, and threatening financial penalties against those who did not comply; requiring franchisees to add recovery treatment to their gyms and purchase additional equipment for same; and indicating O'Hare and Mead would join the marketing collective in January 2021. Day 5, pp. 91:25-92:22; Ex. 2718.

**EXHIBIT 3**

64.    On December 21, 2020, O'Hare filed a Demand for Arbitration against Respondents. *See* Ex. 2729.

65.    Commencing on or about January 8, 2021, and continuing through on or about January 25, 2021, via its counsel, CP sent O'Hare three notices of defaults of the FA. Ex. 2760, 2772 & 2782. Via counsel, O'Hare responded to the second letter on or about January 21, 2021. Day 3, pp. 15:19-22, 19:16-20; 23:6-10; Ex. 2775.

66.    By letter from counsel dated on or about January 29, 2021, CP terminated O'Hare's franchise. Day 3, p. 23:15-21; Ex. 2782.

## B.  McNutt

67.    Claimant Tim McNutt is vice president of operations for a property restoration business. Day 2, p. 7:6-10. He has operated construction businesses and other businesses for at least 25 years. He testified, among other things, that he knows how to read financials, and that he had a significant amount of background in marketing and advertising his businesses. Day 2, p. 157:4-9; p. 169:25-170:4; p. 177:11-18. Before McNutt became a CP franchisee, Mr. McNutt had no background or experience running a personal training studio.  Day 2, pp. 7:23-8:1.

68.    Mr. McNutt learned of CP because his wife was a client. He was part owner of a building in Lakewood, Colorado in which a tenant had a gym.  After the tenant had financial problems, he worked out a lease settlement whereby he took over the tenant's gym equipment. Day 2, p. 8:2-19.

69.    Mr. McNutt connected with Cerf via CP's website in November 2018.  received CP's FDD and FA from Cerf on or about November 29, 2018. Day 2, pp. 10:14-11:12; Ex. 2001. The FDD included unaudited financial statements of CP for the two-month period ended September 2017. Ex. 2001.

70.    McNutt received "updated" PowerPoint slides, which the Parties refer to as the "Brochure," from Cerf on or about January 16, 2019. Day 2, p. 11:13-17; Ex. 2002. He felt they "summarized the opportunity."  Day 2, p. 33:15-17.  Cerf told him a CP franchise was "a business in a box and there would be … plenty of support to run the business."  Day 2, p. 36:13-21.

71.    Between November 2018 and becoming a franchisee in April 2019, Mr. McNutt met with Cerf several times, both at McNutt's prospective gym and elsewhere.  Day 2, pp. 12:7-13:10.

72.    In reviewing the FDD, Mr. McNutt was particularly interested in Item 7 (how much it would cost him to get into the CP program) and Item 2 (CP's business experience) among others. Day 2, p. 20:13-25.  He also paid particular attention to Exhibit G, the table of contents for CP's Operations Manual, because he was "getting into a business that – that I had no experience or knowledge of, I would be relying on the expertise and how – the recipe of how to run the business …." Day 2, p. 21:6-19.  He "relied heavily on th[e Operations M]anual to give us a recipe of how to run the gym …."  Day 2, p. 25:1-9.  He told his wife that "the manual should – would be worth $45,000 in itself."  Day 2, p. 27:13-14.

**EXHIBIT 3**

73.     After reviewing the version of the FA attached to the FDD he had received, Mr. McNutt negotiated with Cerf about altering or omitting some of its terms, and indicated Cerf was amenable to his proposed changes.  Day 2, pp. 17:12-19:7.

74.     Cerf sent McNutt an updated FDD and an updated FA on or about February 7, 2019. Day 2, p. 47:14-24; Ex. 2003. The former included audit financial statements for the same two-month period of 2017 and the full year of October 2017 through September 2018. Ex. 2003. Item 2 of the FDD was different from the prior version, with more executives listed.  Day 2, p. 50:11-5:15.  The latter reflected changes he and Cerf had negotiated.  Day 2, pp. 48:20-50:6.

75.     On March 28, 2019, Cerf sent McNutt a pro forma for a CP outlet prepared by franchisee Luis Garcia. Day 2, pp. 64:20-65:21; Ex. 2004.  In turn, McNutt prepared a pro forma for his CP franchise in which he included a general manager's salary.  Day 2, p. 194:15-24; Ex. 511.

76.      McNutt signed their FDD and FA electronically on April 3, 2019, to become a CP franchisee. Day 2, p. 74:12-18; Ex. 2006.  Based on a text exchange with Cerf, McNutt understood that the FA he signed contained the changes he had negotiated.  Day 2, p. 73:2-18; Ex. 2082. Before signing, McNutt re-reviewed the FDD but not the FA.  Day 2, pp. 63:8-64:15.  As a result, McNutt did not realize until much later that the FA they executed did not include the revisions to which Cerf and Mr. McNutt had agreed, and contained other changes that were not in the original exemplar FA he reviewed.  Day 2, p. 76:17-79:12.

77.     McNutt leased the Lakewood, Colorado space from which he still runs his Core Progression outlet in the spring of 2019, soon after signing the franchise agreement.  Day 2, p. 161:18-162:5 (indicating that as of the end of 2020 McNutt had not paid rent for the space for a year and a half).  McNutt is a co-owner with his brother and one or more other partners of the building in which the outlet is located. Day 2, p. 206:13-19 & 207:12-19.

78.     The reality regarding most of the people CP had represented comprised its leadership team was that they worked for companies other than CP.  He had no interaction with some except meeting them at training.  Others such as Messrs. Machol and Ferguson billed franchisees for their services.  Day 2, pp. 50:14-53:10.

79.     McNutt received CP's Operations Manual and related Cliff Notes on April 5, 2019. Day 2, p. 99:10-18; Ex. 2083. The documents were transmitted electronically, not as a bound paper manual, and were not password protected.  Day 2, pp. 100:7-17 & 102:13-20. Initially, after skimming the manual and noting its length, Mr. McNutt initially communicated enthusiasm about it.  Day 2, pp. 100:21-101:7. But as McNutt and their general manager reviewed it in more depth, they realized "there was just little to no content regarding how to run a personal training gym … I expected there at least to be some content on how to manage trainers on, what do those trainers do?  And – and when I got to the parts where I thought I was going to glean some – some education and knowledge, there's nothing in her, and I was, like, uh-oh."  Day 2, pp. 101:20-102:12.  The Operations Manual contained no training programs, something he was expecting to find.  Day 2, p. 116:10-16.  He concluded the manual was of no value, and further that much of it related to running a restaurant.  Day 2, pp. 105:11-106:12.  McNutt's general manager reached the same conclusion.  Day 2, pp. 116:21-117:2.  The Cliff Notes also revealed that most of those listed as

**EXHIBIT 3**

being CP executives in Item 2 of the FDD did not have CP email addresses.  Day 2, p. 113:24-114:12.

80.     McNutt attended CP's new franchise training at CP's Northglenn company gym between July 8-13, 2019. Day 2, pp. 117:24-118:15; 237:10-16; Ex. 2014.  They found it "subpar" and of no particular use to running a CP gym.  Day 2, pp. 118:17-120:18.

81.     McNutt's "soft opening" of McNutt's Core Progression gym was on or about August 7, 2019, and the official "grand opening" was on or about September 12, 2019. Day 2, pp. 227:12-14; pp. 244:23-245:3.  The quality of leads generated by CP's and Mr. Machol's marketing efforts were poor, and after initial interactions with McNutt about these concerns and how to resolve them, Machol indicated he would have to charge McNutt for further help.  Day 2, pp. 124:5-127:24.

82.      McNutt's landlord, of which McNutt was part-owner, abated McNutt's rent for the Core Progression gym in 2019. Even after factoring in that advantage of Mr. McNutt being part-owner of the building in which their CP gym was located, McNutt still lost $34,000 by year-end 2019.  Day 2, pp. 140:18-141:6.  McNutt did not pay the landlord any rent for 2020 and indicated that was the reason they netted $5,000 in 2020.  Day 2, p.141:16-24. While Mr. McNutt alluded during his testimony to the need to pay the landlord this abated or waived rent, as of his January 2023 testimony during the Final Hearing this had not occurred, and he described no plan or deadline for any such payment(s). Day 2, p. 161:24-162:8. Having Mr. McNutt as part owner of McNutt's landlord placed McNutt in a materially different position from the other Claimants with respect to the lease of space and payment of rent for a Core Progression gym.

83.     Also during 2020, in connection with an independent contractor's application for unemployment benefits during the pandemic, McNutt was subjected to an audit by the relevant Colorado agency.  Day 2, pp. 142:19-143:10.  After notifying Respondents of this and seeking assistance, McNutt learned CP was already under audit and had received a hearing decision.  Day 2, p. 143:11-23.  Based on this information McNutt converted all their independent contractors to employees and paid the back tax and related liabilities, adding significant expense and complexities.  Day 2, p. 144:11-15.

84.     McNutt had initial communications with O'Hare about franchise-related concerns in September or October 2020, months after McNutt opened their gym. Day 2, p. 134:25-135:3. McNutt, the other Claimants, and other franchisees held an online meeting in September 2020 about forming a franchisees association and talked with a lawyer about that option.  Day 2, p. 261:3-11.  They had an online meeting to vet a franchisee lawyer on October 14, 2020. Day 2, p. 261:12-21; Ex. 303.

85.     Following receipt of a November 17, 2020 "Important please read" email from Respondents to all franchisees, Ex. 2662, McNutt opted to go their own way with respect to marketing and use Google Ad Words, after which McNutt's leads and revenues materially improved. Day 2, pp. 156:25-157:16.

86.     McNutt filed a Demand for Arbitration against Respondents on or about December 21, 2020. Day 2, 157:17-21; Ex. 2730.

**EXHIBIT 3**

87.     McNutt abandoned what Mr. McNutt termed the "CP method" of operations and marketing in January 2021. Day 2, p. 259:18-22.  However, as of the Final Hearing, McNutt continued to operate a CP franchise gym and pay royalties but was not participating in CP marketing or training. Day 2, p. 301:2-19.

### C.  Mead

88.     Claimant Mytchell Mead has a bachelor's degree in business and a master's degree in marketing. Day 7, p. 8:5-10. He worked as the international marketing director for an integrated circuit design automation company for about five years, opened a bike shop and operated it for about three years, built a house, and interned with a local artist—later starting an art business with gallery representation in Jackson Hole, South Lake Tahoe, Park City, Scottsdale, Bend, Portland, and Stowe, Vermont. Day 7, p. 8:14-12:1.

89.     Claimant Jan Mead has been a licensed physical therapist for 32 years and a licensed acupuncturist for 23 years. She is one of only a few people who have such dual licenses. Day 5, p. 107:16-22.

90.     Ms. Mead was the first of the two to have contact with CP, sometime in July 2019. Day 5, pp. 108:3-110:12; Day 7, p. 13:2-23. Cerf sent Ms. Mead the Brochure on or about July 11, 2019. Day 5, pp. 111:18-112:13; Day 7, pp. 16:13 -17:3; Ex. 2020.

91.     Thereafter, Mead had conversations with Cerf about the operations manual and the types of training they would receive during which Cerf described a CP franchise as a "business in a box." Day 7, p. 22:13-24.

92.     CP sent Mead the FDD on or about July 17, 2019. Day 7, p. 23:8-10; Ex. 2021.

93.     Item 2 of the FDD indicated to Mr. Mead that CP was a built-out, robust, established company. Day 7, p. 23:14-22.

94.     Mead did not receive a copy of the pro forma. Day 7, p. 31:18-20.

95.     Mead signed their FA on or about September 25, 2019. Day 7, p. 113:1-4; Ex. 2022.

96.     After signing the FA, Mead discovered the copy he signed was different than the one he had reviewed during the disclosure process. Day 7, p. 32:3-7. It does not appear that Mead notified CP of this fact.

97.     On or about December 23, 2019, Mead entered a 10-year commercial lease for the space in Colorado Springs, Colorado in which it intended to open its Core Progression gym. Mr. Mead personally guaranteed the lease. Day 7, p. 39:11-13; Ex. 2238.

98.     CP's one-employee model was important to Mead. Day 7, p. 18:18. As discussed in more detail in section IV.B.8. below, in September 2019, the Colorado Department of Labor and Employment (the "CDLE") began an audit of CP. Ex. 2173. The CDLE eventually concluded that personal trainers CP had classified as independent contractors were actually employees,

**EXHIBIT 3**

however, that determination did not occur until January 2020, ex. 2262, after Mead had signed the FA and entered into his commercial lease.

99.    On or about May 12, 2020, CP (via Mr. Lewis) sent Mead an updated Operations Manual. Day 7, p. 47:2:5; Ex. 2311.[9] Mead initially responded: "This is great, thank you so much!" Day 7, p. 47:15-17, ex. 2311. After actually reviewing the manual, however, Mead saw that it was lacking specifics, and he felt Respondents had conned him. Day 7, p. 48:11-21.

100.    Mr. Mead later attended CP's new franchisee training in Colorado from July 13-17, 2020. Day 7, p. 122:18-25. Mr. O'Hare was also in attendance. *See*, *e.g.*, Exs. 2355 & 2358-2360.

