| **CHRIS O'HARE** *et al.*<br>Claimants<br><br>v.<br><br>**CORE PROGRESSION FRANCHISE LLC** *et al.*<br>Respondents | JAMS Consolidated Case ID 27679 |
|---|---|
| **FINAL AWARD** | |

As set forth in the September 15, 2023, Interim Award, the Panel ruled in favor of the Claimants and against the Respondents on the Claimants' claims for Fraudulent Misrepresentation related to representations made in FDD Item 2 and related to the Core Progression Operations Manual. The Panel awarded Claimants Chris O'Hare and CAO Enterprises, Inc. ("O'Hare") $287,755.00 on those claims, awarded Claimants Tim McNutt and Cedar Drive Investments, LLC ("McNutt") $90,040.00 on those claims, and awarded Claimants Mytchell Mead, Jan Mead, Altru Fitness LLC, and Altru Fitness Cos LLC ("Mead") $363,510.00 on those claims.

The Panel ruled against the Claimants on their claims for Fraudulent Misrepresentation in connection with the Respondents' Sales Brochure, FDD Item 7, FDD Item 19, the closure of the West Arvada Gym, differences between forms of the Franchise Agreements, and the Colorado Department of Labor Audit, as well as any other allegation of Fraudulent Misrepresentations or Omissions presented at the Final Hearing. The Panel further ruled against the Claimants on all their claims of Negligent Misrepresentation other than those related to FDD Item 2 and the Operations Manual, and ruled against the Claimants on their claims for Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, violation of the Colorado Consumer

**EXHIBIT 4**

Protection Act, and Civil Theft. The Panel dismissed Respondent Core Progression's counterclaim against McNutt for an accounting.

Based on the foregoing findings and conclusions, the Panel determined the Claimants were the prevailing Parties in the arbitration for the purpose of awarding reasonable attorney fees pursuant to Section 21.3 of the Parties' Franchise Agreements. The Panel further determined that, pursuant to Section 20.7 of the Franchise Agreements, each side was required to pay one half of JAMS Denver's and the arbitrators' fees.

The Panel did not decide in the Interim Award the amount of reasonable attorney fees to be awarded to the Claimants, the amount of other costs the Claimants could recover, or the amount of any pre-award interest. Following our receipt and review of briefing from the Parties on these matters, the Panel addresses them herein.

## I.  Reasonable Attorney Fees

Pursuant to Section 21.3 of the Parties' Franchise Agreements, since the Claimants prevailed in part in the arbitration, they are entitled to recover their reasonable attorney fees. Similarly, JAMS Comprehensive Arbitration Rule 24(g) permits the Panel to allocate attorney fees if provided by the parties' agreement.

With regard to the allocation of reasonable attorney fees, when the term "reasonable" is not specifically defined, the determinations should be made in light of all the circumstances and based on the time and effort reasonably expended by the prevailing party's attorneys. *Tallitsch v. Child Support Services, Inc.,* 926 P.2d 143, 147 (Colo. App. 1996). The determination is based upon the number of hours reasonably expended multiplied by a reasonable hourly rate—known as the lodestar amount—and that amount may be adjusted upward or downward based on

**EXHIBIT 4**

consideration of other factors. *Id.* The degree of success achieved by the prevailing party is a factor that may be considered as a basis to adjust the lodestar amount. *Id.* at 148.