101.    The "soft opening" of Mead's Core Progression gym occurred on or about August 25, 2020. Day 5, p. 121:3-9.

102.    The "grand opening" of Mead's Core Progression gym occurred on or about October 17, 2020. Messrs. Cerf and Lewis were in attendance. Mead described their calling out of aspects of Mr. Mead's and his gym staff's interactions with visiting customers and prospects as humiliating in the context of the event. Day 7, pp. 76:23-77:7.

103.    On or about October 21, 2020, Mr. Mead participated in a meeting with the other Claimants and other franchisees about hiring a franchise attorney to represent them. Day 7, p. 147:14-22.

104.    On October 29, 2020, CP held a marketing meeting with franchisees, during which it called out Mead's Colorado Springs gym as not performing well. Day 7, p. 81:9-23.

105.    On or about November 12, 2020, Mr. Mead had a phone conversation with Cerf in which Cerf recommended that Mead terminate its general manager, Thomas Terrell. During the conversation, Mr. Mead used an expletive. Later that day, Mr. Mead sent Cerf an email apologizing for same, and setting forth his reasons for retaining Mr. Terrell, and urging Cerf to consider and assess the Colorado Springs market's individual dynamics rather than adhering to a one-size-fits-all approach. Day pp. 162:21-24 and 166:22-167:2; Ex. 2648.

106.    On or about November 17, 2020, Mead received the above-described "Important please read" email from Respondents to all franchisees. Ex. 2662.

107.     On December 16, 2020, Respondents sent Mead a "Happy Holidays" email comparable to the one they sent O'Hare. Ex. 2725 at Bates CP 19068. Mead responded the next day, expressing concern about the addition of new products while franchisees were in startup mode and trying to save expenses, and expressing concern that CP's franchise-wide marketing efforts were not working or drawing desirable prospects to the Colorado Springs gym. *Id*. While Respondents' response on or about December 18, 2020, expressed willingness to listen, it also indicated Colorado Springs was underperforming in several areas, alluded to the above-described

---

[9] It is unclear why CP did not send this update to Mead on the same day it sent the update to CP's other franchisees, on or about May 5, 2020. *Cf*. Ex. 2302.

**EXHIBIT 3**

unpleasant exchange between Mr. Mead and Cerf the prior month, and indicated CP was "shifting … resources to compliance and legal [rather than support] as we are having [franchisees] not follow documents and guidelines already agreed upon." *Id.*

108. On or about December 21, 2020, Mead filed an Arbitration Demand against Respondents. *See* Ex. 2728.

109. On or about January 19, 2021, via counsel, CP sent Mead a notice of default under the FA. *See* Ex. 285. The default letter offered Mead 30 days to cure the alleged defaults, something required by the FA. *See id.* & Ex. 2022 (Mead FA) at § 17.2.

110. On or about February 1, 2021, via counsel, CP terminated Mead as a franchisee, obviously less than 30 days after sending the notice of default. Day 7, p. 99:5-7; Ex. 2784.

### D. Cerf and Core Progression Franchise

111. Mr. Cerf graduated from Baylor University in 2006, with a B.S. in health and exercise sciences. He subsequently went to work at a 24-Hour Fitness. He started the Core Progression business in 2008, originally providing personal training services to individual clients himself and then bringing in others to do the same as part of the business. From 2008-10, he rented space in others' facilities to continue the business. Day 1, pp. 85:16-87:8.

112. In 2010, Cerf or an entity he controlled entered a lease-to-buy arrangement for a separate Core Progression facility, and Cerf began contemplating franchising. Core Progression did not ultimately remain in or buy that space. Instead, in 2011 Cerf or an entity he controlled leased a different facility in Northglenn, Colorado. In 2012, Cerf or an entity he controlled rented a second space that became the West Arvada Core Progression gym and expanded that site in 2013. Day 1, pp. 87:12-88:21; 93:18-20.

113. From 2012 until roughly 2016, Core Progression's model was to rent rooms to or revenue share with other personal trainers or other vendors to provide personal training, group exercise classes, wellness services, or other services to their respective, separate clients. From roughly 2016 forward, all clients were clients of Core Progression and not of other trainers, vendors, or service providers. It was this latter model that Respondents proceeded to franchise. Day 1, pp. 88:22-93:1.

114. In 2016, Cerf or an entity he controlled purchased the facility Core Progression still uses in Northglenn. Day 1, 87:22-88:13. In addition, Cerf began pursuing franchising seriously. Day 1, 94:5-11. Cerf formed Respondent CP in late 2017. Day 1, 95:18-21. CP's first FDD was filed and publicly available in October 2017. Day 1, 103:9-14; Ex. 2031.

115. The marketing and sale of a franchise generally began with telephonic contact from an interested party. Cerf would generally speak with them by phone, send them the Brochure, have a more in-depth conversation with them, and then send them the FDD (which included an exemplar FA). He would subsequently have a brief follow-up conversation, followed by a longer conversation to go through the FDD. If both sides remained interested in proceeding Cerf would set up a clearance call in which a prospective franchisee could talk with an existing franchisee. If

**EXHIBIT 3**

interest continued, prospects could attend a Discovery Day to visit a CP gym, meet members of the CP team, and further assess the franchise opportunity. If the prospect remained interested in CP and vice versa, there would be additional follow up that ultimately led to the prospect's receipt and execution of an FA to become a franchisee. Day 1, pp. 118:2-122:3.

## IV.     FINDINGS AND CONCLUSIONS

### A.  Respondents' Motion to Exclude Claimants' Evidence that Respondents Contend is Improper or Inadmissible Because it is Not the Subject of Direct Allegations in Claimants' Demands

116.     In an oral motion at the start of the Final Hearing, Respondents contended Claimants should be precluded from basing their claims based upon: (a) CP's Franchise Disclosure Document ("FDD") Item 2 representations; (b) the "How We Stack Up" slide in a sales brochure of PowerPoint® slides Respondents created and distributed to Claimants (the "Brochure") (Exs. 2002, 2016 & 2020); (c) an "independent contractor vs. employee" issue; (d) CP's Franchise Operations Manual (the "Operations Manual"); and (e) articles posted on CP's website. Day 1, pp. 14:3–15:3. Respondents asserted Claimants had not alleged these items in their Demands, and Respondents thus were not on notice of them and unable to defend against them at the Final Hearing. *Id. See also* Resp. Clg. Br. at 11-12 and Resp. Rp. Br. at 27-28.

117.     Claimants demurred. They contended that all these matters had been the subject of discovery dispute hearings before Judge McGahey. They pointed out that their Demands explicitly reference CP's representations about a growing system, and that those allegations inherently include FDD Item 2 representations about CP's executive management and expressly include criticisms of the Brochure. They asserted that their Demands include allegations about inaccuracies in FDD Item 19 regarding financial performance, and that Item 19 includes references independent contractors versus employees. They contended that their allegations regarding the uniqueness of CP's system inherently include CP's Operations Manual, and further noted that there was testimony about the Operations Manual during preliminary injunction proceedings in the Mead Lawsuit and in *Core Progression Franchise LLC v. Chris O'Hare and CAO Enterprises, Inc*., Case No. 21-cv-0643-WJM-NYW (U.S.D.C. Colo.) (the "O'Hare Lawsuit"). *See* Cl. Clg. Br. at 1-5; Cl. Rp. Br. at 2-3; Day 1, pp. 16:23-22:1.

118.     We have carefully considered both sides' oral and written arguments on this subject. We also observed what occurred in the arbitration before and during the Final Hearing. Judge McGahey has informed the other two of us that the foregoing matters were indeed the subject of discovery disputes the Parties brought before him, and his above-cited Orders and Respondents' below-cited Certifications are reflective of all those matters having received a full airing during discovery and preparation for the Final Hearing.

119.     Further, Respondents produced more than 28,000 pages of additional documents in large, unsorted PDFs between July 2022 and January 2023, well after the Parties' initial disclosures

**EXHIBIT 3**

were due in April 2022. Based on the extent, nature, and timing of these disclosures, Respondents are not well-positioned to protest that they were ambushed by surprise theories or evidence.[10]

120.    Equally important, nothing in Respondents' presentations at the Final Hearing indicated they were surprised by or unable to meet Claimants' evidence about any of the foregoing matters. On the contrary, on each of these subjects Respondents' counsel conducted well-prepared, vigorous, and thorough direct and cross examinations of the Claimants, Respondents' own witnesses (particularly Mr. Cerf), and both sides' experts.

121.    Respondents contend we cannot consider evidence on the foregoing matters if the Claimants did not allege those matters specifically in their Demands, because in our Counterclaims Order we rejected Respondents' own timely filed attempt to amend their pleadings and add counterclaims. Resp. Rp. Br. at 27-28. We disagree. We denied Respondents' counterclaims against O'Hare as moot because Respondents voluntarily withdrew them in their counterclaims-related briefing. We denied their counterclaims against Mead because they did not comply with a federal judge's order in the Mead Lawsuit that they must declare by a date certain what further claims they intended to pursue against Mead in litigation *or arbitration*. We allowed the single counterclaim Respondents asserted against McNutt because Respondents did not withdraw it and were not under an order from either us or a court to assert it earlier than they did.

122.    JAMS Rule 9(a) provides:

> Each Party shall afford all other Parties *reasonable* and *timely* notice of its *claims*, affirmative defenses or counterclaims. Any such notice shall include a *short* statement of its factual basis. No claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the *absence* of such prior notice to the other Parties, *unless* the Arbitrator determines that no Party has been *unfairly prejudiced* by such lack of *formal* notice or all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice. (Emphasis supplied.)

---

[10] In this regard, though we do not believe the Parties referenced them during the Final Hearing, we note Claimants' Exs. 2995 (Oct. 18, 2022), 2996 (Nov. 15, 2022), and 2997 (Dec. 14, 2022). There, Respondents certified as they made supplemental productions that they were doing so in compliance with Judge McGahey's discovery dispute rulings. The cited categories of produced documents include: FDD Item 2 statements about CP's management; vendor agreements (which also implicate Item 2); CP's inability to locate and produce the original version of a franchise operating manual it purchased from FranMan; FDD Item 7 (estimated initial franchise investment); CP's financial representations in FDD Item 19; the Colorado Department of Labor and Employment audit and appeal about whether CP's personal trainers were independent contractors or employees; and the West Arvada location that CP was closing or had closed while at least O'Hare and Mead were deciding whether to become franchisees. These Certifications, dated one to three months before the Final Hearing, contradict Respondents' assertions at the Final Hearing that Claimants' presentation of evidence and argument about some of these subjects and documents at the Final Hearing (*see* ¶ 43, *supra*) constituted a surprise against which Respondents could not effectively and vigorously defend.

**EXHIBIT 3**

123.    Considering the Parties' arguments during the Final Hearing, the testimony and Exhibits both sides presented at the Final Hearing, the Parties' arguments in their Closing Briefs, and the foregoing facts and circumstances, we find Claimants supplied reasonable and timely notice of their claims, and/or the requisite short statements of factual bases for same. Alternatively, we find and conclude Respondents were not unfairly prejudiced by Claimants' presentation of such evidence considering the foregoing chronology, the evidence and argument presented at the Final Hearing, and the Parties' Closing Briefs. ***We therefore deny Respondents' motion to exclude the above-referenced evidence from the Final Hearing; we will consider such evidence in rendering our award.***

**B. Fraudulent Misrepresentation, Nondisclosure, and Concealment Claims (All Claimants, Against Cerf and CP)**

124.    For Claimants to recover on their claims of fraudulent misrepresentation or fraudulent non-disclosure, *e.g.*, concealment, they must prove the following elements by a preponderance of the evidence:

  a.  Respondents made a false representation of a past or present fact; or Respondents: (a) concealed a past or present fact, or (b) failed to disclose a past or present fact which they had a duty to disclose;
  b.  The fact was material;
  c.  At the time the representation was made, Respondents: (a) knew the representation was false; or (b) were aware that Respondents did not know whether the representation was true or false; or Respondents: (a) concealed it, or (b) failed to disclose it, with the intent of creating a false impression of the actual facts in the mind of Claimants;
  d.  Respondents made the representation with the intent that Claimants would rely on the representation; or Respondents: (a) concealed, or (b) failed to disclose, the fact with the intent that Claimants take a course of action they might not take if they knew the actual facts;
  e.  Claimants relied on the representation;
  f.  Claimants' reliance was justified; and
  g.  This reliance caused damages to Claimants.

CJI-Civ. 19:1 & 19.2 (CLE ed. 2022).[11]

125.    We consider in turn the main allegedly fraudulent statements, misstatements, and omissions on which Claimants produced evidence at the Final Hearing.

### 1. Respondents' Sales Brochure

126.    Claimants contended at the Final Hearing and in their Closing Briefs that in soliciting them to become CP franchisees, Respondents made financial misrepresentations and

---

[11] As Claimants did in their Closing Briefs, we have modified the pattern jury instructions to use "Claimants" and "Respondents" rather than "Plaintiffs" and "Defendants."