With regard to the degree of success achieved, when a claimant asserts multiple claims based on distinctly different facts and legal theories, the litigation is fairly treated as if it were a series of discrete claims raised in separate actions. *Rocky Mountain Festivals, Inc. v. Parsons Corp.,* 242 P.3d 1067, 1073 (Colo. 2010). In such a circumstance, attorney fees should only be awarded on those claims on which the claimant succeeded. *Id.*

Lastly, in this regard, the essential goal in determining the amount of reasonable attorney fees is to do rough justice rather than to achieve auditing perfection. *Payan v Nash Finch Co.,* 2012 COA 135M, ¶ 35 (quoting *Fox v. Vice,* 563 U.S 826, 838 (2011)). Accordingly, it is appropriate to take an overall sense of a suit into account, and to use estimates in calculating and allocating attorneys' time. *Id.*

The Claimants' attorneys provided breakdowns of the time they and members of their firms spent in connection with the arbitration. The attorneys gave a 100% discount to time that the Claimants concede was related to theories the Panel rejected. Additionally, some of the time was spent collectively on matters related to both the above-named Claimants and prior claimants Kris and Tina Pacey, Douglas Filipov, and their respective legal entities. Mr. Meretta also identified whether his time was spent on individual Claimants or spent on the Claimants as a group. The attorneys also eliminated some hours. Deducting time related solely to unsuccessful theories, deducting 40% of any time spent on all five original claimant groups, deducting eliminated hours, and apportioning any remaining time among McNutt, Mead, and O'Hare, then multiplying those amounts by corresponding hourly rates creates appropriate lodestar amounts.

**EXHIBIT 4**

Doing so results in lodestar amounts of $230,485 for McNutt, $223,509 for Mead, and $225,520 for O'Hare, rounded to the nearest dollar.[1]

Although the Claimants succeeded in part on their claims, they were unsuccessful on the overwhelming majority of their claims. Specifically, they succeeded on only two claims: that the Respondents made fraudulent misrepresentations in FDD Item 2 by identifying certain vendors as officers in Core Progression, and that the Respondents made fraudulent misrepresentations regarding Core Progression's Operations Manual by claiming that the Manual would provide the Claimants with all the information they needed to operate a Core Progression studio when the Operations Manual was actually a modified template of a restaurant franchise manual that contained numerous provisions that had nothing to do with the operation of Core Progression franchises and nothing of any significance related to how to offer individualized personal training and training sessions for Core Progression clients. It is of note, however, that the arbitration demands the Claimants filed, and even the amended arbitration demand that Mead submitted, had no claims based on those representations. Instead, the arbitration demands focused primarily on purported fraudulent misrepresentations and omissions related to things such as the financial success of the Core Progression, financial information the Respondents provided to the Claimants, the number of franchises Core Progression had sold, Core Progression's closure of its West Arvada location, the manner in which Core Progression used marketing funds, and the financial status of other Core Progression franchises. The arbitration demands also asserted claims based on civil theft, conversion, and violation of the Colorado

---

[1] The amounts attributable to Mr. Meretta's time are $110,935 for McNutt, $103,959 for Mead, $105,970 for O'Hare, and the amounts allocated to Dady & Gardner's time are $358,650 collectively for McNutt, Mead, and O'Hare.

**EXHIBIT 4**

Consumer Protection Act, and Mead's amended arbitration demand added claims for breach of contract and breach of the covenant of good faith and fair dealing.

The majority of the evidence and testimony at the 10-day arbitration was directed toward: information in the sales brochure provided to the Claimants; financial representations contained in FDD Items 7 and 19; the closing of the West Arvada franchise; differences between the franchise agreements provided to the Claimants for review and the ones provided to them for signatures; and the Colorado Department of Labor audit regarding the classification of trainers as employees rather than independent contractors. In fact, as discussed in the Interim Award, the Parties spent a great deal of the arbitration Final Hearing time on the examinations of lay and expert witnesses and presentation of exhibits to present their disparate views on the sources, accuracy, and materiality of the statements in Item 19 in particular, and the Parties dedicated considerable analysis and argument to the subject in their closing briefs.

Aside from the arbitration Final Hearing itself, a significant amount of time was spent in connection with discovery disputes between the parties, however, those disputes were largely related to issues other than the two on which the Claimants prevailed. The majority of the Claimants' efforts to obtain additional information concerned things such as financial information, communications with third parties, agreements with other franchisees, other marketing materials, information about the Arvada West location, marketing expenditures, customer information, and insurance information. Such information had little if any bearing on the claims on which the Claimants prevailed.