**EXHIBIT 3**

omissions in both the Brochure that Respondents supplied to all Claimants, Exs. 2002 (McNutt), 2016 (O'Hare) & 2020 (Mead), and in Item 19 of the FDD. Exs. 2003 (McNutt), 2017 (O'Hare) & 2021 (Mead). We consider the Brochure first, since the evidence indicated it was the first document Respondents sent each Claimant.

127.    In connection with their allegations regarding the Brochure, Claimants made numerous references to a script (the "Script") that Cerf testified he prepared as part of a webinar to solicit prospective franchisees. Ex. 2057. *See*, e.g., Day 4, pp. 174:20-175:3. However, there was no evidence Respondents supplied the Script to the Claimants prior to the commencement of the arbitration, and as a result we granted Respondents a continuing objection to Claimants' referral to and testimony regarding the document. Day 4, pp. 175:6-176:19 (during direct examination of O'Hare). There was similarly no evidence any of the Claimants viewed any CP webinar, at least not when they were evaluating whether to become franchisees. As a result, we do not further consider the Script nor find it to be a viable basis for Claimants' claims or alleged damages.

128.    None of the Claimants was uneducated, unsophisticated, or inexperienced in business. We find and conclude that it is self-evident the Brochure was a high-level, introductory sales and marketing pitch. We find nothing troubling about the "Our Story" chronology indicating CP had undertaken a "National Expansion" in 2017. Ex. 2002 at CL287. Cerf's uncontroverted testimony was that CP registered its franchise materials in several states then and had conversations with prospective franchisees in multiple states. Day 1, pp. 128:22-129:16; Day 3, p. 248:9-19. The "Revolutionary" descriptor and icon is plainly marketing puffery. *Id*. at CL289. The "Low Cost of Entry" descriptor and icon tracks with the "Investment Range" described later in the Brochure that comes from Item 7 of CP's FDD. *Id*. The "One Employee Needed" descriptor, icon, and separate slide track CP's model that franchise owners could either be owner-managers or hire a manager. *Id*. at CL289 & CL298; *see also id*. at 307. As described below, each Claimant understood the distinction and opted to have a general-manager employee.

129.    With respect to the "Independent Contractors (Trainers)" descriptor and icon, *id*. at 291, as of the dates Respondents supplied the Brochure to Claimants, there was no determination in Colorado or any other state that the information was inaccurate. Instead, that determination occurred much later in January 2020. The "How We Stack Up" slides presented a comparison of certain costs between CP and gym franchises such as Gold's Gym, Orange Theory, and Planet Fitness. Although Claimants attacked the precision of the initial investment range for CP, no evidence was presented that the figure was not significantly less than the other franchises. Moreover, prospective franchisees had access to relevant financial information and could conduct independent research in deciding whether to pursue a franchise. *Id*. at 292-93. The "Awards" slide, *id*. at 301, contains information about affiliations with sports teams and franchise-focused organizations that any reasonable prospective investor would approach with care, and makes clear that several of the affiliations (with the Denver Broncos, *5280* magazine, and the City of Northglenn, Colorado) had concluded or were one-time endorsements from prior years. The "Impressive Economics" slide is explicit that its source is CP's 2018 FDD. *Id*. at CL302. We find and conclude that Claimants did not prove they were misled by the variance between the use of "Net Profit" on this slide and "Net Revenues" in Item 19 of CP's FDD when they became CP

**EXHIBIT 3**

franchisees. The cited "Franchise Fee," "Investment Range," and "Royalty" descriptions are consistent with the FDD. *Id*. at CL303.

130.    In summary, *we find and conclude that Respondents' Brochure did not contain misstatements or omissions of material fact on which Claimants justifiably relied in deciding to become CP franchisees*.

### 2.    FDD Item 2

131.    Claimants contend the FDD's Item 2, concerning Business Experience, is fraudulent due to misrepresentations about the roles of the individuals listed or concealment of information about their true status. *See* Exs. 2003 (McNutt FDD); 2017 (O'Hare FDD) & 2021 (Mead FDD); Cl. Clg. Br. at 20-22; Cl. Rp. Br. at 4 & 11-12. Respondents disagree, arguing that the statements comport with FTC guidance, that in any event the individuals listed provided the services Claimants needed to operate their franchises, and that Item 2 reads the way it does due to advice of CP's franchise counsel. *See* Resp. Clg. Br. at 24-25; Resp. Rp. Br. at 11-12.

132.    When Mr. O'Hare reviewed the FDD, he found Item 2 of importance, given that he was new to franchising and personal training and "[i]t told me there would be plenty of support for franchisees in the system." Day 4, pp. 195:19-196:6. What he learned about the status of the individuals identified in Item 2 after he became a franchisee differed from what is represented there. He did not hear from or interact with most of those listed. Mr. Machol was a vendor, and after an initial phone call with O'Hare, wanted $85/hour to provide further assistance. Day 4, 196:7-197:20.

133.    We agree with Claimants that what is said and not said about the individuals CP listed in Item 2 is fraudulent. As Cerf conceded, he was the only one of the eight listed individuals who was employed by CP. Day 1, pp. 188:25-189:6. DeWitt, Machol, and Ferguson did not work for CP, held no titles with it, and worked for separate companies that were among CP's vendors. While he was working for one of CP's company-owned gyms, Lewis was not employed by CP and held no title with it. Samantha Cerf, Cerf's wife, was represented as managing CP's human resources function. While she did some administrative and payroll work for the company, she was not paid by CP. Zakroczemski held no title with CP and did not work for it. Kissenger was a vendor who also was not an employee of and held no title with CP. CP represented that DeWitt, Machol, Samantha Cerf, and Zakroczemski had "previously" worked for others. *See* Day 1, pp. 183:6-189:6. Implicit in the wording Respondents used in Item 2 was that those individuals "used to" work for others and "now" worked for and held the described titles with CP. They did not. Other than Cerf, *none* of these individuals would "have *management responsibility* relating to the *sale or operation of franchises offered by* [the FDD]." 16 C.F.R. § 436.5(b). *None* of their *actual* positions or employers was stated. *See id*.

134.    Notably, the information in Item 2 of the FDD that all Claimants received contrasts starkly with Item 2 in the FDD that CP sent McNutt on or about November 29, 2018. Ex. 2001. In that earlier version, Item 2 named only three individuals – Cerf, Ellenwood, and Clarkson – and descriptions about Ellenwood and Clarkson indicate each was running one of CP's company stores.  It is apparent that in the interim Respondents augmented Item 2 in an effort to show CP

**EXHIBIT 3**

was robust and had ample personnel to support prospective franchisees. Regrettably, the information communicated was false by omission or commission.

135. ***We find and conclude that: Respondents' made misrepresentations and omissions in Item 2; those misrepresentations and omissions were material; Respondents knew the misrepresentations and omissions were false when they made them; Respondents intended that prospective franchisees such as Claimants would rely upon what Respondents said and did not say about their executive team in Item 2; Claimants relied upon Respondents' misrepresentations and omissions, and they were part of what persuaded Claimants to become CP franchisees; and Claimants were justified in relying upon those misrepresentations and omissions***.

136. Cerf testified he relied on experienced franchise counsel to prepare CP's FDDs, and it is thereby apparent that Respondents implicitly asserted advice-of-counsel as an affirmative defense at the Final Hearing. *See* Resp. Clg. Br. at 24. While Respondents did not formally assert the same in their Answer, to rely upon it they would have had the burden to prove that (1) they requested the advice of independent counsel on the legality of a proposed action, (2) they made full disclosure of the relevant facts to counsel, (3) they received advice from counsel that the proposed action would be legal, and (4) they relied in good faith on counsel's advice. *See C.E. Carlson, Inc. v. S.E.C.*, 859 F.2d 1429, 1436 (10th Cir. 1988). Respondents did not supply us with this information, and Cerf admitted that calling several of those listed in Item 2 officers was "maybe a poor choice of words." Day 3, pp. 189:21-190:2. This was an understatement. The words knowingly conveyed false information, and further failed to convey fully accurate information about a majority of those listed. In these circumstances, even if Respondents did rely on counsel for material in Item 2, we find and conclude such reliance was not in good faith; they knew full well that Item 2 made flatly untrue representations about several people.

137. Respondents go on to ask, even if Claimants' reliance upon these false statements and omissions was reasonable, what was the harm? Resp. Rp. Br. at 11. After all, by way of example, Claimants still received services from vendors such as Machol. We agree Claimants did receive limited initial services from Machol, but after that Machol made clear he would bill them – through his company that was his actual employer – for further assistance. Such actual and threatened billing presumably would not have occurred if Machol had indeed been a CP employee and executive. And one thing all Parties agreed upon was that effective marketing was vital to franchisees' prospects for success. Above all, the Item 2 misstatements and omissions reasonably led Claimants to conclude CP was exactly what Respondents told them it was: a sophisticated, well-staffed franchisor that was on the move and would be well-prepared to help them build and operate successful franchised gyms. We cannot agree with Respondents that Claimants' reliance upon Respondents' Item 2 misstatements and omissions was harmless. It drew them in and contributed to their decisions to become franchisees.

### 3. <u>FDD Item 7</u>

138. Item 7 of the FDD supplied CP's guidance on the "ESTIMATED INITIAL INVESTMENT" a prospective franchisee such as Claimants could anticipate making to launch a franchise. Respondents listed nineteen categories of expenditures, and for each category provided

**EXHIBIT 3**

a range of estimated investment. Ex. 2003, at Item 7, pp. 10-11. The total estimated initial investment was between $152,990 and $408,630. *Id*.

139.    Following the table of categories and ranges, CP provided a series of Notes. The opening, unnumbered Note states:

> These estimated initial expenses *are our best estimate of the costs you may incur* in establishing and operating your Core Progression Franchise. We do not offer direct or indirect financing for these items. Our estimates are based on our experience, the experience of our affiliate, and our current requirements for the Core Progression Franchises. The factors underlying our estimates may vary depending on several variables, and *the actual investment you make in developing and opening your Core Progression Franchise may be greater or less than the estimates given*, depending upon the location of your Franchise, and current relevant market conditions. Your costs will also depend on factors such as how well you follow our methods and procedures; your management skills; your business experience and capabilities; local economic conditions; the local market for our products and services; the prevailing wage rates; competition; and sales levels reached during your initial phase of business operations. All expenditures paid to us or our affiliates are uniform and non-refundable under any circumstances once paid. All expenses payable to third parties are non-refundable, except as you may arrange for utility deposits and other payments.

*Id*. (emphasis supplied). A series of numbered Notes follows the initial, unnumbered Note. Those provide more details on most of the categories in the preceding table. The last of them states:

> 15. <u>Figures May Vary</u>. This is an estimate of your initial start-up expenses for one Core Progression Franchise. You should review these figures carefully with a business advisor before making any decision to purchase the Franchise.

*Id*.

140.    The only significant testimony regarding Item 7 came from Mr. McNutt, who testified that the cost of signs for McNutt's CP gym was higher than the Item 7 range of $2,500-$10,000. Ex. 2001 at CL115. (McNutt had budgeted $3,500 for his CP gym's signs, but the actual cost was $10,509.10. Day 2, p. 314:22-315:18; Ex. 454. While McNutt was troubled that the signage bid came back so much higher than what he had budgeted, and that Cerf was not empathetic about the variance, Day 1, p. 190: 24-191:1; Ex. 2085, we find and conclude that the variance was not material and that – as set forth above – CP had adequately warned McNutt and other prospective franchisees in Item 7 that their expenses may vary from CP's estimates.

141.    ***We find and conclude that Claimants did not meet their burden to prove that Respondents made materially false statements or omissions in FDD Item 7 regarding Claimants' estimated initial investment to establish and operate their CP franchise gyms***.

**EXHIBIT 3**

###### 4.  FDD Item 19

142.    As noted above, Claimants contend Respondents' financial misrepresentations and omissions to them occurred in CP's FDD as well as in the Brochure. Having already addressed the Brochure, we now turn to the FDD.

143.    Item 19 of the FDD is entitled "FINANCIAL PERFORMANCE REPRESENTATIONS" ("FPR"). Ex. 2003 at CL360 (McNutt), 2017 at CL1675 (O'Hare) & 2021 at CL614 (Mead). The financial data CP supplied in Item 19 appeared in three tables, one for revenue by month by CP-affiliate gym, one for net revenues by affiliate during calendar year 2017, and one for revenues by affiliate during calendar year 2018.

144.    The Parties spent a great deal of Final Hearing time on direct and cross-examinations of lay and expert witnesses and numerous Exhibits to present their disparate views on the sources, accuracy, and materiality of CP's Item 19 statements. They also dedicated considerable analysis and argument to the subject in their Closing Briefs.

145.    Having considered the evidence and arguments, we find and conclude for three reasons that Claimants failed to meet their burden of proof to establish fraud with respect to CP's Item 19 FPRs.

146.    *First*, we find that the variances Claimants addressed between the FPRs and documents such as tax returns were not large enough to be material.

147.    *Second*, the Item 19 FPRs were replete with cautionary language putting Claimants – all experienced businesspeople – on notice of the limited reliability and utility of the Item 19 information.