The Claimants' assertion that they prevailed on 78.5% of the claims, counterclaims, and affirmative defenses is refuted by the Panel's findings and conclusions in the Interim Award. The

**EXHIBIT 4**

claims based on FDD Item 2 and the Operations Manual are factually independent of the claims based on information in the sales brochure, the representations contained in FDD Items 7 and 19, the closing of West Arvada, differences in the franchise agreements provided for signature, and the Colorado Department of Labor audit.

On the other side, the Respondents pursued only one counterclaim in the Final Hearing—their request for an accounting against McNutt. However, McNutt's position was that McNutt had produced additional financial documents as part of arbitration proceedings before the Final Hearing, and that such production obviated the need for an accounting. The Respondents did not present evidence in support of the counterclaim at the Final Hearing; indeed, Mr. Cerf indicated at the Final Hearing that McNutt's production of documents provided him the information he was seeking, and the Respondents did not further argue the issue in their closing briefs.

On the other hand, the Respondents' assertion that the Claimants only prevailed on 21.4% of the claims at issue is also not persuasive. Some of the unsuccessful claims involved overlapping facts, fraudulent and negligent misrepresentations claims are not fairly separated, and some evidence in support of the unsuccessful claims would need to have been presented at the Final Hearing even if those claims had not been pursued. Accordingly, the Panel finds and concludes that a reduction by almost 80% is also inappropriate.

In the end, this is a case in which the adjustment to the lodestar figure is appropriately based on an overall sense of the degree of success based upon the time, argument, and focus spent on unsuccessful claims. Considering all of the above issues, the Panel finds 33% of the lodestar properly takes into account the Claimants' degree of success, the time spent on the various claims, and the overall circumstances of the proceedings. As a result, **we award**

**EXHIBIT 4**

**attorney fees in favor of the Claimants and against the Respondents as follows: McNutt,**

**$76,060; Mead, $73,758; and O'Hare, $74,422**, again rounded to the nearest dollar.

## II.    Costs

Section 20.7 of the Parties' Franchise Agreements provides that, in the case of an

arbitration: "Each party shall bear its own costs of arbitration; however, the fees of the arbitrator

shall be divided equally between the parties." The language specifically differentiates the Parties'

costs from the fees of the arbitrators. On its own, the provision would make clear that the Parties

are responsible for their own costs of arbitration and each side is responsible for half the

arbitrators' fees. The Claimants, however, assert that they are entitled to recover their costs from

the Respondents pursuant to Section 21.3, which provides:

> If either party institutes a legal proceeding, including a permitted court proceeding
> or arbitration, and prevails entirely or in part in any action at law or in equity
> against the other party based entirely or in part on this Franchise Agreement, the
> prevailing party shall be entitled to recover from the losing party, in addition to
> any judgment, reasonable attorney fees, court costs and all of the prevailing
> party's expenses in connection with any action at law.

The provision in Section 21.3 indicating that the prevailing party is entitled to court costs and

expenses is potentially inconsistent with the provision of Section 20.7 providing that each party

shall bear its own costs of arbitration. In Colorado, however, contracts must be read in their

entirety, seeking to harmonize and give effect to all provisions so that none will be rendered

meaningless. *Copper Mountain, Inc. v. Indus. Sys., Inc.,* 208 P.3d 692, 697 (Colo. 2009). In fact,

each word in an agreement must be given meaning if possible. *U.S. Fidelity & Guar. Co. v.*

*Budget Rent-A-Car Systems, Inc.,* 842 P.2d 208, 213 (Colo. 1992). Lastly in this regard, a more

specific provision of a contract controls the effect of a more general provision. *Massingill v. State*

*Farm Mut. Auto. Ins. Co.,* 176 P.3d 816, 825 (Colo. App. 2007).