148.    As expressly indicated in the financial information, CP's FPRs as of December 31, 2018, concerned only "three *affiliate-owned* [CP] Businesses [(Northglenn, West Arvada, and Old Town Arvada)] and *no* franchised outlets." *Id.* (emphasis supplied). The introductory paragraphs of Item 19 went on to say, "We have included certain expenses for the affiliate-owned [CP] Businesses. Franchise locations may or may not have similar expenses, and they may have additional expenses to the ones listed below." *Id.*

149.    A series of Notes follows the financial tables. Note 1 describes the amount of time each affiliate gym had been open and that reporting for the Old Town Arvada gym covered only 3-4 months. It concludes, "It may take some time for a new [CP] Business to establish itself in its marketplace, especially in locations where the brand may be unfamiliar." Note 2 describes the nature and source of Gross Revenues. Note 3 discusses Wages and Employment Taxes for "all" employees and personal trainers and states that they "do not include owner's salary and draws (as well as the associated taxes) made by the owner of the companies." (More on this below.) Note 4 describes how Net Revenues were determined and identifies twelve streams of expense that were not subtracted from Gross Revenues in calculating Net Revenues. Note 5 made clear that adjustments (deductions) from Net Revenues for Royalties and Brand Fund Contributions were "projections" "based on historical information" and "assumptions," and warned the prospective franchisee: "You should conduct your own independent research and due diligence to assist you

**EXHIBIT 3**

in preparing your own projections." It continues, in a separate paragraph, "**Some outlets have earned this amount. Your individual results may differ. There is no assurance that you'll earn as much**." *Id*. (boldfaced emphasis in original). Finally, Note 5 states: "Other than the preceding financial performance representation, [CP] does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing."

150.    *Third*, the pro formas O'Hare and McNutt created themselves and the one that Mead effectively adopted from fellow CP franchisee Luis Garcia indicate Claimants placed no or minimal reliance upon Item 19 in connection with their decision to become franchisees and move forward with opening their CP gyms. They created their own detailed projections of income and expenses. They budgeted for the salary of an employee-general manager.  *See*, *e.g.*, Day 2, pp. 198:12-199:4 & Ex. 511 (McNutt).

151.    ***We find and conclude that Claimants did not meet their burden to prove that Respondents made materially false statements or omissions in FDD Item 19, nor that they reasonable could have or did rely upon the Item 19 FPRs in deciding whether to become CP franchisees***.

### 5.    CP's closure of its West Arvada gym

152.     CP leased space for a gym in West Arvada (referred to simply as "West Arvada"). West Arvada was the subject of significant debate during the Final Hearing. Initially, it is worth noting that Claimants' allegations about West Arvada were *not* among those Respondents argued Claimants should not be able to pursue due to lack of prior allegations in their Demands. *See* Section II.A. & ¶ 43, *supra*.

153.    To summarize the testimony and related Exhibits, close in time to CP's purchase of a building in Olde Town Arvada and pursuit of opening another company owned gym in that Olde Town space, Respondents undertook lease renewal negotiations with the West Arvada landlord. Displeased with the outcome of those negotiations, by no later than July 2019 Respondents decided to close West Arvada and migrate West Arvada's clients to Olde Town. By this time McNutt was already a franchisee engaged in preparations to open their Lakewood, Colorado gym, but O'Hare and Mead were actively considering whether to become franchisees. McNutt testified and Claimants argue that knowing Respondents were closing West Arvada might have influenced whether they remained a franchisee and finished and opened their gym. O'Hare testified strongly and Mead testified even more strongly that had they known Respondents were closing West Arvada, they would have concluded CP was shrinking rather than expanding and consequently declined to become franchisees.

154.    We do find it troubling that Respondents did not tell O'Hare and Mead they were closing West Arvada. We find it even more troubling that Respondents included a visit to West Arvada on Mead's Discovery Day agenda, and then made excuses about running out of time to have that visit. Both suggest a discomforting lack of transparency on their part.

155.    But we also note Respondents' apt observation that West Arvada was located very close to Mead's Discovery Day at Olde Town, and that if West Arvada's status and operation was

**EXHIBIT 3**

as important as Mead indicated during the Final Hearing, Mead could easily have visited West Arvada after their Discovery Day concluded and before returning to Colorado Springs. More importantly, after closely reviewing all the evidence both sides offered about West Arvada, we cannot find by a preponderance of the evidence that Claimants proved West Arvada's existence or status was material to McNutt's decision to proceed as a franchisee or O'Hare's and Mead's decisions to become franchisees.

156.    *We therefore find and conclude in favor of Respondents and against Claimants on Claimants' allegations regarding West Arvada with respect to all claims for fraudulent misrepresentation and concealment.*

## 6.    Respondents' provision to Claimants of for-execution FAs that were different from the versions provided with the FDDs

157.    Upon receiving his FA for signature, O'Hare contacted Cerf by text on or about August 30, 2019, pointed out that the version number of the FA supplied to him for signature was different from the one attached to the FDD, plainly inquiring about whether the two were the same. Ex. 2103 at CP14980. Cerf responded, "As far as I know it's the same doc, just diff states requires diff updates. As long as it's the 2018 2019 document that's the accurate and most recent doc[.]" *Id.*

158.    Based on this information, O'Hare executed the FA the Respondents had supplied him on or about September 2, 2019. *Id.* at CP14980-81. *See also* Ex. 2016.

159.    Testimony and exhibits presented during the Final Hearing indicate that McNutt and Mead similarly received FAs for execution that differed from those attached to the FA they had previously reviewed, about which McNutt in particular had negotiated with Respondents. *Cf.* Ex. 2003 *with* 2006 (McNutt) *and cf.* Ex. 2021 *with* 2022 (Mead).

160.    These FA-related interactions and exchanges between Respondents and Claimants occurred within a relatively short period (between April and September 2019). And based on the evidence, neither Respondents nor Claimants were aware of the discrepancies between the version of the FA attached to the FDD and the version of the FA that Claimants executed until the Parties were engaged in this dispute.

161.    On balance, *we find and conclude that Respondents did not intentionally supply Claimants with an FA for execution that differed in certain respects from the ones attached to Claimants FA, and therefore did not commit intentional misrepresentation or concealment with respect to the differences between the FA's.*

## 7.    CP's Operations Manual

162.    The FDD that all Claimants received indicates CP's Operations Manual is "confidential," "states our *standards, specifications, and guidelines* for all products and *services* we *require* you to obtain in establishing and *operating* your [franchise]," is valuable enough that Claimants would only receive "one copy" of it after becoming franchisees (they could only see the table of contents before then), and could be subject to a $500 replacement fee if "lost, destroyed,

**EXHIBIT 3**

or significantly damaged." Exs. 2003, 2017 & 2021 at Item 6 (Other Fees), Item 8 (Restrictions on Sources of Products and Services), Item 11 (Franchisor's Assistance … and Training) & Exhibit G (Franchise Operations Manual Table of Contents) (emphasis supplied).

163. The FA's all Claimants signed include similarly stringent provisions with respect to the Operations Manual. *See* Exs. 2006, 2018 & 2022 at § 7.1(h).

164. Respondents represented to Claimants that the Operations Manual contained all the "proprietary" information the Claimants would need to understand and operate the System. Ex. 2003 (CL344) (CP will "guide you through the Franchise Operations Manual" and "[a]llow you to continue to use confidential materials, including the Franchise Operations Manual.").

165. Cerf acknowledged that he advised prospective franchisees that CP had a "very comprehensive training manual and program," Day 1, pp. 116:25-117:3, with 213 pages of trade secret information." Day 1, p. 200:7-11. During the sales process, Respondents told prospects the Operations Manual was "extremely comprehensive" and asserted that it contained all information necessary to operate a CP business. Day 4, pp. 181:18-182:3. Cerf represented to Mr. McNutt before McNutt signed the FA that "the manual was going to be . . . where all the answers are to the recipe[.]" Day 2, p. 35:1-8. Mr. O'Hare testified that Respondents represented the Operations Manual was "too private," and "too secret" to provide to non-franchisees, and that it was "highly detailed and it would give [O'Hare] all the information [he] needed to operate the CP studio. All [he] would need to do was to execute what was in this manual." Day 4, p. 206:1-17. Mr. Mead testified he moved forward with the purchase of a franchise based on Respondents' representations that the manual contained a "business in a box," Day 7, pp. 22:13-23:8, and was "top secret." *Id.* at p. 119:12-14.

166. Testimony at the Final Hearing indicates the origin of CP's Operations Manual was a template of a restaurant franchise manual that CP purchased for $2,500 from an entity named "FranMan." Day 4, pp. 119:6-120:7. Nonetheless, Respondents represented that it contained "most of the information and know how" that franchisees would need to know to run their CP gyms. Ex. 2083 § 1.3 (CL1002).

167. All three versions of the Operations Manual in effect when Claimants were franchisees[12] contained editing remarks from FranMan or provisions Respondents conceded had nothing to do with owning and operating a CP franchise. For example, Respondents acknowledged that in Version 1.0: (a) Section 5.9.2 had "absolutely nothing to do with" CP, Day 1, p. 205:16-23; (b) Section 5.12.5, which concerned walk-in refrigerators and food products and prep areas, had "no business" being in the Operations Manual, Day 1, p. 206:13-21; and (c) the Operations Manual still contained red text with bracketed comments from FranMan. Day 1, pp. 207:15-22 & 208:3-4 *See also* Day 1, p. 241:14–17 (acknowledging that Cerf sent McNutt Version 1.0 and that Version 1.0 was the one that "had all the references that needed to be filled in, the restaurant references

_____

[12] McNutt received Operations Manual 1.0 and 1.2. Exs. 2083 & 2302, Day 1, p. 241:14-17 & Day 3, p. 151:9-11. O'Hare received Operations Manual 1.0, 2.0, and 1.2. Exs. 2245, 126 & 2302. Mead received Operations Manual 2.0 and 1.2. Ex. 2254 & Day 7, p. 47:2-5. Mead did not receive either Operations Manual 1.0 in its entirety or the related "Cliff Notes." Day 7, p. 42:11-16; Day 1. pp. 200:12-201:8.

**EXHIBIT 3**

and all of that."). Version 2.0, which CP published in January 2020, Day 1, p. 207:17-19, still contained the same references to walk-in refrigerators, food products, and prep areas. Day 1, p. 211:1-12; Ex. 2254 (CP19682, 19691–92). Even Version 1.2, the third version of the Operations Manual that CP released in May 2020 (Day 1, p. 212:8-14; Ex. 2302), contained references to running a restaurant with costs that "do not" belong. Day 1, p. 228:17-25; Ex. 2302 (CP28868) ("The two biggest costs in your operation will be food and labor.").

168.    Respondents also suggested that "the meat" of their "training methodology" and Cerf's personal experience was not part of Version 1.0 of the Operations Manual, but rather included in separate "Cliff Notes." Ex. 2083; Day 3, pp. 131:3-11 & 170:17-22. Despite these contentions, the workouts that formerly appeared in the "Cliff Notes." were not incorporated into Versions 2.0 or 1.2 of the Manual. *See* Ex. 2254 & 2302; Day 10, p. 28:13-22. Moreover, Respondents did not even provide the "Cliff Notes." to Mead. Day 7, p. 42:11-16; Day 1, pp. 200:12-201:8.

169.    Perhaps the starkest example of the inadequacy of the Operations Manual was the section entitled "Production Procedures" in version 1. There, one finds the following note:

> Jon: This section of the manual is where you will talk about how to do what it is that you do. Outline your various programs, how they work, how they are conducted, etc. There should be a section for each of the classes, like below
>
> 5.7.1 Hard Core
> 5.7.2 Semi-Private Training
> 5.7.3 Speed and Strength.
>
> Then you should describe each type of session, exactly how you expect the franchisee to deliver that session, etc. Lots of photos, etc.

Ex. 2083 at CL1099 (yellow highlighting in original). Respondents included no content of the sort FranMan recommended. Nor did the "Cliff Notes." that accompanied the first version do so. Thus, the portions of the Operations Manual intended to tell franchisees the "secrets" of successfully operating a CP gym had no substantive content.

170.    Ultimately, the most updated version of the Operations Manual that any Claimant (in this case only O'Hare and McNutt, and not Mead) received from Respondents said only this about the heart of CP's business, personal training:

> Training sessions will last 60, 45, and 30 min.
> Semi Private training sessions will last 45 or 60 min
> Group Classes will last 30, 45 or 60 min
>
> The trainers have the pleasure to create programing for the clients they are working with to achieve results based on their goals. With the skill set and education and certifications they have they should be uniquely qualified to be able to produce results at a high level.

**EXHIBIT 3**

For the group class offerings we will have in training an outline of ideal schedule, as well as formats to run said classes.

Ex. 2302 at § 5.27 (CP28884).