**EXHIBIT 4**

The Claimants propose that Sections 20.7 and 21.3 can be read to mean that the Parties must initially bear their own costs and divide the arbitrators' fees equally, but the prevailing Party can recover all of its costs once the arbitration is over. The Panel rejects this interpretation of the provisions. If the sentence at issue in Section 20.7 did not exist, the Parties would still have to initially bear their own costs and divide the arbitrators' fees. As such, the Claimants' proposed reading renders the provision meaningless. On the other hand, Section 21.3 applies to both arbitrations and court proceedings. In connection with costs and expenses, it references "court" costs, and references expenses related to any "action at law." The provision could have simply referred to costs, and the Franchise Agreement uses such unmodified language when specifically discussing actions seeking injunctive relief. The provision could also have simply referred to the prevailing party's expenses, but it limits such expenses to those connected to an action at law. The reasonable reading of Section 21.3, and one that is harmonious with Section 20.7 and gives meaning to all of the language in both provisions, is that the prevailing party in both an arbitration and a court proceeding may recover reasonable attorney fees, while the prevailing party in a court proceeding may also recover court costs and its expenses. Further, since Section 21.3 applies to all legal proceedings including arbitrations and court proceedings, but Section 20.7 applies only to arbitrations, Section 20.7 is the more specific provision, so it controls over Section 21.3 in any event.

In light of the above, **the Panel finds and orders that the Claimants are not entitled to recover their costs of arbitration. The Panel also denies the Claimants' request that the Panel reconsider its ruling in the Interim Award that each side must pay one-half of JAMS Denver's and the arbitrators' fees**.

**EXHIBIT 4**

### III.    Interest

Prejudgment interest in actions that do not involve personal injury accrues upon the wrongful withholding of money or property. *Goodyear Tire & Rubber,* 193 P.3d 821, 824-25 (Colo. 2008). A wrongful withholding, which is distinguishable from a wrong, occurs when an aggrieved party lost or was deprived of something to which it was otherwise entitled. *Id.* at 825.

The Panel awarded McNutt $90,040 in operating losses. It is unclear from the evidence precisely when McNutt incurred those losses, but the Respondents propose using the date of McNutt's opening on August 7, 2019. The proposal is reasonable, and it is clear McNutt, who as of the Final Hearing continued to operate his Core Progression Franchise, did not incur operating losses before that date. Interest at 8% compounded annually from August 7, 2019, to the date of the Interim Award, September 15, 2023, is $43,389.

The Panel awarded Mead $111,976 in operating losses, and half of the net present value of their remaining lease term, which was $251,534, for a total of $363,510. Mead opened their franchise on August 25, 2020, and Core Progression terminated their franchise on February 1, 2021. As was the case with McNutt, it is unclear from the evidence precisely when during that time Mead incurred the operating losses, but the Respondents propose using the midpoint between the opening and termination, which is November 13, 2020.[2] This should roughly average the interest on the operating losses, and the midpoint is a more reasonable date than the opening date since most operating losses would have occurred after the opening date. Interest at 8% on $111,976 compounded annually from November 13, 2020, to September 15, 2023, is

---

[2] The Claimants and Respondents assert the midpoint date is November 15, 2020. There are 160 days between August 25, 2020, and February 1, 2021. The 80th day is November 13, 2020. Some of the other midpoint dates proposed by the Parties were also slightly off, and the Panel uses the corrected midpoint dates set forth below.

**EXHIBIT 4**

$38,542. The Panel awarded a net present value amount on Mead's the remaining lease as of the date of the Interim Award, so for purposes of pre-award interest, Mead's lease-related loss is properly measured from that date. Accordingly, the Panel awards no pre-award interest on the damages related to the net present value of the remaining lease term.