171.    Based on Respondents' representations about the Operations Manual, Claimants understandably expected to find specific guidance in it about how to run a CP gym, training programs to use with clients, guidance on CP's represented scientific methods, and so forth. They found no such insights and guidance, so much so that after Mr. Mead reviewed the version of the Operations Manual he received, he felt he'd "been conned," and consequently "felt helpless." Day 7, p. 48:11-21.  *See also* Day 2, pp. 114:21-116:15 & 117:19-23 (McNutt) & Day 4, p. 206:1-17; Exs. 2544 & 2342 (O'Hare).

172.    We have reviewed all three versions of CP's Operations Manual and the Cliff Notes. We find them woefully inadequate to do what Respondents' repeatedly represented they would do: provide a comprehensive explanation of what Claimants would need to know and do to run a successful CP-franchised personal training gym. On the contrary, the Operations Manual and "Cliff Notes." are all but devoid of any substantive guidance or secrets to success. We do not find it surprising that once Claimants reviewed it, all of them believed they had been duped and left to their own devices in running their CP gyms.

173.    Indeed, the Operations Manuals and "Cliff Notes." are a microcosm of where we believe things went sideways here: Cerf was a far more skilled and prepared *seller of franchises* – ably applying techniques of scarcity and urgency to close franchise sales[13] – than he was a *franchisor* able and willing to train, guide, lead, and encourage Claimants as CP's early franchisees.

174.    In summary, Respondents' representations about CP's Operations Manual were false, and Respondents concealed the falsity of their representations by prohibiting Claimants from seeing the Operations Manual until after they signed their FAs and paid their $45,000 franchise fees. *See* Day 4, p. 66:7-16 & 68:17-70:4.

175.    A fallback position Respondents asserted in their closing briefing is that the FAs' definition of Franchise Operations Manual essentially includes *everything* CP provides to a franchisee. *See* Resp. Rp. Br. at 13 *and* Exs. 2006, 2018 & 2022 at Definition (i). However, given that the balance of the FA discusses the Operations Manual in the singular (one copy; a $500 fee to replace it; etc.) the foregoing broad definition is somewhere between ambiguous and inaccurate. Equally important, as described above the manual Respondents touted would contain CP's "secret sauce," and that Respondents could not and would not supply until a franchisee was signed up, plainly was not "everything"; it was *the Operations Manual* (with or without the Cliff Notes) of which Claimants received between one and three versions only *after* they became franchisees. As a result, we do not find this argument credible or persuasive.

---

[13] *See*, *e.g.*, Day 4, pp. 208:9-23 (Mr. O'Hare's discussion of his final teleconference with Cerf before O'Hare executed their FA).

**EXHIBIT 3**

176. *We find and conclude that: Respondents' misrepresentations and omissions regarding the Operations Manual were false; those misrepresentations and omissions were material; Respondents knew the misrepresentations and omissions were false when they made them; Respondents intended that prospective franchisees such as Claimants would rely upon what they said and did not say about the Operations Manual; Claimants relied upon Respondents misrepresentations and omissions, and those misrepresentations and omissions were part of what persuaded Claimants to become CP franchisees; and Claimants were justified in relying upon those misrepresentations and omissions*.

### 8. Colorado Department of Labor Audit regarding personal trainers as employees vs. independent contractors

177. On or about September 6, 2019, the Colorado Department of Labor and Employment (the "CDLE") notified CP of an audit to "verify the wages reported for your workers are accurate, workers are properly classified, the appropriate reports have been filed, and that the information associated with your [Unemployment Insurance] account is correct." Ex. 2173. The audit was scheduled for a month later, on or about October 9, 2019. *Id*. On or about January 31, 2020, the CDLE issued a Hearing Officer's Decision finding that personal trainers CP had classified as independent contractors were "considered to be in covered employment and therefore remunerations paid to such individuals must be reported to [CDLE] and taxes paid." Ex. 2262. Soon thereafter, CP appealed the determination. Ex. 2268. On or about May 22, 2020, the CDLE issued a Hearing Officer's Decision affirming that CP's personal trainers were employees under Colorado law and not independent contractors. Ex. 2320. CP again appealed. On or about August 21, 2020, Colorado's Industrial Claim Appeals Office affirmed the prior determination. Ex. 2419.

178. Respondents did not notify any Claimant of the pending audit, nor of the initial outcome of CP's appeal. Claimants contend the nondisclosure was fraudulent because the pendency of the audit and the CDLE's initial determination against CP undermined Respondents' related representations in the Brochure and FDD that if they became franchisees, they could operate their CP gyms with one employee. Cl. Clg. Br. at 32-35; Cl. Rp. Br. at 13-14.

179. Respondents essentially contend in response that the mere pendency of an audit, with no final determination, was not material, and in any event the question of whether personal trainers may work as independent contractors or must work as employees is a matter of law, not fact, and therefore something for which: (a) a fraud claim is not available; and (b) Claimants promised in the FA they would be responsible. Resp. Rp. Br. at 14-15.

180. Having carefully evaluated the considerable Final Hearing testimony, Exhibits, and arguments related to this issue, we agree with Respondents that the mere notice of a CDLE audit – the examination under which did not even occur until after all Claimants were franchisees and was not finally concluded until nearly a year later – was not a material fact Respondents were obligated to disclose even to their Colorado franchisees, let alone to franchisees like O'Hare operating in other states. Further, the ultimate determination was one of law: were personal trainers at CP's company owned and franchised Colorado gyms legally employees or not. Finally, based on the totality of the testimony and how evidently committed all Claimants were to pursuit of their franchises in the fall of 2019 and winter of 2020, we simply are not persuaded that the pendency

**EXHIBIT 3**

of an audit, or even the CDLE's initial determination of the issue, would have led any franchisee to abandon the CP franchise ship.

181.     Accordingly, *we find and conclude in favor of Respondents and against Claimants on Claimants' claims that Respondents' nondisclosure of the CDLE audit regarding whether CP's personal trainers could be independent contractors or must be employees constituted fraud.*

### 9.     Other Allegations of Fraudulent Misrepresentations or Omissions

182.     In preparing this Interim Award, we have considered all other factual allegations regarding fraud that Claimants brought to our attention during the Final Hearing and in their Closing Briefs. As to any of those allegations not addressed at length here, including without limitation Cerf having only an Executive MBA from the Small Business Administration and certain articles posted on CP's website, *we find and conclude that such alleged false statements or concealments either were not material, were predictions of future events, or Claimants did not (or could not justifiably) rely upon them in deciding to become CP franchisees.*

### C.     Negligent Misrepresentation and Negligence Claims (O'Hare and McNutt Against Cerf and CP)

183.     For O'Hare and McNutt[14] to recover on their claims of negligent misrepresentation, the Panel must find that Claimants proved the following by a preponderance of the evidence:

   a.   Respondents gave false information to Claimants;
   b.   Respondents gave such information to Claimants in the course of a transaction in which Respondents had a financial interest;
   c.   Respondents gave the information to Claimants for the guidance of Claimants in a business transaction;
   d.   Respondents were negligent in obtaining or communicating the information;
   e.   Respondents gave the information with the intent or knowing that Claimants would act in reliance on the information;
   f.   Claimants relied on the information supplied by Respondents; and
   g.   This reliance on the information supplied by Respondents caused damage to Claimants.

CJI-Civ. 9:4 (CLE ed. 2022).

184.     For O'Hare and McNutt to recover on their negligence claims, they must prove that:

   a.   Respondents had a duty of reasonable care to O'Hare and McNutt;
   b.   Respondents breached that duty;

---

[14] In their Amended Demand, Mead did not plead claims of negligent misrepresentation or negligence against either Respondent.

**EXHIBIT 3**

     c.   Respondents' breach was a cause of O'Hare's and McNutt's damages.

*See United Blood Servs. v Quintana*, 827 P.2d 509 (Colo. 1992); CJI-Civ. 9:1 (CLE ed. 2022). Whether a duty of reasonable care exists depends on policy considerations. *Univ. of Denver v. Whitlock*, 744 P.2d 54 (Colo. 1987).

185.    In their closing Brief, O'Hare and McNutt indicate that their negligence-based claims relate to the following subjects: "(1) Item 19 financial misrepresentations; (2) misrepresentations concerning the 'growth' of the System; (3) omissions concerning the switch of the franchise agreements; (4) the omission of other material facts; and (5) Item 7 misrepresentations and omissions." Cl. Clg. Br. at 10.

186.    We have provided above our findings and conclusions regarding *all* Claimants' allegations about "growth," FDD Item 7, and FDD Item 19. For the same reasons we found that Respondents' representations (or silence) about those matters were not fraudulent, we also find that Respondents' representations (or silence) about them do not comprise negligent misrepresentations and were not negligent vis a vis O'Hare and McNutt. Further, the reference in Claimants' closing Brief to the "omission of other material facts," Cl. Clg. Br. at 10, is too generic to be informative, and we have addressed above our conclusions about the other major areas of concern all Claimants brought to our attention.

187.    We evaluate more closely Respondents' provision to O'Hare and McNutt of an execution version of the FA different from the version Respondents supplied to them as part of their FDDs.

188.    As noted above, O'Hare informed Respondents that the version number of the FA supplied to him for signature was different from the version number of the FA attached to his FDD. It is apparent from both the immediacy and nature of Cerf's response that Cerf did nothing to verify that the two were actually the same before responding to O'Hare's inquiry. *See* Ex. 2103 at CL14980.

189.    As with intentional misrepresentation, Colorado law requires that with respect to a claim for negligent misrepresentation the claimant's reliance must also be justifiable. If the claimant had access to information that was equally available to both parties and would have led to discovery of the true facts, the claimant has no right to rely upon the allegedly negligent misrepresentation. *Balkind v Telluride Mountain Title Co.*, 8 P.3d 581, 587 (Colo. App. 2000).

190.    Here, O'Hare and McNutt received the version of the FA attached to their FDDs. Each received another version of the FA for execution, and notably had each negotiated with Respondents for variances from the FDD version. Each was making a consequential investment for which the franchise fee alone was $45,000. And yet the evidence indicates that neither O'Hare nor McNutt did a careful, further review of the for-execution FA, or undertook to compare it with the FA attached to the FDD, before signing. In these circumstances we find and conclude that: information that would have revealed that the for-execution version differed from the FDD version was equally available to both sides; O'Hare and McNutt could have used that information to discover the variations between the documents; and O'Hare and McNutt could thereafter have

**EXHIBIT 3**

either insisted that Respondents revise the for-execution FA to comport with the Parties prior negotiations and the FDD version of the FA or declined to become franchisees.

191.    We find and conclude that Respondents had a duty of care with respect to the for-execution version of the FA they supplied to O'Hare and McNutt. Respondents breached that duty by supplying different versions and then representing the two were the same.  However, for the reasons set forth above Respondents' breach was not the cause of O'Hare's and McNutt's alleged damages arising from Respondents' negligence.  O'Hare and McNutt had every opportunity to undertake their own review of the for-execution version of the FA and compare it to both the FDD version and the amendments to the FA each of them had negotiated with Respondents.  O'Hare and McNutt did not provide us with proof that they did either of these things.

192.    We concur with Respondents' concerns about O'Hare's and McNutt's apparent endeavor, in Claimants' Closing Brief, to convert their pleaded claim for negligence to a claim for negligence *per se*. *Cf.* Cl. Clg. Br. at 9 & fn. 8 *with* Resp. Rp. Br. at 18. To our knowledge, Respondents had no notice that O'Hare or McNutt might try to do this until they received Claimants' Closing Brief. In these circumstances, we have not considered a claim for negligence *per se* in rendering our Interim Award.

193.    ***We therefore find in favor of Respondents and against Claimants O'Hare and McNutt on O'Hare and McNutt's negligent misrepresentation and negligence claims***.

### D.    Breach of Contract and the Covenant of Good Faith and Fair Dealing Claim (Mead Only, Against CP Only)

194.    For Mead to recover on their claim for breach of contract and the covenant of good faith and fair dealing, Mead must prove:

    a.  A contract;
    b.  Performance by Mead or justification for nonperformance;
    c.  CP's failure to perform; and
    d.  Resulting damages to Mead (causation).

*See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

195.    Colorado law holds that every contract contains an implied duty of good faith and fair dealing. *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).

196.    Mead's Amended Demand for Arbitration does allege both these claims, solely against CP, but does not specify any act or omission of CP that constitutes either a breach of contract or a breach of the covenant. Rather, the claim incorporates Mead's preceding factual allegations *in toto*, and submits that they comprise CP's "material breach." Mead Amended Demand at ¶ 84; *see also id*. at ¶¶ 6-56. In these circumstances, and considering the testimony and exhibits at the Final Hearing, we agree with Respondents that "[t]he basis for this claim is left wholly unspecified, and hearing testimony failed to shed any additional light on which provision(s) the Meads claim were breached." Resp. Clg. Br. at 40.

**EXHIBIT 3**

197.    Only in Claimants' closing brief does Mead specify what they contend were CP's breaches of the FA: (a) "requiring the Meads to pay the $10,000 Initial Advertising Program fee to Respondents rather than to 'Third Parties,'" and (b) "charg[ing] the Meads $1,000 for Core Cards, which had been marked up by $300 to $400." Cl. Clg. Br. at 54. These bases for Mead's contract claims were as much a revelation to us as they were to Respondents. Resp. Rp. Br. at 25.