The Panel awarded O'Hare $99,800 for a lease deposit and leasehold improvements. It is unclear from the evidence when the expenditures for the leasehold improvements were made, but the Respondents propose using February 5, 2020, the date O'Hare signed their lease. This is a reasonable date under the circumstances. Interest at 8% on $99,800 compounded annually from February 5, 2020, to September 15, 2023, is $42,583. The Panel also awarded O'Hare $57,039 for equipment expenses. O'Hare purchased the equipment over the course of a year from February 10, 2020, to January 18, 2021. The midpoint between those dates is July 30, 2020. Interest at 8% on $57,039 compounded annually from July 30, 2020, to September 15, 2023, is $21,361. The Panel also awarded O'Hare $45,916 for operating losses. O'Hare opened their franchise on August 10, 2020, and Core Progression terminated O'Hare on January 29, 2021. While it is unclear precisely when the losses were incurred, using the midpoint between those dates—November 4, 2020—is reasonable and should roughly average the interest on the losses. Interest at 8% on $45,916 compounded annually from November 4, 2020, to September 15, 2023, is $15,918. Finally, the Panel awarded O'Hare $85,000 for the lease termination fee O'Hare paid on August 20, 2021. Interest at 8% on $85,000 compounded annually from August 20, 2021, to September 15, 2023, is $22,686. Adding these four amounts results in a total pre-award interest award to O'Hare of $102,548.

**EXHIBIT 4**

Since the Claimants could not reduce the Interim Award to a judgment, the Panel also awards them pre-award interest from the date of the Interim Award to the date of this Final Award. Interest at 8% from September 15, 2023, to December 19, 2023, on the award and pre-award interest amounts is $2,778 for McNutt, is $8,370 for Mead, and is $8,127 for O'Hare.

**Final Award**

For the reasons discussed above, **the Panel hereby enters Final Awards in favor of the Claimants and against the Respondents as follows**:

**Claimants Tim McNutt and Cedar Drive Investments, LLC**:
- $90,040 (Interim Award amount)
- $43,389 (pre-award interest)
- $2,778 (interest from Interim Award to Final Award)
- $76,060 (reasonable attorney fees)
   **Total = $212,267**

**Claimants Mytchell Mead, Jan Mead, Altru Fitness LLC, and Altru Fitness Cos LLC**:
- $363,510 (Interim Award amount)
- $38,452 (pre-award interest)
- $8,370 (interest from Interim Award to Final Award)
- $73,758 (reasonable attorney fees)
   **Total = $484,090**

**Claimants Chris O'Hare and CAO Enterprises, Inc.**:
- $287,755 (Interim Award amount)
- $102,548 (pre-award interest)
- $8,127 (interest from Interim Award to Final Award)
- $74,422 (reasonable attorney fees)
   **Total = $472,852**

**The Panel further orders that each Party will pay their own costs and expenses and reiterates its previous order that each side is responsible for one half of the fees of JAMS Denver and the arbitrators**.

**EXHIBIT 4**

Pursuant to JAMS Rule 24(j), the Panel advises the Parties and counsel of the following:

Within seven (7) calendar days after service of a … Final Award by JAMS, any Party may serve upon the other Parties and file with JAMS a request that the Arbitrator[s] correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31(c) or on account of the effect of an offer to allow judgment), or the Arbitrator[s] may *sua sponte* propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days thereafter in which to file and serve any objection. The Arbitrator[s] may make any necessary and appropriate corrections to the Award within twenty-one (21) calendar days of receiving a request or fourteen (14) calendar days after [their] … proposal to do so. The Arbitrator[s] may extend the time within which to make corrections upon good cause. The corrected Award shall be served upon the Parties in the same manner as the Award.  (Bracketed portions supplied.)

**EXHIBIT 4**

Dated: December 19, 2023

 

_____
Hon. John W. Madden, IV (Ret.), Chair


_____
Hon. Robert L. McGahey, Jr. (Ret.)


_____
Steven C. Choquette, Esq.

**EXHIBIT 4**