198.    For the reasons that led us to conclude the foregoing CP charges to Mead did not constitute fraud or concealment, we also conclude that those CP charges did not amount to a breach of either the FA or the covenant of good faith and fair dealing that Colorado law implies in the FA.

199.    The FA expressly required Mead to pay an Initial Advertising Program fee of $10,000 at the inception of the franchise. Ex. 2022 at § 11.1(a). Further, the FDD informed Mead that CP "may receive rebates or other consideration from suppliers in consideration for goods or services that we require or advise you to obtain from approved suppliers, and we reserve the right to do so in the future." Ex. 2021 at CP 594. It may well be that when CP charged the Initial Advertising Program fee to them, Mead did not yet know Machol was a "supplier" and not a management-level CP executive. But if so, Mead's ignorance arose out of Respondents' lapses with respect to Item 2 – something we have addressed above – and not the charge itself.

200.    While all Claimants were roundly critical of the cost, CP's markups on, and the poor functionality of the Core Cards, Respondents correctly point out that the FA expressly authorized CP to introduce new programs which franchisees were required to undertake and for which they were required to pay. Ex. 2022 at §§ 2.2 & 7.4(a).

201.    Based on the testimony and Exhibits at the Final Hearing, we find and conclude that Mead did not meet their burden of proving these claims. ***We therefore find in favor of Respondent CP and against Claimant Mead on Mead's Fourth Claim for Relief for breach of contract and breach of the implied covenant of good faith and fair dealing.***

E.    **Claimants' Colorado Consumer Protection Act Claim (O'Hare and McNutt, Against Cerf and CP)**

202.    O'Hare and McNutt allege Respondents' acts and omissions with regard to their franchises violated Colorado's Consumer Protection Act, C.R.S. § 6-1-101, *et seq*. (the "CCPA").[15] The gist of the claim is that Respondents "engaged in unfair or deceptive trade practices in the course of their business selling [CP] franchises by using false financial statements and projections in marketing [CP] franchises as successful businesses and by failing to disclose material information … which [they were] under a duty to disclose." O'Hare and McNutt Demands for Arbitration, Fourth Claim for Relief.

203.    To prevail on their CCPA claim, O'Hare and McNutt must prove the following elements:

---

[15] For reasons unclear to us, Mead's Amended Demand for Arbitration does not plead a CCPA claim against either Respondent.

**EXHIBIT 3**

a.  The respondent engaged in an unfair or deceptive trade practice;
b.  The deceptive trade practice occurred in the course of respondent's business, vocation, or occupation;
c.  The deceptive trade practice significantly impacted the public as actual or potential consumers of the respondent's goods, services, or property;
d.  The claimant was injured in the course of his business or occupation as a result of the deceptive trade practice; and
e.  The deceptive trade practice caused actual damages or losses to the claimant.

CJI-Civ. 29:1 (CLE ed. 2022); *Hall v. Walter*, 969 P.2d 224, 234 (Colo. 1998).

204.    The above-stated allegations of O'Hare's and McNutt's CCPA claim are principally focused on Respondents' allegedly false financial statements and projections. As noted above we have found in favor of Respondents and against Claimants with respect to those allegations.

205.    Of more importance, Claimants were obligated to prove that the challenged practice "may prove injurious, offensive, or dangerous *to the public*," and that the impact on the public is significant. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-147 (Colo. 2003) (emphasis supplied); *Hall*, 969 P.2d at 234. Colorado courts have held that a challenged practice must affect more than a few people to constitute a breach under the CCPA, particularly when claimants have an alternate cause of action. "[T]he [CCPA] is intended to reach practices of the type which affect *consumers generally* and is not available as an additional remedy to redress a purely private wrong." *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 155 (Colo. 2007) (emphasis supplied).

206.    To determine whether a challenged practice has a significant impact on the public, we must consider three factors: (a) The number of consumers directly affected by the challenged practice; (b) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (c) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future. *Rhino Linings*, 62 P.3d at 146, 149 (finding three affected dealers out of approximately 550 worldwide did not significantly affect the public); CJI-Civ. 29:4 (CLE ed. 2022). Similarly, in *Colorado Coffee Bean LLC v. Peaberry Coffee, Inc., 261 P.3d 9 (Colo. App. 2010)*, a franchise case, the court affirmed dismissal of a CCPA claim because plaintiff failed to demonstrate that a sufficiently substantial number of consumers were affected. There, a franchisor advertised certain franchise information on its website, producing 500 to 635 inquiries which the franchisor screened down to 68. 251 P.3d at 25. Also, where a plaintiff is relatively sophisticated a court is less likely to find a public impact. *Rhino Linings*, 62 P.3d at 150.

207.    Here, a total of four Claimants (two individuals and two companies) assert that Respondents violated the CCPA.[16] O'Hare is highly educated and experienced in various forms of

---

[16] When Filipov and Pacey were parties to this consolidated arbitration, there were still only five individuals and four companies asserting CCPA claims against Respondents. Indeed, Claimants acknowledge that between 2018 and 2020, Respondents sold just twelve franchises to members of the public. Cl. Clg. Br. at 52.

**EXHIBIT 3**

business, as described above. While the testimony regarding McNutt's educational background is less clear, he is thoroughly experienced in business, analyzing financials, and undertaking marketing efforts. (Both men apparently also had higher net worth and liquidity than members of the general public. *See* Ex. 2002 (the Brochure) at CP305, indicating franchisee candidates should have a net worth of at least $300,000 and liquid working capital of at least $75,000.) Given the small number of those allegedly affected by Respondents' wrongdoing and the foregoing appellate authority, we find and conclude that Claimants did not and could not meet their burden to prove Respondents' alleged wrongful acts and omissions had or will in the future have significant public impact.[17]

208.    ***We therefore find and conclude in favor of Respondents and against Claimants O'Hare and McNutt on their CCPA claims***.

**F.   Civil Theft Claim (All Claimants, Against CP and Cerf)**

209.    All Claimants asserted a claim against both Respondents for civil theft, a claim that arises under C.R.S. § 18-4-405. In their claims, Claimants contend they contributed money to CP's marketing fund to receive advertising and marketing support and that Respondents "knowingly, and by deception, did not follow through on the promise to provide … [such] support." O'Hare and McNutt Seventh Claim for Relief; Mead Fifth Claim for Relief.

210.    To prove civil theft, Claimants were required to prove the following elements:

a.  The claimants (owned) (possessed) (had an ownership interest in) the marketing funds;
b.  The respondents knowingly (without authorization) (by threat) (by deception) (obtained) (retained) (exercised control over) the marketing funds;
c.  The respondents did so with the intent to permanently deprive the claimant of the use or benefit of the claimant's marketing funds.

CJI-Civ. 32:4 (CLE ed. 2022); *Itin v. Ungar, 167 P.3d 129, (Colo. 2000*); *Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009).

211.    The bar for proving civil theft is high. As Respondents note, because the civil theft claim arises from a statute in Colorado's criminal code, courts have held that the claim "was intended to be a punitive measure depriving *thieves* and persons who buy and sell *stolen goods* of the immediate fruits of their criminal activities." *Montoya v. Grease Monkey Holding Corp.*, 883 P.2d 486, 490 (Colo. App. 1994) (emphasis supplied); *see also Vickerie v. Diversified Inv. Holdings, Inc.*, No. 19-cv-03256-REB-KMT, 2020 WL 9432908, at *5 (D. Colo. Nov. 13, 2020) ("To recover under the [civil theft] statute, the owner must prove that the taker committed acts constituting at least one of the statutory crimes of *theft, robbery, or burglary*") (emphasis supplied).

---

[17] We would have reached the same conclusion with respect to Mead if Mead had also asserted a CCPA claim.

**EXHIBIT 3**

212.    Further, where the alleged thief and victim are parties to a contract, the claimant-alleged victim must prove the alleged theft breached a legal duty to the claimant that is independent of any contractual duty. *Rees v. Unleaded Software, Inc.*, 383 P.3d 20, 28 (Colo. App. 2013), *aff'd in part and rev'd in part on other grounds*, 373 P.3d 603 (Colo. 2016).

213.    Here, the FA governed Claimants' up-front payments towards marketing and the debits of their accounts for Core Cards. As determined above, Claimants have legitimate concerns about Respondents' lack of transparency regarding Messrs. DeWitt and Machol in Item 2 of the FDD. They may also have legitimate concerns about Respondents' and Machol's lack of transparency concerning how their marketing funds were spent and the results of those expenditures with respect to their gyms and markets. But Respondents correctly point out that nothing in the FA requires CP to supply Claimants with the sort of marketing data Claimants contend CP and Machol wrongly declined to provide. *See* Resp. Clg. Br. at 7.  At least McNutt was frustrated by the expense of the Core Cards, their lack of functionality, and the portion of the charge for them that CP received, and believed that in toto the transaction amounted to "theft." *See* Day 2, pp. 90:14-92:22 & 96:8-98:2.

214.    Having considered the Parties' pleadings, the testimony and Exhibits at the Final Hearing, and the Parties' Closing Briefs, we find and conclude that Claimants did not meet their burden of proving that Respondents committed civil theft with respect to the marketing funds or billed expense for Core Cards. There is simply no credible evidence that Respondents *stole* or were *thieves* with respect to those funds. Because the FA governs Claimants' payments for marketing and advertising and CP's use of those funds, Claimants' complaints in this regard properly relate to their fraud claims, O'Hare's and McNutt's negligent misrepresentation claims, and Mead's contract claim rather than this one.  We have decided those claims above.

215.    Accordingly, *we find and conclude in favor of Respondents and against Claimants on Claimants' civil theft claims.*

### G.  CP's Counterclaim No. 18 Against McNutt, for an Accounting

216.    We acknowledge that via email from Claimants' counsel dated March 23, 2023, the Parties asked if we could decide Claimants' February 3, 2023, oral Motion to Dismiss CP's Counterclaim No. 18 against McNutt before they submitted their Closing Briefs.[18] We regret that our schedules did not permit us to do so.

217.    CP's Counterclaim No. 18 against McNutt, which we allowed CP to pursue via our January 2, 2023, Order Regarding Counterclaims, sought "an order requiring McNutt to turn over the records relating to the gross revenues generated in [McNutt's] wellness center, including revenues generated by the HIIT IT business operating inside [McNutt's] center." CP's Counterclaims at p. 47, ¶ 249.

---

[18] At the Final Hearing, we reserved ruling on the motion. *See* Day 10, pp. 171:1-177:21.

**EXHIBIT 3**

218.     During the Final Hearing, Claimants' counsel indicated McNutt believed the counterclaim had effectively been resolved by CP's articulation of what it sought and McNutt's production of additional financial documents before the Final Hearing. Respondents supplied no evidence or exhibits to rebut this position.

219.     During Respondents' cross-examination of Mr. McNutt, they asked him no questions related to the counterclaim or any purported accounting-records gap. During Respondents' case, they did not present testimony or Exhibits indicating that as of the Final Hearing McNutt had failed to produce the records sought.

220.     In addition, during Claimants' adverse direct of him, Cerf conceded that following McNutt's production of additional accounting and banking records, *see* Ex. 2974 (McNutt's general ledger from January 2019 through December 2022), he could not say there were any additional financial documents from McNutt that he did not have. *See* Day 4, pp. 30:17-31:6.

221.     Finally, there is no mention of the Counterclaim, nor any request for relief related to it, in Respondents' Closing Briefs.

222.     In these circumstances, we find and conclude that CP has either abandoned or failed to prove its counterclaim against McNutt. We therefore ***grant McNutt's Motion to Dismiss CP's Counterclaim No. 18 against McNutt and dismiss that Counterclaim <u>with</u> prejudice***.

## H.  <u>Respondents' Affirmative Defenses</u>

223.     We have addressed some of Respondents' actual or potential affirmative defenses above. We incorporate our foregoing findings and conclusions about them here. We now consider in more detail affirmative defenses that Respondents asserted, some addressed in the Parties' Closing Briefs and most not.

224.     ***We find and conclude against Respondents and in favor of Claimants on Respondents' <u>Affirmative Defense No. 1</u>, for failure to state a cause of action***, about which Respondents offered no evidence or argument at the Final Hearing or in their Closing Briefs.

225.     Respondents' <u>Affirmative Defense No. 2</u> asserts that Claimants' claims are barred by their own unclean hands. "To support a defense of unclean hands, a [respondent] must show that [claimant] is (1) guilty of conduct involving fraud, deceit, unconscionability, or bad faith, (2) directly related to the matter at issue, (3) that injures the [respondent], and (5) [*sic*] affects the balance of equities between the [parties]." *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 2010 WL 3522409, at *3 (D. Colo. Aug. 11, 2010) (citing *In re New Valley Corp.*, 181 F.3d 517, 523 (3d Cir. 1999)), *approved and adopted by District Court*, No. 01-CV-01644-REB-CBS, 2010 WL 3522408 (D. Colo. Sept. 2, 2010). It "prevents one who has engaged in improper conduct regarding the subject matter of the cause of action, to pursue the claim at issue." *Sender v. Mann*, 423 F. Supp. 2d 1155, 1167 (D. Colo. 2006).

226.     Respondents' principal unclean hands-related evidence and argument concerned Claimants' (particularly O'Hare's and Mead's) undertaking to pursue their own personal training gyms, something O'Hare and Mead were enjoined from doing in the O'Hare Lawsuit and the Mead

**EXHIBIT 3**

Lawsuit. However, we agree with Claimants that such facts and arguments addressed Claimants' conduct at the end of the Parties' franchise relationships, whereas the claims and allegations on which we have found in favor of Claimants concern Respondents' false statements, concealments, negligence, and negligent misrepresentations at or near the inception of the Parties' franchise relationship. *See* Cl. Clg. Br. at 58-59. Thus, *we find and conclude that Respondents did not meet their burden of proof on their Affirmative Defense No. 2, and therefore find and conclude against Respondents and in favor of Claimants on same*.

227.    Regarding Respondents' Affirmative Defense No. 3, alleging waiver, to prevail upon it Respondents were obligated to prove by a preponderance of evidence that Claimants learned of the actual facts regarding FDD Item No. 2 and the Operations Manual (the two matters on which we found in favor of Claimants) after beginning the process to become franchisees and before they executed the FAs, and then continued to become franchisees with full knowledge of the actual facts when a reasonable person under the same or similar circumstances would not have done so. *See* CJI-Civ. 19:16 (CLE ed. 2022) (citing authorities). *We find and conclude that Respondents did not meet their burden of proof with respect to FDD Item No. 2 and the Operations Manual, therefore find against Respondents and in favor of Claimants on Respondents' Affirmative Defense No. 3, alleging waiver*.

228.    The elements of Respondents' Affirmative Defense No. 4, alleging estoppel, are Claimants' full knowledge of the facts, Claimants' unreasonable delay in asserting the available remedy, and intervening reliance by and prejudice to Respondents. *See Barker v. Jeremiasen*, 676 P.2d 1259, 1262 (Colo. App. 1984). Consistent with our findings and conclusions in Sections IV.B.2. & 7., *supra*, *we find and conclude against Respondents and for Claimants on Respondents' affirmative defense No. 4 with respect to FDD Item 2 and the Operations Manual*. Claimants did not have full knowledge of Respondents' false statements and concealments regarding FDD Item 2 and the Operations Manual when they became franchisees. They did not unreasonably delay in asserting the available remedy; indeed, all of them demanded arbitration while still franchisees and before Respondents terminated O'Hare and Mead. Respondents did not meet their burden to prove their intervening reliance, or any prejudice related to these matters.

229.    Regarding Respondents' other fraud-related affirmative defenses, comprised of "non-actionable future predictions" (Affirmative Defense No. 5), "no actual reliance" (Affirmative Defense No. 7), "no reasonable reliance" (Affirmative Defense No. 8) and "not material" (Affirmative Defense No. 9), consistent with our findings and conclusions in Section IV.B., *supra*, *we find and conclude against Respondents and for Claimants with respect to FDD Item 2 and the Operations Manual. We find and conclude for Respondents and against Claimants with respect to the Brochure, FDD Item 7, FDD Item 19, the closure of West Arvada, the for-execution FAs, and the CDLE Audit*.

230.    Pursuant to Section IV.E. of this Interim Award, *we find and conclude in favor of Respondents and against Claimants on Respondents' "Non-actionable deceptive trade practice," e.g. CCPA, Affirmative Defense No. 6*.

231.    We address Respondents' affirmative defense of offset (Affirmative Defense No. 10) in Section IV.I., *infra*.

**EXHIBIT 3**

232.     Because, as discussed *infra* in Section IV.I., we find and conclude that Claimants did incur damages as a consequence of Respondents' above-described misrepresentations and concealments, we must address Respondents' <u>Affirmative Defense No. 11</u>, alleging failure to mitigate. *See* CJI-Civ. 5:2 (CLE ed. 2022). To prevail on this defense, Respondents had to prove by a preponderance of evidence that Claimants breached an affirmative duty to mitigate their damages arising from Respondents' wrongful conduct and Claimants had increased damages because of that breach. *Id*. Notably, Claimants need use only *reasonable* means to reduce their damages. *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997). The essence of Respondents' mitigation argument, at the Final Hearing and in their Closing Briefs, is that Claimants could and should have eliminated (and thus completely mitigated) their claimed damages by remaining CP franchisees. Resp. Rp. Br. at 20. Of course, McNutt effectively remains a franchisee, and Respondents terminated O'Hare and Mead from continuing as franchisees and sued them for alleged violations of their FAs.  During their continued tenure as a franchisee, McNutt have plainly endeavored to make their gym financially viable.  O'Hare took several steps after CP terminated them to mitigate their damages, such as selling their gym equipment and negotiating an early termination of their lease for a one-time termination fee.  Mead took steps after CP terminated them to build their alternative health/fitness center and make it financially viable and able to meet its lease and other commitments.  Having considered all the evidence, ***we find and conclude that Respondents have not proven their Affirmative Defense No. 11, for failure to mitigate, by a preponderance of the evidence***.

233.     Finally, the essence of a causation affirmative defense (Respondents' <u>Affirmative Defense No. 12</u>) is the contention that the purportedly wrongful conduct of Respondents did not cause Claimants' alleged injuries, and thus could not have caused their alleged damages. *See* CJI-Civ. 9:18 (defining causation in the context of negligence) *and* 19:1 (causation is an element of a claim for fraud and fraudulent concealment) (CLE ed. 2022). Consistent with our findings and conclusions in Sections IV.B. and C., *supra*, ***on Respondents' "causation" Affirmative Defense No. 12, we find and conclude against Respondents and for Claimants with respect to FDD Item 2 and the Operations Manual, and in favor of Respondents and against Claimants with respect to the Brochure, FDD Item 7, FDD Item 19, West Arvada, the for-execution FAs, and the CDLE Audit***.

### I.  <u>Damages</u>

234.     Considering our foregoing rulings, finding for Claimants on some claims and against them on others, we now consider their damages.

235.     In their Closing Briefs, all Claimants indicate that they have elected recission as their requested remedy for Respondents' fraudulent misrepresentations and concealment. *See* Cl. Rp. Br. at 16.

236.     When a contract is rescinded, it is effectively rendered void. Rescission must be accompanied by the equitable doctrine of restitution, which seeks to return both parties to the *status quo ante*, or to the same position they were in prior to entering into the contract. *Forest View Acres Water Dist. Colo. State Bd. of Land Comm'rs*, 968 P.2d 168, 173 (Colo. Ct. App. 1998).

**EXHIBIT 3**

237.    In determining whether Claimants may pursue recission as a remedy, we must be guided by Colorado law.  We therefore begin our analysis by quoting at some length from a case addressing the matter, *Martinez v Affordable Housing Network,* 109 P.3d 983 (Colo. App. 2004), *rev'd on other grounds*, 123 P.3d 1201 (Colo. 2005):

A party asserting fraudulent inducement of a contract must elect whether to rescind or affirm the agreement.  *Alien, Inc. v. Futterman,* 924 P.2d 1063 (Colo. App.1995); *Altergott v. Yeager,* 37 Colo. App. 23, 28, 543 P.2d 1293, 1297 (1975) ("By an unbroken line of cases our courts have held that one defrauded has either the right to affirm the contract and sue for damages, or rescind the contract and sue for return of the money paid....").

This election can be manifested in three ways. First, the defrauded party may inform the other party that it is canceling the agreement. In doing so, the defrauded party must tender back, or offer to tender back, to the other party any benefit received pursuant to the agreement. *Tisdel v. Cent. Savings Bank & Trust Co.,* 90 Colo. 114, 130, 6 P.2d 912, 917 (1931) ( "When one is induced through false and fraudulent representations to enter into an agreement, upon discovery thereof, he [may] rescind, in which event he must tender back that which he has received...."); *Rubie Combination Gold Mining Co. v. Princess Alice Gold Mining Co.,* 31 Colo. 158, 161, 71 P. 1121, 1122 (1903) (In an action seeking cancellation of a deed, an "unbroken line of authorities" indicates that it "was incumbent upon plaintiff ... to place defendant in the status quo ...."); *see Bennett v. Coors Brewing Co.,* 189 F.3d 1221 (10th Cir.1999) (applying Colorado law to preclude rescission claim based on fraud when no tender had been made). After rescinding the agreement and tendering back any benefit received, a defrauded party may bring suit for restoration to receive back any benefit conferred upon the other party. This remedy was historically known as rescission at law. *See Savers Fed. Savings & Loan Ass'n v. First Fed. Savings & Loan Ass'n,* 298 Ark. 472, 768 S.W.2d 536 (1989); D. Dobbs, *Law of Remedies* § 4.8, at 673–74 (2d ed.1993).

Second, the defrauded party may affirm the agreement. Typically, this affirmation is accomplished when the defrauded party takes action consistent with the continued vitality of the agreement. *See, e.g., Gladden v. Guyer,* 162 Colo. 451, 426 P.2d 953 (1967); *Wark v. Bopp,* 119 Colo. 12, 199 P.2d 892 (1948). In such an instance, a party cannot seek rescission and is limited to an action for damages arising out of the fraud. *Tisdel v. Cent. Savings Bank & Trust Co., supra,* 90 Colo. at 130, 6 P.2d at 917 (Upon discovery of the fraud, the party "may affirm the agreement, and maintain his action in damages for deceit."); *see also Shappirio v. Goldberg,* 192 U.S. 232, 242, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904) ("If [a defrauded party] continues to treat the property as his own the right of rescission is gone, and the party will be held bound by the contract.").

Third, a defrauded party who has neither informed the other party of its intention to rescind nor taken acts affirming the agreement may instead, if otherwise timely, file a claim for judicial rescission of the agreement. This action is in equity and

**EXHIBIT 3**

proceeds under a theory of equitable rescission. *See Knaebel v. Heiner,* 663 P.2d 551 (Alaska 1983); Dobbs, *supra,* § 4.8, at 675–77.

A plaintiff seeking equitable rescission need not have tendered back anything received pursuant to the agreement prior to the commencement of a lawsuit. Nevertheless, in its pleadings, the defrauded party must, at a minimum, indicate that it is prepared to tender back any benefit received under the agreement. This indication is required because, for a trial court to "do equity" when canceling an agreement, the defrauded party must have the ability to return anything it had received pursuant to that agreement. *Cahill v. Readon,* 85 Colo. 9, 15, 273 P. 653, 656 (1928) ("It is claimed that there was no sufficient tender of rescission, but in Colorado the general tender of equity in the complaint is enough."); *Treat v. Schmidt,* 69 Colo. 190, 194, 193 P. 666, 668 (1920) (In an action for rescission of a deed, "tender in the complaint was sufficient."); *see also Gerbaz v. Hulsey,* 132 Colo. 359, 364, 288 P.2d 357, 359 (1955) (Failure to "plead an intention to restore plaintiffs to status quo" prevented rescission.).

*Id*. at 987-88.

238.    Here, we were presented with no evidence, testamentary or documentary, demonstrating that any Claimant informed Respondents they were cancelling the FA, or tendering (or offering to tender) any benefit received pursuant to the agreement.  Neither McNutt nor O'Hare pleaded for recission in their Demands; their prayers for relief seek only economic damages.  Nor did they in their Demands tender or offer to tender any benefit received in conjunction with rescinding.  In fact, none of the Claimants sought rescission in their initial arbitration demands. Mead did later request recission as a remedy in their prayer for relief in their amended arbitration demand but still did not tender or offer to tender any benefit received in conjunction with rescinding.

239.    As a result, we are compelled to find and conclude that *Martinez* options one and three are unavailable to Claimants, and that they have instead chosen *Martinez* option two: affirming their FAs and seeking damages for Respondents' fraud.  McNutt, of course, continues to pay royalties under their FA and has never taken action to rescind, though they have contended and persuaded us in part that they were defrauded.  Even after concluding Respondents had defrauded them, O'Hare and Mead proceeded under their FAs for months, and remained franchisees until CP terminated them for their alleged breaches of their FAs.

240.    If a claimant prevails on a fraud claim, he or she is entitled to all "actual damages insofar as they have been proved by a preponderance of the evidence." *T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F. Supp. 1476, 1488 (D. Colo. 1991) (citing CJI-Civ.3d 19:17 (1990)). These damages include all "consequential damages sustained as a proximate result of the false representation, concealment, or nondisclosure." *Id*.; *see also Carpenter v. Donohoe*, 388 P.2d 399, 401 (Colo. 1964).

241.    Here, among the damages Claimants have requested are their franchise fee and, in the case of O'Hare and Mead, their site location fee (McNutt negotiated not to pay this).  However, this misapprehends what is available in damages for fraud.  What is available is the difference

**EXHIBIT 3**

between the value of what one received and the value of what one would have received if the representations had been true and there had been no concealment.

242.     Thus, consequential damages arising from fraud are different than sums incurred to enter into the transaction induced by fraud.  For example, a seller markets a tractor as new and thus the sale price is $120,000.  After buying it for that "new" price, the buyer learns the tractor was used and therefore has a value of only $80,000.  If the buyer rescinds and tenders the used tractor back to the seller, then his damages are the full $120,000 he paid for a purported new tractor.  But if the buyer retains the tractor rather than giving notice of recission and returning it, then his damages as a consequence of the fraud are the $40,000 difference between the price of a genuinely new tractor and the price of the used tractor the buyer was fraudulently induced to purchase, as well as other damages that arise as a consequence of the tractor being used (lesser harvests, more frequent and expensive maintenance, higher fuel costs for a less fuel-efficient engine, etc.).  The buyer cannot then recover the $120,000 he paid for the tractor under the theory that he would not have purchased it but for the fraud.

243.     Given their express or implied affirmations of their FAs, by seeking return of their franchise fee and (where applicable) site location fees, Claimants effectively seek to retain their franchises and get them for nothing.  We find and conclude that Colorado law does not permit this, and awarding Claimants their franchise and site location fees would give them a windfall.  Instead, the damages to which they are entitled are those arising from their CP franchises not being what Respondents promised, and those damages Claimants occurred due to the gap between Respondents' misrepresentations or concealments and reality.  We proceed to award damages accordingly.

244.     Respondents' Affirmative Defenses No. 10 is for offset, also known as setoff. While there is a dearth of Colorado appellate law on this subject in civil cases, as Respondents note such discussion as exists indicates that offset is an equitable principle to avoid bestowing an unfair windfall on a party by reducing a party's recovery by the amount that he has benefited. *See Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1026-28 (Colo. Ct. App. 2005). *See also*, B. Garner, *Black's Law Dictionary*, "Offset" at 1195 & "Setoff" at 1496 (9th ed. 2009). Despite the dearth of Colorado authority, we agree with Claimants that if Respondents contend via an affirmative defense that Claimants received value from the Parties' contractual relationship despite Respondents' fraud, it was Respondent's burden to prove the offset for such value to which Respondents are entitled. *See, e.g.*, *Powell Valley Health Care, Inc. v Healthtech Mgmt. Servs., Inc.*, 2013 WL 12085501, at *15 (D. Wyo. May 23, 2013) ("the burden rests with the defendant to prove an offset to restitution"); *Bluebonnet Sav. Bank F.S.B. v. United States*, 67 Fed. Cl. 231, 236-37 (2005) ("after the plaintiff has satisfied its burden, the law in specific instances shifts the burden from the non-breaching party, the [claimant], to the breaching party, the [respondent], to demonstrate that offsets to the plaintiff's recovery are warranted"); *Grissom v. Moran*, 292 N.E.2d 627, 629 (Ind. Ct. App. 1973) ("once the right to rescind is established, the burden then shifts to the [respondent] to prove with specificity the various equities necessary to return both parties to the *status quo*, particularly those that will offset the amounts that he must restore to the [claimant]").

245.     Having considered the testimony, Exhibits, and arguments brought before us, we find and conclude that Respondents did not meet their burden of proving what, if any, economic

**EXHIBIT 3**

value Claimants received during the periods when each of them was a CP franchisee. Thus, *we find and conclude in favor of Claimants and against Respondents on Respondents' Affirmative Defense No. 10, for offset*.

246.    Though not briefed by either side, we have considered the question of whether we should award damages against just CP as franchisor or against both CP and Cerf as CP's sole member and manager. Claimants neither asserted nor proved that CP is Cerf's alter ego. However, an individual may be held personally liable for his own tortious acts even though committed on behalf of a corporate entity, which is also held liable. *Hoang v. Arbess,* 80 P.3d 863, 867 (Colo. App. 2003). This precept applies to fraudulent conduct. *See Colorado Coffee Bean, LLC, supra.* Accordingly, as reflected in our orders below regarding each Claimant's damages, we have entered our damages awards against both Respondents.

### 1. O'Hare

247.    Having found and concluded that O'Hare have prevailed in part on their fraudulent misrepresentation and concealment claims as described above, we find and conclude that O'Hare's damages arising as a consequence of Respondents' acts and omissions are:

| | | |
|---|---|---|
| a. | Lease deposit and leasehold improvements: | $99,800.00 |
| b. | Equipment (less re-sale of same): | $57,039.00 |
| c. | Operating losses while a franchisee: | $45,916.00 |
| d. | Lease termination fee: | $85,000.00 |
| | **Total:** | **$287,755.00** |

248.    We do not believe it appropriate or equitable to award O'Hare as consequential damages their operating losses following CP's termination of their franchise agreement, particularly when the U.S. District Court for Colorado found in the O'Hare Lawsuit that O'Hare had violated same and entered a preliminary injunction against them.

249.    We do not award O'Hare their claimed interest on personal credit card debt, finding and concluding the evidence offered in support of same was insufficient to meet O'Hare's burden of proof.

250.    ***We therefore award damages in favor of Claimants Chris O'Hare and CAO Enterprises, Inc. and against Respondents in the amount of $287,755.00***.

### 2. McNutt

251.    Having found and concluded that McNutt prevailed in part on their fraudulent misrepresentation and concealment claims, we find and conclude that McNutt's recoverable damages are:

**EXHIBIT 3**

a.  Operating losses, April 2019 – December 2020:    $90,040.00

**Total:**    **$90,040.00**

252.    We acknowledge McNutt's contention that they are also entitled to recover either all funds spent to build out McNutt's CP gym or, alternatively, all funds they will spend to eliminate their CP trade dress and signs and rebrand. We do not agree. First, McNutt remains a CP franchisee, and thus recovery of these expenses for the alternative reason is not an option.  Second, as co-owner and landlord of the building in which McNutt's CP gym was located, Mr. McNutt received exercise equipment another party had placed in the space – evidently to operate a gym – after that party defaulted on its lease. McNutt decided to pursue their own gym in the space as a new business venture. As a result, McNutt was going to incur significant expense to build out, obtain signs for, and open a new gym in the space regardless of whether the gym was a CP gym or, to coin Respondents' phrase, a "Tim's Gym." And, as Respondents note, McNutt has continued to operate under the CP name and trademarks, albeit without participating in CP's ongoing marketing efforts, and therefore has yielded some benefit from being part of CP's website and local marketing and advertising. On balance, we find and conclude it would not be lawful or equitable to award McNutt their claimed build-out/rebrand damages.

253.    ***We therefore award damages in favor of Claimants Tim McNutt and Cedar Drive Investments, LLC and against Respondents in the amount of $90,040.00***.[19]

### 3.  Mead

254.    Having found and concluded that Mead prevailed in part on their fraudulent misrepresentation and concealment claims, we find and conclude that Mead's recoverable damages are:

a.  Operating losses while a franchisee:    $111,976.00

b.  One-half of net present value of remaining lease term:    $251,534.00

**Total:**    **$363,510.00**

255.    As above with O'Hare, we do not believe it appropriate or equitable to award Mead consequential damages for their operating losses following CP's termination of their franchise agreement, particularly when the U.S. District Court for Colorado found in the Mead Lawsuit that Mead had violated same and entered a preliminary injunction against them.

256.    We further do not find it would be appropriate or equitable to award Mead the present value (as calculated by Claimants' expert Mr. Cadorette, which calculation we find and conclude used an appropriate discount rate) of the *entire* remaining term of their lease. As of late 2022 Mead reported they had broken even in operating their Altru Integrated Health operation,

---

[19] We note that following the Parties' receipt of this Interim Award and pending the below-described remaining briefing, if they wish to do so Respondents and McNutt may negotiate regarding these damages and the remaining term of McNutt's FA.

**EXHIBIT 3**

thus mitigating the consequences of Respondents' fraud.  Further, an award at this level will provide Mead the opportunity to pursue negotiations for the early termination of their lease if they wish to do so.

*257.    We therefore award damages in favor of Claimants Mytchell Mead, Jan Mead, Altru Fitness LLC, and Altru Fitness Cos LLC f/k/a Colorado Springs Core Progression, LLC and against Respondents in the amount of $363,510.00.*

**258.  ATTORNEY FEES, ARBITRATORS' FEES, COSTS OF ARBITRATION, AND INTEREST**

256.    Section 21.3 of the Parties' FA provides:

> If either party *institutes* a legal proceeding, including a permitted court proceeding or *arbitration*, *and prevails* entirely or *in part* in any action at law or in equity against the other party based entirely or in part on this Franchise Agreement, the *prevailing party shall be entitled to recover from the losing party,* in addition to any judgment, *reasonable attorney fees*, court costs and all of the prevailing party's expenses in connection with any action at law. (Emphasis supplied.)

257.    We have, of course, found in favor of Claimants on some of their claims, and awarded them some of their requested consequential damages. And we have dismissed CP's sole counterclaim that proceeded to Final Hearing. We have found in favor of Claimants and against Respondents on most of Respondents' affirmative defenses.  Considering the totality of our findings, conclusions, and awarded damages, along with the foregoing language of Section 21.3, *we find and conclude that Claimants are the prevailing Parties in this arbitration*.

258.    Section 21.3 of the FA does not address the allocation of or provide for the shifting of the *arbitrators*' fees. Rather, Section 20.7 of the FA provides:

> *Each party shall bear its own costs* of arbitration; however, *the fees of the arbitrator shall be divided equally between the parties*. *The arbitrator shall have no authority to amend or modify the terms of this Franchise Agreement*. (Emphasis supplied.)

259.    JAMS Rule 24(f) provides:

> The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses, *unless such an allocation is expressly prohibited by the Parties' Agreement*. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).) (Emphasis supplied.)

260.    We have conferred with our staff and learned that, per our above-referenced April 27, 2022, Procedural Order No. 1, each side has paid and will pay one-half of JAMS Denver's and our fees to date. As a result, no reallocation of our fees between the Parties is necessary or appropriate under JAMS Rule 31(c).

**EXHIBIT 3**

261.    We find and conclude that Section 20.7 of the FA precludes us from reallocating JAMS Denver's and our fees. Thus, *we find and order that each side will pay one-half of JAMS Denver's and our fees in this arbitration through the issuance of this Interim Award and our Final Award*.

262.    Whether we may award Claimants their own costs (other than our fees) related to this arbitration is unclear.  Section 21.3 of the FA provides that "the prevailing party shall be entitled to recover from the losing party, in addition to any judgment, *reasonable* attorney fees, *court costs and all of the prevailing party's expenses in connection with any action at law*." (Emphasis supplied.) However, that same Section goes on to state that "*Each party shall bear its own costs* of *arbitration*." (Emphasis supplied.)  As discussed below, we will leave it to the Parties to supply their perspectives on whether Claimants, as prevailing Parties, are entitled under the FA to recover their costs as well as their attorney fees.

263.    The FA does not specify the interest rate with respect to the damages we have awarded here. However, since the FA is governed by Colorado law, *see* Exs. 2006, 2018 & 2022 at § 21.1, *we will award Claimants pre-award and post-award interest at Colorado's statutory rate of 8% compounded annually on the damages we have awarded to them*. C.R.S. § 5-12-102.

264.    We order Claimants to submit a brief, not to exceed 25 pages, double-spaced, by 5:00 p.m. mountain time on October 20, 2023 addressing (a) their claimed attorney fees and costs of arbitration (other than JAMS Denver's and our fees), (b) the date from which they contend pre-award interest should run, (c) their calculation of pre-award interest due from that date through the date of this Interim Award, and (d) their position regarding the per-diem amount of post-award interest. Respondents may file any opposition brief they wish to submit on these subjects, not to exceed 25 pages, double-spaced, by 5:00 p.m. mountain time on November 10, 2023. Claimants may file a reply brief not to exceed 12 pages, double-spaced, by 5:00 p.m. mountain time on November 17, 2023. We do not currently anticipate requesting oral argument on these subjects but reserve the right to do so after reading the briefs.

265.    Regarding the foregoing briefing, we note that we intend to follow the above-quoted language of the FA and award Claimants their *reasonable* attorney fees, and their *reasonable* costs if we are persuaded they are entitled to same. In making that determination, we anticipate reviewing how such fees (and, if appropriate, such costs) were allocated between claims on which Claimants have prevailed and those on which they have not. We urge Claimants' proactive efforts to provide such analysis and allocation to us, and similarly urge Respondents' rebuttals to same.

266.    We currently anticipate deciding the matters of attorney fees, costs, and interest, and entering our Final Award, within 42 days after the foregoing briefing has closed, but reserve the right to seek additional time as permitted by JAMS Rule 24.

**EXHIBIT 3**

## V.     CONCLUSION

267.     Consistent with Section 20.9 of the Parties' FA and their Stipulation, we remind the Parties and counsel that this arbitration is a private proceeding. We perceive nothing in the FA or JAMS' Rules that would permit either the Parties or their counsel to publish this Interim Award or our Final Award, nor to make public statements about them, other than what federal or state law or regulations may require of CP in relation to its solicitation of future franchisees or otherwise.

Dated: September 15, 2023

_____
Hon. John W. Madden, IV (Ret.), Chair


_____
Hon. Robert McGahey (Ret.)


_____
Steven C. Choquette, Esq.

**EXHIBIT 3**